## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| ---------------------------------------------------- | ) | |
| In re: | ) | |
| | ) | Case No.: 10-25805-MER |
| DB CAPITAL HOLDINGS, LLC, | ) | Chapter 11 (Involuntary Petition) |
| | ) | |
| Debtor. | ) | Judge Romero |
| | ) | |
| ---------------------------------------------------- | ) | |
| | | |
| ---------------------------------------------------- | ) | |
| In re: | ) | |
| | ) | Case No. 10-39584-MER |
| DANCING BEAR LAND, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | Judge Romero |
| | ) | |
| ---------------------------------------------------- | ) | |

## DEBTORS' SECOND MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (1) APPROVING POSTPETITION FINANCING, (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (3) GRANTING ADEQUATE PROTECTION, AND (4) MODIFYING AUTOMATIC STAY

Debtors, DB Capital Holdings, LLC ("DB Capital"), and Dancing Bear Land, LLC ("DB Land", and collectively, the "Debtors"), by and through their undersigned proposed counsel, respectfully submit this motion (the "DIP Motion"), pursuant to sections 105, 361, 362, 363, 364 and 507 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), Local Bankruptcy Rule 4001-3, seeking entry of a order (the "Order") *inter alia*:

(i)     authorizing the Debtors to obtain secured, superpriority postpetition financing (the "DIP Facility") pursuant to the terms and conditions of that certain Debtor in Possession Credit Agreement (as may be amended, supplemented, restated, or otherwise

modified from time to time, the "DIP Agreement") by and among the Borrowers[1], Colbeck

Capital Management, LLC, as Administrative Agent (in such capacity, together with it

successors in such capacity, the "DIP Agent"), and the lenders party thereto from time to time

(collectively, the "DIP Lenders"), substantially in the form of Exhibit A attached to the DIP

Motion;

(ii)     authorizing the Debtors to execute and deliver the DIP Agreement and

other related loan documents (collectively with all documents comprising the DIP Facility, the

"DIP Documents") and to perform such other acts as may be necessary or desirable in

connection with the DIP Documents;

(iii)     granting to the DIP Agent and the DIP Lenders allowed superpriority

administrative expense claims in each of the Cases and any Successor Cases (as defined herein)

for the DIP Facility and all obligations owing thereunder and under the DIP Documents

(collectively, and including all "Obligations" as described in the DIP Agreement, the "DIP

Obligations"), subject to the priorities set forth in paragraph 8 below;

(iv)     granting to the DIP Agent, for the benefit of itself and the DIP Lenders

automatically perfected security interests in and liens on all of the DIP Collateral (as defined

herein), including, without limitation, all property constituting "cash collateral" (as defined in

section 363(a) of the Bankruptcy Code, "Cash Collateral"), which liens shall be subject to the

priorities set forth in the DIP Agreement;

(v)     authorizing and directing the Debtors to pay the principal, interest, fees,

expenses and other amounts payable under each of the DIP Documents as they become due,

---

[1] Capitalized terms used but not defined herein shall have the same meaning ascribed to them in
the DIP Agreement.

closing fees, extension fees, servicing fees, unused line fees, appraisal fees, administrative

agent's fees, commitment fees, the fees and disbursements of each DIP Agent's attorneys,

advisers, accountants, and other consultants, and the legal expenses of the DIP Lenders, all to the

extent provided by and in accordance with the terms of the respective DIP Documents;

(vii)    providing adequate protection to the Prepetition Agent and Prepetition

Lenders for any Diminution in Value (as defined herein) of their respective interests in the

Prepetition Collateral (as defined herein); and

(viii)    vacating and modifying the automatic stay imposed by section 362 of the

Bankruptcy Code to the extent necessary to implement and effectuate the terms and provisions of

the DIP Documents and this Interim Order.

In support of this Motion, DB Capital states:

## Background

1.      DB Capital has two members, Aspen HH Ventures, LLC ("Aspen HH"), an

Illinois limited liability company, and Dancing Bear Development, L.P. ("DB Development")[2], a

Colorado limited partnership.

2.      DB Capital is a limited liability company organized under the laws of the State of

Colorado.  DB Capital's assets include its membership interest Dancing Bear Land, LLC ("DB

Land")[3] as well as Dancing Bear Realty, LLC ("DB Realty") and LCH, LLC ("LCH", and

collectively, with DB Capital, DB Land and DB Realty, the "Debtors").  Those entities were

---

[2] On October 19, 2010, DB Development filed a voluntary chapter 11 petition in the United States
Bankruptcy Court for the District of Colorado in a case styled, *In re Dancing Bear Development, LP*,
Case No. 10-36493-MER (Bankr. D. Colo.).

[3] On November 23, 2010, DB Land filed a voluntary chapter 11 petition in the United States Bankruptcy
Court for the District of Colorado in a case styled, *In re Dancing Bear Land, LLC*, Case No. 10-39584-
MER (Bankr. D. Colo.).

formed to develop and sell the Project, a luxury fractional ownership condominium project in Aspen, Colorado known as "Dancing Bear Aspen".

3.      The Project is made up of two buildings located across the street from each other: the first building was completed in January, 2009 ("Building One"); and the second building has steel and concrete to the top floor, with all floors and stairwells poured ("Building Two").  DB Land holds title to the two parcels of real property (the "Property") on which the Project is being constructed.

4.      In order to finance the Project, on or about June 15, 2006, the Debtors[4] obtained a senior secured loan from WestLB in the principal amount of $53,000,000 (the "Mortgage Loan")[5].  In addition, on or about September 22, 2006, WestLB made a second secured loan (the "Mezzanine Loan" and, together with the Mortgage Loan, the "Loans") to the Debtors in the principal amount of $5,000,000.  The Loans were secured by, among other things, first priority deeds of trust on the Property.

5.      Around the time the initial funding closed, the Aspen market for fractional interests and residential clubs witnessed profound shifts in the market place and an acceptance of the sale of fractional interests at much higher prices than achieved historically in the Aspen community.

6.      In the summer of 2006, the developer of the Project made upgrades in design, fixed finishes and furniture, fixtures and equipment to meet market demand and rising pricing opportunities.  These elective changes, along with a change in architectural firms and increases in city fees, increased costs previously modeled and were undertaken during a period of

---

[4] The term "Debtors" as used herein, refers to DB Capital and DB Land and their affiliated entities associated with the Project.

[5] The borrowers were DB Capital, DB Land and LCH.

unprecedented increases in construction costs. However these greater costs were, and remain, in proper relation to the higher price points being achieved and projected to be realized through sell out.

7.     WestLB was aware of the elective changes and market cost escalations and demonstrated its acceptance thereof by funding the Project each month from May, 2006 through October, 2008, based on the approval of its independent consultant and in-house review. Moreover, in November and December, 2009, and January, 2010, WestLB approved the release of additional funds from a segregated net sales proceeds account for the Project's operations and maintenance. Though WestLB had the right not to advance funds when a project's budget was out of balance, WestLB funded each month without delay to the extent of its financing facility.

8.     The Project has always been well received by the community. In fact, the American Resort Development Association (ARDA) bestowed one of the top hospitality industry honors for the New Resort Unit category upon Dancing Bear Aspen at their 2010 Awards Gala.

9.     In the Spring of 2008, banks, including WestLB, were experiencing major losses as a result of increased default rates, particularly in the sub-prime mortgage market, and many lenders no longer offered certain types of loans or significantly heightened their loan qualifications. As a result of the effects of the economic downturn in late 2008 and 2009 and an overall decline in the U.S. real estate market, large homebuilders and developers, including Levitt and Sons LLC, Kimball Hill, Inc., General Growth Properties, Inc., Tousa Inc., WCI Communities Inc., and Woodside Group LLC, have sought bankruptcy protection.

10.     Notwithstanding world economic downturns, the Debtors were able to offer WestLB solutions for financing needs throughout the fall of 2008 and all of 2009 with proposals for additional debt and equity. However, with the need for significant state bailout (estimated in

excess of $10 billion) and ongoing monthly reorganizations, WestLB was not in a position to consider reasonable solutions to the restructure of an individual project.

11.     In October, 2009, the Debtors and WestLB agreed conceptually to an extension of the existing notes for three years and WestLB agreed to, and then funded, over $1.2 million during November, 2009 through early January, 2010 consistent with that conceptual plan and the working capital budget provided to the lender.  Further, offers of additional debt of $15 million, and end user financing for fractional buyers were rejected by the lender as it worked through its own solvency issues.

12.     With another change in personnel in early January, 2010, WestLB decided not to accept the offers made for restructure, which included additional investment, and not to extend the notes for three years as had been the conceptual agreement with a prior Managing Director of WestLB.

13.     In the 60 days prior to the start of new personnel, the Project achieved three closed sales at the average price of $665,000 for a one-eighth fractional interest.  The Project continued to succeed despite the overall market conditions and the need for developer working capital.

14.     Faced with a newly engaged bank consultant driven to obtain control of the Property, the Debtors were determined to negotiate a deed-in-lieu of foreclosure transaction (the "DIL") with WestLB, which provided for partial payment to unsecured creditors and provided the equity owners with a right of first refusal (the "ROFR") for two years.

15.     With the concurrence of the Project attorneys and restructuring professionals, it was determined that the DIL was, although not the most desirable outcome, the most effective outcome under the circumstances extant, and left open the chance to repurchase the Project over

the next several months as WestLB moved through its own reorganization and sale of assets. The Debtors' preferred path was always to reorganize and continue the Project through completion.

16.     In January and February, 2010, all of the options available to the Debtors were communicated in emails and memorandums to Aspen HH.  Aspen HH then intervened in the DIL negotiations.  The introduction of Aspen HH during the negotiation process ultimately led to the failure of this effort on account of unreasonable demands, threats and their disregard for legitimate unsecured creditors.

17.     On or about March 12, 2010, while restructuring negotiations were continuing, WestLB filed a Verified Complaint for Appointment of Receiver and Other Relief against the Debtors, seeking the appointment of a receiver over the Project in the District Court of Pitkin County, Colorado (Case No. 10-CV-98).  On or about March 17, 2010, that court, appointed James DeFrancia of Weston Capital Corporation, a Colorado company ("Weston"), as receiver for the Project (the "Receiver").

18.     Using whatever means available regardless of the harm, inequity, inaccuracy or short term position, Aspen HH continued to demand for its own gain, not for the future and protection of the Project.

19.     On May 21, 2010, Aspen HH was granted leave to intervene in the WestLB receivership action and to file its own cross complaint for dissolution and appointment of a receiver for the Debtors.

20.     On May 27, 2010, DB Management caused the filing of a voluntary Chapter 11 bankruptcy petition on behalf of DB Capital in the United States Bankruptcy Court for the District of Colorado in a case styled, *In re DB Capital Holdings, LLC*, Case No. 10-23242-MER

(Bankr. D. Colo.).  Accordingly, pursuant to Section 362 of the Bankruptcy Code, Aspen HH's receivership action was stayed.

21.     On June 21, 2010, this Court dismissed the voluntary petition, finding that DB Management lacked the authority to commence the proceeding.

22.     Immediately thereafter, Aspen HH continued prosecuting its receivership action in order to take control of the Debtors and secure a settlement with WestLB on terms favorable to itself at the expense of the unsecured creditors.

23.     On June 24, 2010 (the "Petition Date"), five unsecured creditors of DB Capital (the "Petitioning Creditors")[6] filed an involuntary chapter 11 petition against DB Capital and commenced a bankruptcy proceeding (the "Involuntary Proceeding") in the United States Bankruptcy Court for the District of Colorado.  [Docket No.: 1.]

24.     On July 8, 2010, Aspen HH filed a motion to dismiss the Involuntary Proceeding on the grounds that the Petitioning Creditors' claims were allegedly the subject of bona fide disputes and for bad faith.  [Docket No.: 8.]

25.     In August and September 2010, the Court held hearings on the motion to dismiss and ordered the submission of written closing arguments and rebuttals.

26.     During that time, WestLB filed a foreclosure action against the Property owned by DB Land and an action to foreclose on DB Development's membership interest in DB Capital.

27.     In order to stay the foreclosure of its membership interest, on October 19, 2010, DB Development filed a voluntary chapter 11 petition in the United States Bankruptcy Court for

---

[6] The Petitioning Creditors were G.D.B.S at Snowmass, Inc., William Dennis, Fred Funk, Realty Financial Resources, Inc., and O'Bryan Partnership, Inc.  On August 13, 2010, Mr. Funk withdrew as a Petitioning Creditor.

the District of Colorado in a case styled, *In re Dancing Bear Development, LP*, Case No. 10-36493-MER (Bankr. D. Colo.), and in order to stay foreclosure on the Property, on November 23, 2010, DB Land filed a voluntary chapter 11 petition in the United States Bankruptcy Court for the District of Colorado in a case styled, *In re Dancing Bear Land, LLC*, Case No. 10-39584-MER (Bankr. D. Colo.).

28.     On November 29, 2010, this Court entered an order for relief in DB Capital's case (the "Relief Order").  [Docket No. 91.]

29.     On December 17, 2010, DB Capital filed a motion to substantively consolidate its case with the cases of DB Land and DB Development.  The relief requested in that motion is appropriate under the circumstances and realities of these related proceedings.  The Project as a whole has a number of creditors, including WestLB and the Petitioning Creditors.

30.     Additionally, WestLB filed a motion to excuse turnover of the assets of the Debtors by the Receiver pursuant to section 543 of the Bankruptcy Code.  (Case No. 10-39584-MER, Docket No. 18.)  The Debtors have filed an objection and cross motion seeking the immediate turnover of the assets of the Debtors.  (Case No. 10-39584-MER, Docket No. 28.)

31.     On December 17, 2010, the Debtors filed a motion to motion for an interim and final orders (i) authoring the debtor to incur postpetition secured superpriority indebtedness pursuant to 105(a), 362, 364(c)(1) and 364(c)(3), (ii) to modify the automatic stay and (iii) scheduling a final hearing pursuant to Bankruptcy Rules 4001(b) and 4001(c) (the "First Motion").  (Docket No. 112).  Subsequent to that filing, the Debtors continued to negotiate with potential lenders of debtor in possession financing.  As a result of those negotiations, DB Capital was able to obtained a commitment on more favorable terms than those contained in the First Motion.  Contemporaneously, herewith, the Debtors are filing a withdrawal of the First Motion.

32.     When the Debtors have possession of their assets, and with the use of the funds requested in this Motion, DB Management will (i) bring in a targeted third party manager to head up development, management, and sales and marketing activities; (ii) analyze rebranding the Project and repositioning of sales and marketing efforts; (iii) prepare for an initial soft opening of sales; and (iv) administer the bankruptcy process.

33.     Absent the monies available under the DIP Facility, the Debtors' projected revenues from operations and sales of fractionals will be insufficient to conduct ordinary business operations, complete development of Building Two, and preserve the value of the Debtors' estates.  The Debtors are unable to secure alternate sources of post-petition borrowing. The Debtors have not been able to obtain sufficient credit on an unsecured or junior lien basis.

### Jurisdiction & Venue

34.     This Court has subject matter jurisdiction to consider and determine this matter pursuant to 28 U.S.C. § 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

### Summary of Material Provisions Pursuant to Local Rule 4001-3

35.     Attached hereto as Exhibit A is a copy of the DIP Agreement.[7]  The terms were reached as a result of an arm's length negotiation between the Debtors and the DIP Lenders. Pursuant to Bankruptcy Rule 4001(b) and Local Rule 4001-3(a), the Debtors submit this concise statement listing certain material terms of the relief set forth in the DIP Facility.  Specifically, the Debtors believe that the following financing terms are required to be identified in accordance with Local Rule 4001-3 and, as discussed in detail herein, are necessary and justified in the

---

[7] Attached hereto as Exhibit B is commitment letter between the Debtors and Colbeck Capital Management, LLC.  The terms contained in the commitment letter were reached as a result of an arm's length negotiation between the Debtors and Colbeck Capital Management, LLC.

context of, and the circumstances relating to, these chapter 11 cases.  The following summarizes

some of the terms of the DIP Agreement.

(A)    <u>The Maximum Borrowing Available On A Final Basis</u>.  Pursuant to the DIP Agreement, the maximum borrowing available is $5,000,000.00.  (DIP Agreement at 1.)

(B)    <u>Borrowing Conditions</u>.  Among the material conditions to closing and borrowing are the entry of the Order, execution of the DIP Agreement, and completion and adherence to the 13–week projections.  (DIP Agreement, Art. IV.)

(C)    <u>Interest Rate</u>.  The interest rate charged under the DIP Agreement is LIBOR plus 13.00% per annum.  (DIP Agreement § 2.06.)

(D)    <u>Maturity</u>.  The DIP Agreement maturity date is the earliest of (a) the date that is 12 months after the Effective Date, (b) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of a Reorganization Plan filed in the Cases that is confirmed pursuant to an order entered b y the Bankruptcy Court and (c) the date of the acceleration of the Loans and termination of the Commitments under Article VII of the DIP Agreement. (DIP Agreement § 1.01.)

(E)    <u>Events Of Default</u>.  The events of default are fully described in Section 7.01 of the DIP Agreement.

(F)    <u>Use Of Funds Limitations</u>.  Pursuant to the DIP Agreement, the Debtors shall use the proceeds of (i) the Loans made on the Effective Date solely to pay administrative expenses in connection with the Cases, the fees and expenses due to the Agents and Lenders pursuant to the Loan Documents, expenses in connection with obtaining additional financing necessary to complete the Project and other approved expenses as set forth in the Order and (ii) any other Loans for working capital and general corporate purposes of the Debtors, including, without limitation, payment of fees and expenses related to the Cases and expenses in connection with obtaining additional financing necessary to complete the Project, which, in each case, shall be in accordance with the operating forecast and the most recently delivered 13-Week Projection and in compliance with the DIP Agreement.  No proceeds of Loans may be used to make payments, directly or indirectly, to any equity holders or Affiliates of the Debtors or any unsecured creditors of the Debtors, in each case, without the consent of the DIP Lenders. (DIP Agreement § 3.23.)

**Relief Requested**

36.      By this Motion, the Debtors ask this Court to grant a Section 364(c) superpriority claim to secure the DIP Facility.  This is a standard DIP Facility protection and necessary to secure the loan.  The Debtor further requests that the automatic stay imposed under Section 362 of the Bankruptcy Code be modified so as to allow the Debtors to grant security interest and liens in favor of the Lender for any new borrowing, and to enable the parties to take any other actions that may be necessary to comply with the terms and conditions of the DIP Facility.

37.      Further, the Debtor seeks to grant a lien on its assets that is senior to the liens of WestLB.  Bankruptcy Code Section 364(d) provides authority for a debtor to obtain this relief, namely, post-petition credit secured by a senior or priming lien.

**A.      Senior Lien on Collateral of Existing Lenders**

38.      Section 364(d) of the Bankruptcy Code provides that a debtor may obtain post-petition financing by granting a lien on property of the estate that is senior or equal to liens that already exist on such property, so long as the debtor provides adequate protection of the previous lienholder's interest in such property.  *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (debtor must provide adequate protection to pre-petition secured creditor in order to obtain post-petition super priority financing); *In re Crouse Group, Inc.*, 71 B.R. 544, 549 (Bankr. E.D. Pa. 1987) (debtor must establish that the credit transaction is necessary to preserve the estate and the terms of the transaction are fair and reasonable).

39.      Section 364(d) of the Bankruptcy Code provides:

(l) The court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if –

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

(2) In any hearing under this subsection, the trustee has the burden of proof on the issue of adequate protection.

11 U.S.C. § 364(d).

40.     The Debtors satisfy the requirements of Section 364(d) of the Bankruptcy Code as they are unable to obtain credit otherwise, and the proposed financing is in the best interest of the estates.  The Debtors seek to grant a senior lien upon the Property.  The Debtors also seek authority that the liens granted to the Lender will be senior in priority and thus "prime" any and all existing liens including, without limitation, WestLB's liens.  Any other parties that may have a lien on other property of the estate are not affected by the interim request for a senior or equal lien which is to be granted to the Lender.  Furthermore, as will be demonstrated below, WestLB will be provided additional adequate protection during the entirety of the case by virtue of the Debtors' ability to better protect and even to enhance the value of the Property.

**B.**     **Debtors are Unable to Obtain Comparable Alternative Credit**

41.     In the weeks leading up to the Relief Order, the Debtors undertook substantial negotiations with different potential debtor-in-possession financing lenders, including the Lender.  Although the Debtors attempted to reach favorable term sheets with each potential lender, they were unable to develop agreements comparable to the proposed DIP Facility in the time available.

42.     Prior to the Petition Date, the Debtors and their advisors canvassed approximately twenty sources of prospective postpetition financing, including financing from WestLB and various other third parties.  In particular, Realty Financial Resources, Inc. prepared

comprehensive models and presentations seeking financing proposals.  The models and presentation were distributed to sophisticated providers of debtor-in-possession financing.

43.     WestLB indicated that they were not willing to extend further credit to the Debtors and insisted on full repayment of all outstanding obligations under the Loans.  However, various other parties expressed interest.  The Debtors then negotiated expeditiously with each of these parties to obtain the most favorable lending terms for the benefit of the estates.  Following the Debtors' evaluation and comparison of the various financing proposals, the Debtors selected the Lender to provide credit under the terms of the DIP Credit Agreement.

44.     Bankruptcy Code Section 364(d)(1)(A) does not impose upon a debtor-in-possession the onerous duty to seek credit from every possible lender before concluding that such credit is unavailable.  *Bray v. Shenandoah Fed. Sav. And Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (7th Cir. 1986); *see In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (two lenders refused to grant unsecured loans).  Instead, the debtor need only make a good faith effort to obtain less burdensome credit.  *In re Snowshoe Co.*, 789 F.2d at 1088.

45.     The Debtors' decision to obtain the DIP Facility represents an exercise of its sound business judgment in the continued operation of its business and the beginning of the process to consummate a reorganization plan.  Like most business decisions, the Debtors' decision to enter into a post-petition credit agreement involves tradeoffs, but the proposed loan is the mechanism that is most likely to allow the Debtors to operate efficiently in bankruptcy, increase the value of its assets, and reorganize.  *See In re Simasko Prod. Co.*, 47 B.R. 444, 449 (Bankr. D. Colo. 1985) (debtor used its sound business judgment in obtaining secured financing pursuant to § 364(d)).

46.     The Debtors' attempt to obtain credit pursuant to Bankruptcy Code § 364(c) or otherwise proved futile.  The Debtor was unable to find unsecured credit sufficient to fund its operations.  The Lender has agreed to fund the Debtor only if it is given the added protections and benefits provided by Bankruptcy Code § 364(d).

### C.     WestLB is Adequately Protected

47.     WestLB is adequately protected under the proposed DIP Facility by the increase in the value of their collateral which will flow directly from the use of the DIP Facility funds.  Additionally, adequate protection payments will be made to WestLB monthly in the amount of $100,000 pursuant to the DIP Facility.  WestLB is also holding approximately $2,400,000, which is subject to an interpleader action.  The Debtors will offer that as additional adequate protection.

48.     The purpose of "adequate protection" for a creditor "is to insure that the creditor receives the value for which he bargained prebankruptcy."  *In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) (en banc), quoting from *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Mosello*, 195 B.R. 277, 288-289 (Bankr. S.D.N.Y. 1996) (citing *In re Dunes Casino Hotel*, 69 Bankr. 784, 793 (Bankr. D.N.J. 1986) ("Adequate protection is designed to preserve the secured creditor's position at the time of the bankruptcy."); *In re Coors of the Cumberland*, 19 Bankr. 313, 321 (Bankr. M.D. Tenn. 1982).

49.     "The goal of adequate protection is to safeguard the secured creditor from diminution in the value of its interest during the Chapter 11 reorganization."  *In re 495 Central Park Ave. Corp.*, 136 Bankr. 626, 631 (Bankr. S.D.N.Y. 1992).  "In other words, the proposal should provide the pre-petition secured creditor with the same level of protection it would have had if there had not been post-petition superpriority financing."  *In re Swedeland Dev. Group, Inc.*, 16 F.3d at 564.

50.     Congressional intent to preserve pre-petition contractual financial interests, by means of the adequate protection requirement, is evident in the House Report, quoted in *In re Mosello*, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996):

> [Adequate protection] is not intended to be confined strictly to the constitutional protection required, however.  The section, and the concept of adequate protection, is based as much on policy grounds as on constitutional grounds. Secured creditors should not be deprived of the benefit of their bargain. There may be situations in bankruptcy where giving a secured creditor an absolute right to his bargain may be impossible or seriously detrimental to the bankruptcy laws. Thus, this section recognizes the availability of alternate means of protecting a secured creditor's interests. Though the creditor might not receive his bargain in kind, the purpose of the section is to insure that the secured creditor receives in value essentially what he bargained for.

H.R. Rep. No. 595 at 339, 1978, U.S. Code Cong. & Ad. News at 5787, 6295.  Other cases have stated that the important question in determining the adequacy of protection under section 364(d)(1)(B) is whether the interest of the secured creditor whose lien is to be primed "is being unjustifiably jeopardized."  *In re Plabell Rubber Prod., Inc.*, 137 Bankr. 897, 899 (Bankr. N.D.Ohio 1992), quoting from *In re Aqua Assoc.*, 123 Bankr. 192, 196 (Bankr. E.D.Pa. 1991).

51.     The determination of adequate protection is a fact-specific inquiry.  "Its application is left to the vagaries of each case … but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."  *In re Beker Indus. Corp.*, 58 Bankr. 725, 736 (Bankr. S.D.N.Y. 1986).  "Given the fact that super priority financing displaces liens on which creditors have relied in extending credit, a court that is asked to authorize such financing must be particularly cautious when assessing whether the creditors so displaced are adequately protected."  *In re First S. Sav. Assoc.*, 820 F.2d 700, 710 (5th Cir. 1987).

52.     In *In re 495 Central Park Ave. Corp.*, the court considered whether the debtor could obtain debtor-in-possession financing under Section 364(d) by granting a super priority

security interest over the objections of existing secured parties.  *In re 495 Central Park Ave. Corp.*, 136 B.R. 626 (Bankr. S.D.N.Y. 1992).  In that case, the funds were to be used to improve the debtor's primary asset, certain real property.  *Id*.  The evidence showed that the improvements made to the property would increase its value.  *Id*. at 628-630.  The court found that there was "substantial evidence that both prongs of 11 U.S.C. § 364(d) have been satisfied." *Id*. at 630.  Specifically, the court found that the "broad and flexible definition" of adequate protection was satisfied.  *Id*. at 631.  The court stated that it "must consider whether the value of the debtor's property will increase as a result of the renovations funded by the proposed financing."  *Id*. at 631.  "[T]here is no question that the property would be improved by the proposed renovations and that an increase in value will result."  *Id*. at 631.  Just as in *495 Central Park*, the Debtors propose to utilize the DIP Facility to improve the value of their real property assets.  In part, the DIP Facility will be used to maintain existing operations of the Debtors and complete construction of Building Two.  Without the use of the DIP Facility, the Debtors will not be able to maintain much less improve their assets.  To the extent WestLB has valid liens on the Debtors' Property, they will benefit from the added improvements.

53.    The Tenth Circuit has provided clear and powerful direction to bankruptcy courts applying the adequate protection standard, especially in the early stages of a case:

> Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. This quest is the ultimate goal of Chapter 11. Hence, the Debtors' efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end. Thus, while interests of the secured creditor whose property rights are of concern to the court, the interests of all other creditors also have bearing upon the question of whether use of cash collateral shall be permitted during the early stages of administration.

> The first effort of the court must be to insure the value of the collateral will be preserved. Yet, prior to confirmation of a plan of reorganization, the test of that protection is not by the same measurements applied to the treatment of a secured creditor in a proposed plan. In order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard. In doing so, however, care must be exercised to insure that the vested property rights of the secured creditor and the values and risks bargained for by that creditor prior to bankruptcy are not detrimentally affected.

*In re O'Connor*, 808 F.2d at 1397-98 (emphasis added) (citations omitted).  The flexible adequate protection standard is no different in the context of § 364(d) financing.  *See The Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland Dev. Group, Inc.)*, 16 F.3d 552, 555-56 (3d Cir. 1994) (citing *In re O'Connor*).

54.     This flexible standard is manifested in the fact that courts have held that, so long as the valuation is not based upon an unreasonably risky venture, a pre-petition lender is adequately protected if it is expected that the value of its position will remain constant or increase as a result of the § 364(d) financing.  *See, e.g.*, *Save Power Ltd. v. Pursuit Athletic Footwear, Inc. (In re Pursuit Athletic Footwear, Inc.)*, 193 B.R. 713, 716-18 (Bankr. D. Del. 1996); *In re 495 Central Park Ave. Corp.*, 136 B.R. 626, 631-32; *In re Sky Valley, Inc.*, 100 B.R. 107, 115-16 (Bankr. N.D. Ga. 1988).  Here, the proposed lending is necessary to protect and preserve the value of the collateral.

55.     Currently the Property is valued at approximately $25,000,000 to $27,000,000.  The DIP Facility will be used, among other things, to complete construction of Building Two, maintain operations at Building One, and fund a marketing and advertising campaign.

56.     As noted above, Building Two has steel and concrete to the top floor, with all floors and stairwells poured.  All approvals for Building Two have been obtained.  Building One is complete and contains all Project Amenities.  Even conservative estimates place a total value of the completed project at over $100,000,000.

57.     In light of the fact that the projected property improvements to be made with the requested credit will exceed the DIP Facility, it follows that WestLB's secured interest will be adequately protected.  *See In re 495 Central Park Ave. Corp.*, 136 Bankr. at 630 (Bankr. S.D.N.Y. 1992).  "[T]here is no question that the property would be improved by the proposed renovations and that an increase in value will result."  *Id.* at 631.

58.     Just as in *495 Central Park*, "a substitution occurs in that the money spent for improvements will be transferred into value.  This value will serve as adequate protection" for WestLB.  *Id.* at 631; *Rubber Prod., Inc.*, 137 B.R. 897 (Bankr. N.D. Ohio 1992) (stating that "an increase in the value of the collateral generated by the improvements resulting from the super priority financing could constitute adequate protection"); *In re Yellowstone Mountain Club, LLC*, 2008 WL 5875547 (Bankr. D. Mont. Dec. 17, 2008) (finding adequate protection existed for primed secured party, because it preserved the debtor's going concern value).

59.     In addition to the adequate protection discussed above, the Debtors will also provide continued adequate protection in the form of monthly payments of $100,000 to WestLB.

**D.      The Proposed DIP Facility is the Best Interest of the Debtors' Estates and Creditors**

60.     The proposed DIP Facility is required to preserve and maintain the Debtors' going concern value and increase the value of the Property by completing Building Two.  Therefore, it is in the best interest of the Debtors' estates and creditors.  The availability of credit under the DIP Facility is necessary to provide working capital for the Debtors to continue to operate their businesses and afford the Debtors' vendors and customers the necessary confidence to continue ongoing relationships with the Debtors, including the extension of credit terms for the payment of goods and services.  The DIP Facility will be viewed favorably by the Debtors' employees, minimize disruption to the Debtors' businesses and ongoing operations, and avoid immediate

and irreparable harm to the Debtors, their creditors, their business, their employees, and their assets.

61.     In the Debtors' business judgment, the DIP Facility represents the best financing option to effectuate these purposes and advance the Debtors' reorganization efforts.

62.     Likewise, the various fees and charges required under the DIP Facility are reasonable and appropriate under the circumstances.  Courts routinely authorize similar lender incentives that extend beyond the specific liens and rights specified in Bankruptcy Code Section 364.  *See R.T.C. v. Official Unsecured Creditors Comm. (In re Defender Drug Stores*, Inc.), 145 B.R. 312, 316-318 (B.A.P. 9th Cir. 1992) (approving financing facility pursuant to Section 364 that included a lender "enhancement fee").

63.     Courts have previously granted the relief requested by the Debtors under Section 364(d) in other cases.  *See In re Spectrum Jungle Labs Corp.*, Case No. 09-50455-rhk (Bankr. W.D. Tex (San Antonio) March 5, 2009) (Docket No. 229); *In re Physicians Specialty of El Paso East, L.P.*, Case No. 07-30633-lmc (Bankr. W.D. Tex. (El Paso) Oct. 24,2007) (Docket No. 238).

<u>**Notice**</u>

64.     Notice of this pleading will be served via facsimile transmission, electronic mail, or first class mail to (i) the United States Trustee, (ii) those parties listed as the Debtors' 20 largest unsecured creditors, (iii) counsel to Aspen HH Ventures, LLC, (iv) counsel to WestLB, AG, (v) the District Director of the Internal Revenue Service, (vi) the U.S. Attorney for the District of Colorado, and (vii) those persons who file and serve a notice of appearance in the Case pursuant to Rules 2002, 3017(a), and/or 9010 of the Bankruptcy Rules.  No examiner, trustee or creditors" committee has been appointed in this case.

65.     With the exception of the previously filed and withdrawn First Motion, (Docket No. 112), no previous request for the relief requested herein has been made to this or any other court.

## Conclusion

WHEREFORE, the Debtors respectfully pray for the following relief: that the Court enter an order approving this Motion on an interim basis; that the Court authorize the Debtors to obtain post-petition financing from Lender, pursuant to the proposed DIP Loan Agreement; and such other and further relief as allowed by law and as deemed just and equitable by this Court.

Dated: January 11, 2011
     Englewood, Colorado

**LAUFER AND PADJEN LLC**

By:    /s/ Robert Padjen         
         Robert Padjen (No. 14678)
5290 DTC Parkway, Suite 150
Englewood, Colorado 80111
(303) 830-3173
       - and -
**LEWIS BRISBOIS**
**BISGAARD & SMITH, LLP**
Heidi J. Sorvino, *pro hac vice*
77 Water Street, 21st Floor
New York, NY  10005
(212) 232-1300
*Proposed attorneys for the Debtor*