**EXECUTION COPY**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**Dated as of January 11, 2011**

**among**

**DB Capital Holdings, LLC**

**and**

**Dancing Bear Land, LLC,**

**each as a debtor and debtor-in-possession, and collectively, as Borrower,**

**The Guarantors,**

**The Lenders Referred To Herein, and**

**Colbeck Capital Management, LLC,**

**as Administrative Agent and Collateral Agent**

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS ................................................................................................................1

      Section 1.01        Defined Terms ..............................................................2
      Section 1.02        Terms Generally...........................................................24

ARTICLE II THE CREDITS ............................................................................................................24

      Section 2.01        Commitments................................................................24
      Section 2.02        Borrowings; Continuations ..........................................24
      Section 2.03        Optional Prepayment of Loans .....................................25
      Section 2.04        Mandatory Prepayments ...............................................25
      Section 2.05        Repayment of Loans; Evidence of Debt. ......................26
      Section 2.06        Interest Rates and Payment Dates.................................27
      Section 2.07        Computation of Interest ................................................27
      Section 2.08        Termination of Commitments........................................27
      Section 2.09        Pro Rata Treatment and Payments ...............................27
      Section 2.10        Requirements of Law ...................................................28
      Section 2.11        Taxes ...........................................................................30
      Section 2.12        Indemnity .....................................................................31
      Section 2.13        Change of Lending Office .............................................31
      Section 2.14        Sharing of Setoffs ........................................................31
      Section 2.15        [Reserved]....................................................................32
      Section 2.16        Fees ..............................................................................32
      Section 2.17        Joint and Several Obligations .......................................33
      Section 2.18        No Discharge; Survival of Claim..................................33

ARTICLE III REPRESENTATIONS AND WARRANTIES .......................................................34

      Section 3.01        Organization, etc. .........................................................34
      Section 3.02        Due Authorization, Non-Contravention, etc..................34
      Section 3.03        Government Approval, Regulation, etc. ........................34
      Section 3.04        Validity, etc..................................................................35
      Section 3.05        Authorization of Stock of Guarantors...........................35
      Section 3.06        Financial Information....................................................35
      Section 3.07        Action, Suit, etc. ..........................................................35
      Section 3.08        Properties .....................................................................35
      Section 3.09        No Violation.................................................................36
      Section 3.10        Stamp Taxes.................................................................36
      Section 3.11        Taxes ...........................................................................36
      Section 3.12        Labor ...........................................................................36
      Section 3.13        Insurance .....................................................................36
      Section 3.14        Dividends or Distributions............................................37
      Section 3.15        Licenses.......................................................................37

Section 3.16     Margin Regulations................................................................37
Section 3.17     Internal Accounting Controls.................................................37
Section 3.18     Environmental........................................................................37
Section 3.19     Pension and Welfare Plans.....................................................38
Section 3.20     Intellectual Property..............................................................38
Section 3.21     [Reserved] .............................................................................38
Section 3.22     Disclosure..............................................................................39
Section 3.23     Use of Proceeds.....................................................................39
Section 3.24     Anti-Terrorism Laws .............................................................39
Section 3.25     Parkside Building...................................................................40

ARTICLE IV CONDITIONS ................................................................................41

Section 4.01     Conditions to Initial Credit Extensions.................................41
Section 4.02     Conditions Precedent to All Credit Extensions .............................43

ARTICLE V       43

Section 5.01     Limitation on Consolidation, Merger and Sale of Property
                  by the Borrower ....................................................................43
Section 5.02     Limitation on Consolidation, Merger and Sale of Property
                  by Subsidiaries of the Borrower ...........................................44

ARTICLE VI COVENANTS ................................................................................44

Section 6.01     Financial Statements .............................................................44
Section 6.02     Certificates and Other Information ........................................45
Section 6.03     Notices ...................................................................................46
Section 6.04     13-Week Projections; Variance Reports; Operating
                  Forecast.................................................................................46
Section 6.05     Payment of Obligations.........................................................47
Section 6.06     Limitation on Debt................................................................47
Section 6.07     Limitation on Issuance or Sale of Capital Stock of
                  Subsidiaries...........................................................................47
Section 6.08     Limitation on Restricted Payments........................................47
Section 6.09     Limitation on Liens...............................................................47
Section 6.10     Limitation on Asset Sales .....................................................47
Section 6.11     Limitation on Transactions with Affiliates ...................................48
Section 6.12     Prepayments, Etc. of Indebtedness........................................48
Section 6.13     Compliance with Operating Forecast...........................................48
Section 6.14     Future Guarantors .................................................................48
Section 6.15     Limitation on Restrictions on Distributions from
                  Subsidiaries...........................................................................49
Section 6.16     Project Manager ....................................................................49
Section 6.17     Corporate Existence ..............................................................50
Section 6.18     Mountainside Building Construction..........................................50
Section 6.19     Minimum Unit Sales .............................................................50

Section 6.20          Minimum Unit Sale Prices.........................................................50
Section 6.21          Hedging Obligations ................................................................51
Section 6.22          Maintenance of Properties .......................................................51
Section 6.23          Maintenance of Insurance ........................................................51
Section 6.24          Accounting Practices; Fiscal Year ...........................................51
Section 6.25          Margin Regulations..................................................................51
Section 6.26          Chapter 11 Claims....................................................................51
Section 6.27          Use of Proceeds........................................................................51
Section 6.28          Maintenance of Permits, etc.....................................................51
Section 6.29          Compliance with Laws ............................................................51
Section 6.30          Books and Records ..................................................................52
Section 6.31          Inspection Rights .....................................................................52
Section 6.32          Further Assurances...................................................................52
Section 6.33          ERISA .....................................................................................52
Section 6.34          Change in Nature of Business; Organizational Documents...........53

ARTICLE VII DEFAULTS AND REMEDIES ........................................................53

Section 7.01          Events of Default .....................................................................53
Section 7.02          Acceleration .............................................................................57
Section 7.03          Other Remedies........................................................................57
Section 7.04          Priorities ..................................................................................57

ARTICLE VIII THE AGENTS ...............................................................................58

Section 8.01          Appointment and Authority .....................................................58
Section 8.02          Rights as a Lender....................................................................58
Section 8.03          Exculpatory Provisions ............................................................58
Section 8.04          Reliance by Agents ..................................................................59
Section 8.05          Delegation of Duties ................................................................60
Section 8.06          Resignation of Agent ...............................................................60
Section 8.07          Non-Reliance on Administrative Agent and Other Lenders..........61
Section 8.08          No Other Duties, etc. ...............................................................61
Section 8.09          Collateral Agent. .....................................................................61

ARTICLE IX LOAN GUARANTEE ......................................................................61

Section 9.01          Loan Guarantee .......................................................................61
Section 9.02          Limitation of Loan Guarantee..................................................62
Section 9.03          Additional Guarantors.............................................................62
Section 9.04          Release of Guarantor................................................................63

ARTICLE X COLLATERAL ..................................................................................63

Section 10.01         Security Documents; Additional Collateral ...................................63
Section 10.02         Releases of Collateral ...............................................................64

Section 10.03        Authorization of Receipt of Funds by the Administrative
                     Agent Under the Security Agreement ...........................................65
Section 10.04        Powers Exercisable by Receiver or Collateral Agent ...................65

ARTICLE XI MISCELLANEOUS ...................................................................................65

Section 11.01        Notices .........................................................................................65
Section 11.02        Survival of Agreement .................................................................67
Section 11.03        Binding Effect ..............................................................................67
Section 11.04        Successors and Assigns .................................................................67
Section 11.05        Expenses; Indemnity ....................................................................69
Section 11.06        Right of Setoff .............................................................................71
Section 11.07        Applicable Law ............................................................................72
Section 11.08        Amendments, Supplements and Waivers ......................................72
Section 11.09        Interest Rate Limitation ...............................................................73
Section 11.10        Entire Agreement .........................................................................74
Section 11.11        WAIVER OF JURY TRIAL ........................................................74
Section 11.12        Severability ..................................................................................74
Section 11.13        Counterparts .................................................................................74
Section 11.14        Headings .......................................................................................75
Section 11.15        Jurisdiction; Consent to Service of Process .................................75
Section 11.16        Confidentiality ..............................................................................76
Section 11.17        Website Communications .............................................................77
Section 11.18        Collateral Agent as Joint Creditor and Party-in-Interest ...............78
Section 11.19        USA PATRIOT Act Notice .........................................................78


Exhibit A            Form of Assignment and Assumption
Exhibit B            Form of Closing Certificate
Exhibit C            Form of Borrowing Request
Exhibit D            Form of Compliance Certificate
Exhibit E            Form of Guarantee Supplement
Exhibit F            Form of Note

Schedule 1.01        Commitments
Schedule 3.07        Actions, Suits, Etc.
Schedule 3.25        Options
Schedule 6.06        Debt Existing on Effective Date
Schedule 6.08        Investments Existing on Effective Date
Schedule 6.09        Liens Existing on Effective Date
Schedule 6.11        Affiliate Transactions
Schedule 6.15        Limitation on Restriction on Distributions from Subsidiaries
Schedule 6.20        Minimum Sale Prices

DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement") dated as of January 11, 2011, among DB CAPITAL HOLDINGS, LLC AND DANCING BEAR LAND, LLC, each as a debtor and debtor-in-possession (individually, a "Borrower" and collectively, the "Borrower"); the Guarantors (as hereinafter defined) party hereto; the lenders party hereto; and Colbeck Capital Management, LLC, as administrative agent (together with its successors and assigns, in such capacity, the "Administrative Agent") for the Lenders and as collateral agent (together with its successors and assigns, in such capacity, the "Collateral Agent" and, together with the Administrative Agent, the "Agents") for the Lenders.

WHEREAS, the Borrower and Dancing Bear Development, LP ("DB Development" and, together with the Borrower, the "Debtors") are the subject of cases under Chapter 11 of the Bankruptcy code (collectively, the "Cases").

WHEREAS, the Borrower has requested that the Lenders provide it with a multi-draw term loan facility in an aggregate principal amount not to exceed $5,000,000 (the "Facility"). The Lenders are willing to extend or continue, as the case may be, such credit to the Borrower on the terms and subject to the conditions set forth herein.

WHEREAS, on the date hereof, the Bankruptcy Court entered the Final Order approving the Facility, and providing *inter alia*, that (i) the obligations under the Facility shall constitute allowed senior administrative expense claims against each of the Debtors with priority over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, except the Carve-Out, and (ii) the obligations under the Facility shall be secured by fully perfected security interests in and Liens upon, subject to certain exceptions set forth in the Security Documents, all pre-and post-petition property of the Debtors, whether existing on the Petition Date or thereafter acquired, including any cash and any investments of such cash, inventory, accounts receivable, other rights to payment whether arising before or after the Petition Date, contracts, properties, plants, equipment, general intangibles, documents, instruments, interest in leaseholds, real properties, patents, copyrights, trademarks, trade names, other intellectual property, equity interests, and the proceeds of all of the foregoing (as further described and defined in the Final Order, collectively, the "Collateral").  The respective priorities of the Facility and other parties claiming Liens on all or any part of the Collateral are as set forth in the Final Order.

WHEREAS, all of the claims and the Liens granted in the Final Order and the Security Documents to the Agents and the Lenders in respect of the Facility shall be subject to the Carve-Out.

Accordingly, in consideration of the mutual agreements herein contained and other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01   <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings specified below:

"<u>13-Week Projection</u>" means a projected statement of sources and uses of cash for the Borrower and its Subsidiaries on a weekly basis for the following 13 calendar weeks, including the anticipated borrowings and uses of the Facility for each week during such period, which shall be in form and substance satisfactory to the Required Lenders.

"<u>Acquired Debt</u>" means Debt of a Person outstanding on the date on which such Person becomes a Subsidiary or assumed in connection with the acquisition of assets from such Person.

"<u>Act</u>" has the meaning assigned to such term in Section 3.24(a).

"<u>Administrative Agent</u>" has the meaning assigned to such term in the preamble hereto.

"<u>Administrative Agent's Office</u>" means the Administrative Agent's address and, as appropriate, account as set forth in Section 11.01 or such other address or account as the Administrative Agent may from time to time specify (upon reasonable written notice) to the Borrower and the Lenders.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in the form provided by the Administrative Agent from time to time.

"<u>Affiliate</u>" of any specified Person means:

     (a)     any other Person directly or indirectly controlling or controlled by or under direct or indirect common control with such specified Person; or

     (b)     any other Person who is a director or officer of:

          (1) such specified Person; or

          (2) any Person described in clause (a) above.

For the purposes of this definition, "control" when used with respect to any Person means the power to direct the management and policies of such Person, directly or indirectly, whether through the ownership of voting securities, by contract or otherwise; and the terms "controlling" and "controlled" have meanings correlative to the foregoing.  For purposes of Section 6.11 only, "Affiliate" shall also mean any beneficial owner of shares representing 10% or more of the total voting power of the Voting Stock (on a fully diluted basis) of the Borrower or of rights or warrants to purchase such Voting Stock (whether or not currently exercisable) and any Person who would be an Affiliate of any such beneficial owner pursuant to the first sentence hereof.

"<u>Affiliate Transaction</u>" has the meaning assigned to such term in Section 6.11(a).

"<u>Agent Parties</u>" has the meaning assigned to such term in Section 11.17(c).

"<u>Agent Fee Letter</u>" means a fee letter to be entered into between the Borrower and the Administrative Agent on or prior to the Effective Date.

"<u>Agents</u>" has the meaning assigned to such term in the preamble hereto.

"<u>Agreement</u>" has the meaning assigned to such term in the preamble hereto.

"<u>Anti-Terrorism Law</u>" has the meaning assigned to such term in Section 3.24(a).

"<u>Applicable Margin</u>" means 13.00% per annum.

"<u>Approved Fund</u>" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"<u>Asset Sale</u>" means any Disposition (or series of related Dispositions) by a Loan Party or any Subsidiary, including any disposition by means of a merger, consolidation or similar transaction (each referred to for the purposes of this definition as a "disposition"), of:

       (a)     any shares of Capital Stock of any Subsidiary (other than directors' qualifying shares); or

       (b)     any other assets of the Borrower or any Subsidiary or such Subsidiary;

other than, in the case of clause (a) or (b) above:

       (1)     any Disposition by a Borrower to a Borrower or by a Non-Debtor Subsidiary to another Non-Debtor Subsidiary;

       (2)     any Disposition that constitutes a Permitted Investment or Restricted Payment permitted by Section 6.08;

       (3)     any Unit Sales; and

       (4)     any Disposition of Temporary Cash Investments.

"<u>Assignment and Assumption</u>" means an assignment and assumption entered into by a Lender and an assignee thereof in accordance with the terms of Section 11.04 (with the consent of any party whose consent is required by Section 11.04), and accepted by the Administrative Agent, in substantially the form to be attached as <u>Exhibit A</u> on or prior to the Effective Date (which shall be satisfactory in form and substance to the Required Lenders) or any other form approved by the Administrative Agent.

"<u>Attributable Debt</u>" in respect of a Sale and Leaseback Transaction means, at any date of determination:

(a)      if such Sale and Leaseback Transaction is a Capital Lease Obligation, the amount of Debt represented thereby according to the definition of "Capital Lease Obligations"; and

(b)      in all other instances, the present value (discounted at the interest rate borne by the Loans at such time, compounded annually) of the total obligations of the lessee for rental payments during the remaining term of the lease included in such Sale and Leaseback Transaction (including any period for which such lease has been extended).

"Available Commitments" means the excess of (i) total Commitments (as adjusted pursuant to Section 2.08) over (ii) the aggregate principal amount of Loans then outstanding.

"Average Life" means, as of any date of determination, with respect to any Debt or Preferred Stock, the quotient obtained by dividing:

(a)      the sum of the product of the numbers of years (rounded to the nearest one-twelfth of one year) from the date of determination to the dates of each successive scheduled principal payment of such Debt or redemption or similar payment with respect to such Preferred Stock multiplied by the amount of such payment by

(b)      the sum of all such payments.

"Bankruptcy Code" means The Bankruptcy Reform Act of 1978, as heretofore and hereafter amended, and codified as 11 U.S.C. Section 101 et seq.

"Bankruptcy Court" means the United States Bankruptcy Court for the District of Colorado or any other court having jurisdiction over the Cases from time to time.

"Bankruptcy Law" has the meaning assigned to such term in Section 7.01.

"Board" means the Board of Governors of the Federal Reserve System of the United States.

"Board of Directors" means the board of directors (or similar governing body) of the Borrower or a Guarantor, as appropriate, or any committee authorized to act therefor.

"Borrower" means the party named as such in the preamble hereto.

"Borrower Financial Officer" means the chief financial officer or other officer of the Borrower with actual knowledge of the financial affairs of the Borrower or the Borrower and its Subsidiaries (as the context may require).

"Borrowing" means a borrowing of Loans on the Effective Date or at any time thereafter pursuant to the terms of this Agreement.

"Borrowing Date" means any Business Day specified in a notice pursuant to Section 2.01(b) as a date on which the Borrower requests Loans to be made hereunder.

"Borrowing Request" has the meaning assigned to such term in Section 2.02(a).

"Business Day" means a day other than a Saturday, Sunday or other day on which commercial banks in New York, New York are authorized or required by law to close.

"Capital Lease Obligations" means any obligation under a lease that is required to be capitalized for financial reporting purposes in accordance with GAAP; and the amount of Debt represented by such obligation shall be the capitalized amount of such obligations determined in accordance with GAAP; and the Stated Maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.  For purposes of Section 6.09, a Capital Lease Obligation shall be deemed secured by a Lien on the Property being leased.

"Capital Stock" means, with respect to any Person, any shares or other equivalents (however designated) of any class of corporate stock or partnership interests or any other participations, rights, warrants, options or other interests in the nature of an equity interest in such Person, including Preferred Stock, but excluding any debt security convertible or exchangeable into such equity interest.

"Carve-Out" has the meaning specified in the Final Order.

"Cases" has the meaning assigned to such term in the recitals hereto.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (having the force of law) by any Governmental Authority.

"Change of Control" means the occurrence of any one of the following events:

(a)     any "person" or "group" (as such terms are used in Sections 13(d) and 14(d) of the Exchange Act or any successor provisions to either of the foregoing), including any group acting for the purpose of acquiring, holding, voting or disposing of securities within the meaning of Rule 13d-5(b)(1) under the Exchange Act, other than any one or more of the Permitted Holders, becomes the "beneficial owner" (as defined in Rule 13d-3 under the Exchange Act, except that a person will be deemed to have "beneficial ownership" of all shares that any such person has the right to acquire, whether such right is exercisable immediately or only after the passage of time), directly or indirectly, of 50% or more of the total voting power of the Voting Stock of the Borrower (for purposes of this clause (a), such person or group shall be deemed to beneficially own any Voting Stock of a corporation held by any other corporation (the "parent corporation") so long as such person or group beneficially owns, directly or indirectly, in the aggregate a majority of the total voting power of the Voting Stock of such parent corporation); or

   (b) during any period of two consecutive years, individuals who at the beginning of such period constituted the Board of Directors (together with any new directors whose election or appointment by such Board or whose nomination for election by the stockholders of the Borrower was approved by a vote of not less than a majority of the directors then still in office who were either directors at the beginning of such period or whose election or nomination for election was previously so approved) cease for any reason to constitute a majority of the Board of Directors then in office; or

   (c) the stockholders of the Borrower shall have approved any plan of liquidation or dissolution of the Borrower.

"<u>Charges</u>" has the meaning assigned to such term in Section 11.09.

"<u>Closing Certificate</u>" means a certificate substantially in substantially the form to be attached as <u>Exhibit B</u> on or prior to the Effective Date (which shall be satisfactory in form and substance to the Required Lenders).

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"<u>Collateral</u>" has the meaning assigned to such term in the recitals hereto and shall include any other property upon which a Lien is purported to be created by (a) any Security Document to the extent permitted by the Final Order or (b) any additional orders of the Bankruptcy Court under the Cases.

"<u>Collateral Agent</u>" has the meaning assigned to such term in the preamble hereto.

"<u>Commitment</u>" means, with respect to each Lender, the commitment, if any, of such Lender to make a Loan hereunder.  The amount of each Lender's Commitment is set forth in Schedule 1.01 or in the Assignment and Assumption pursuant to which such Lender shall have assumed its Commitment, as applicable.  The initial aggregate amount of the Commitments is $5 million.

"<u>Communications</u>" has the meaning assigned to such term in Section 11.17(a).

"<u>Compliance Certificate</u>" means a certificate substantially in the form to be attached as <u>Exhibit D</u> on or prior to the Effective Date (which shall be satisfactory in form and substance to the Required Lenders).

"<u>Consolidation Motion</u>" means the motion for substantive consolidation of the estate of the Borrower and certain of its subsidiaries filed with the Bankruptcy Court on December 17, 2010 by DB Capital Holdings, LLC.

"<u>Currency Exchange Protection Agreement</u>" means, in respect of a Person, any foreign exchange contract, currency swap agreement, currency option or other similar agreement or arrangement designed to protect such Person against fluctuations in currency exchange rates.

"<u>Debt</u>" means, with respect to any Person on any date of determination (without duplication):

      (a)    the principal of and premium (if any) in respect of:

          (1)    debt of such Person for money borrowed; and

          (2)    debt evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is liable;

      (b)    all Capital Lease Obligations of such Person and all Attributable Debt in respect of Sale and Leaseback Transactions entered into by such Person;

      (c)    all obligations of such Person representing the deferred and unpaid purchase price of Property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the ordinary course of business);

      (d)    all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction;

      (e)    the amount of all obligations of such Person with respect to the repayment of any Disqualified Capital Stock or, with respect to any Subsidiary of such Person, any Preferred Stock (but excluding, in each case, any accrued dividends);

      (f)    all obligations of the type referred to in clauses (a) through (e) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any Guarantee;

      (g)    all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any Lien on any Property of such Person (whether or not such obligation is assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such Property and the amount of the obligation so secured; and

      (h)    to the extent not otherwise included in this definition, Hedging Obligations of such Person.

The amount of Debt of any Person at any date shall be the outstanding principal balance, or the accreted value of such Debt in the case of Debt issued with original issue discount, at such date of all unconditional obligations as described above and the maximum liability upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date.  Debt shall not include contingent obligations arising out of customary indemnification agreements or purchase price adjustments with respect to the sale of assets or securities.

"<u>Debtors</u>" has the meaning assigned to such term in the recitals hereto.

"<u>Default</u>" means an event or condition the occurrence of which is, or after notice or passage of time or both would be, an Event of Default.

"<u>Default Rate</u>" has the meaning assigned to such term in Section 2.06(b).

"Dispose" or "Disposition" means any sale, lease, transfer, issuance or other disposition.

"Disqualified Capital Stock" means, with respect to any Person, any Capital Stock that by its terms (or by the terms of any security into which it is convertible or for which it is exchangeable, in either case at the option of the holder thereof) or otherwise:

      (a)      matures or is mandatorily redeemable pursuant to a sinking fund obligation or otherwise;

      (b)      is or may become redeemable or repurchaseable at the option of the holder thereof, in whole or in part; or

      (c)      is convertible or exchangeable at the option of the holder thereof for Debt or Disqualified Capital Stock;

on or prior to, in the case of clause (a), (b) or (c), the 91st day after the Maturity Date.

"Dollars" or "$" means lawful money of the United States of America.

"Domestic Subsidiary" means any Subsidiary other than (a) a Foreign Subsidiary or (b) a Subsidiary of a Foreign Subsidiary.

"Effect of Bankruptcy" means, with respect to any contractual obligation, contract or agreement to which the Borrower or any of its Subsidiaries is a party, any default or other legal consequences arising on account of the commencement or the filing of the Cases, as applicable (including the implementation of any stay), or the rejection of any such contractual obligation, contract or agreement with the approval of the Bankruptcy Court if required under applicable law.

"Effective Date" means the date on which the conditions specified in Article IV are satisfied (or waived in accordance with Section 11.08), which shall be no later than the Outside Date.

"Environmental Laws" has the meaning assigned to such term in Section 3.18.

"Environmental Liability" means with respect to any Person, all liabilities, obligations, responsibilities, response, remedial and removal costs, investigation and feasibility study costs, capital costs, operation and maintenance costs, losses, damages, punitive damages, property damages, natural resource damages, consequential damages, treble damages, costs and expenses (including all reasonable fees, disbursements and expenses of counsel, experts and consultants), fines, penalties, sanctions and interest incurred as a result of or related to any claim, suit, action, investigation, proceeding or demand by any Person, whether based in contract, tort, implied or express warranty, strict liability, criminal or civil statute or common law, arising under or related to any Environmental Laws or in connection with any Release or threatened Release or presence of a Hazardous Material whether on, at, in, under, from or about or in the vicinity of any real or personal property.

"ERISA" has the meaning assigned to such term in Section 3.19.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that is under common control with a Loan Party or any Subsidiary within the meaning of Section 414 of the Code or Section 4001 of ERISA.

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b) with respect to a Pension Plan, the failure to satisfy the minimum funding standard of Section 412 of the Code and Section 302 of ERISA, whether or not waived; (c) the failure to make by its due date a required contribution under Section 412(m) of the Code (or Section 430(j) of the Code, as amended by the Pension Protection Act of 2006) with respect to any Pension Plan or the failure to make any required contribution to a Multiemployer Plan; (d) a withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (e) a complete or partial withdrawal by a Loan Party, any Subsidiary or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (f) the filing of a notice of intent to terminate, the treatment of a Plan amendment as a termination under Section 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan or the occurrence of any event or condition which could reasonably be expected to constitute grounds under ERISA for the termination of or the appointment of a trustee to administer any Pension Plan, in each case where Plan assets are not sufficient to pay all Plan liabilities; (g) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (h) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon a Loan Party, any Subsidiary or any ERISA Affiliate; or (i) the occurrence of a nonexempt prohibited transaction (within the meaning of Section 4975 of the Code or Section 406 of ERISA) which could reasonably be expected to result in liability to a Loan Party or any Subsidiary.

"Event of Default" has the meaning assigned to such term in Section 7.01.

"Event of Loss" means, with respect to any Property, any (i) loss, destruction or damage of or to such Property or (ii) condemnation, seizure or taking, by exercise of the power of eminent domain or otherwise, of such Property, or confiscation or requisition of the use of such Property.

"Exchange Act" means the Securities Exchange Act of 1934, as amended.

"Excluded Taxes" means, with respect to the Administrative Agent, any Lender or any other recipient of any payment to be made by or on account of any obligation of the Borrower hereunder, (a) taxes imposed on or measured by its overall net income (however denominated), and franchise taxes imposed on it (in lieu of net income taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which its principal office is located or, in the case of any Lender, in which its applicable lending office is located, (b) any branch profits taxes imposed by the United States of America or any similar tax imposed by any other jurisdiction in which the Borrower is located and (c) in the case of a Foreign Lender, any withholding tax that is imposed on amounts payable to such Foreign Lender

9

at the time such Foreign Lender becomes a party hereto (or designates a new lending office) or is attributable to such Foreign Lender's failure or inability (other than as a result of a Change in Law) to comply with Section 2.11(e), except to the extent that such Foreign Lender (or its assignor, if any) was entitled, at the time of designation of a new lending office (or assignment), to receive additional amounts from the Borrower with respect to such withholding tax pursuant to Section 2.11(a).

"Executive Order" has the meaning assigned to such term in Section 3.24(a).

"Exit Fee" means, with respect to any prepayment or repayment of any Loans or any termination or permanent reduction in Commitments, an amount payable in cash equal to (i) 2.0% of the principal amount of the Loans being prepaid or the Commitments being terminated, as the case may be, plus (ii) if the Loans being prepaid or repaid have been outstanding for less than a period of one year, an amount equal to the amount of interest that would have accrued with respect to such Loans pursuant to this Agreement if such Loans had remained outstanding for a period of one year (based on the LIBOR and Applicable Margin then in effect) minus the amount of interest that has been paid to the Lenders with respect to such Loans through and including the date of such prepayment or repayment.

"Facility" has the meaning assigned to such term in the recitals hereto.

"Fair Market Value" means, with respect to any Property, the sale price for such Property that could be negotiated in an arm's-length transaction for cash, between a willing seller and a willing buyer, neither of whom is under undue pressure or compulsion to complete the transaction.

"Federal Funds Effective Rate" means, for any day, the weighted average of the rates (rounded upwards, if necessary, to the nearest 1/100th of 1%) on overnight federal funds transactions with members of the Federal Reserve System arranged by federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York; *provided* that (a) if the day for which such rate is to be determined is not a Business Day, the Federal Funds Rate for such day shall be such rate for such transactions on the next preceding Business Day as so published on the next succeeding Business Day, and (b) if such rate is not so published for any day which is a Business Day, the Federal Funds Rate for such day shall be the average of the quotations for the day of such transactions received by the Administrative Agent from three federal funds brokers of recognized standing selected by it.

"Final Maturity Date" means the date that is 12 months after the Effective Date.

"Final Order" means a Final Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 (1) Approving Postpetition Financing,(2) Granting Liens and Providing Superpriority Administrative Expense Status, (3) Granting Adequate Protection, and (4) Modifying Automatic Stay, in form and substance satisfactory to the Required Lenders.

"Fiscal Year" means the twelve month fiscal period of the Borrower and its Subsidiaries commencing on January 1 of each calendar year and ending on December 31 of such calendar year.

"Foreign Lender" means any Lender that is organized under the laws of a jurisdiction other than that in which the Borrower is resident for tax purposes.  For purposes of this definition, the United States of America, each State thereof and the District of Columbia shall be deemed to constitute a single jurisdiction.

"Foreign Subsidiary" means any Subsidiary which is not organized under the laws of the United States of America or any State thereof or the District of Columbia.

"Fund" means any Person (other than a natural person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans and similar extensions of credit in the ordinary course of its business.

"GAAP" means United States generally accepted accounting principles as in effect from time to time, including those set forth in:

> (a)     the opinions and pronouncements of the Accounting Principles Board of the American Institute of Certified Public Accountants;

> (b)     the statements and pronouncements of the Financial Accounting Standards Board; and

> (c)     the rules and regulations of the SEC governing the inclusion of financial statements (including pro forma financial statements) in periodic reports required to be filed pursuant to Section 13 of the Exchange Act, including opinions and pronouncements in staff accounting bulletins and similar written statements from the accounting staff of the SEC.

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Debt of any other Person and any obligation, direct or indirect, contingent or otherwise, of such Person:

> (a)     to purchase or pay (or advance or supply funds for the purchase or payment of) such Debt of such other Person (whether arising by virtue of partnership arrangements, or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise); or

> (b)     entered into for the purpose of assuring in any other manner the obligee against loss in respect thereof (in whole or in part);

*provided*, *however*, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.

The term "Guarantee" used as a verb has a corresponding meaning.

"Guarantee Supplement" means a Guarantee Supplement, in substantially the form to be attached as Exhibit E on or prior to the Effective Date (which shall be satisfactory in form and substance to the Required Lenders).

"Guarantor" means each Subsidiary and any other Person that is a Guarantor on the Effective Date or that executes a Guarantee Supplement.

"Hazardous Material" means all or any of the following: substances that are defined or listed in, or otherwise classified pursuant to, any applicable laws or regulations, including any Environmental Law, as "hazardous substances", "hazardous materials", "hazardous wastes", "toxic substances" or any other formulation intended to define, list or classify substances by reason of deleterious properties such as ignitability, corrosivity, reactivity, carcinogenicity, reproductive toxicity or "EP toxicity".

"Hedging Obligation" of any Person means any obligation of such Person pursuant to any Interest Rate Agreement, Currency Exchange Protection Agreement or any other similar agreement or arrangement.

"incur" means, with respect to any Debt or other obligation of any Person, to create, issue, incur (by merger, conversion, exchange or otherwise), extend, assume, Guarantee or become liable in respect of such Debt or other obligation or the recording, as required pursuant to GAAP or otherwise, of any such Debt or obligation on the balance sheet of such Person (and "incurrence" and "incurred" shall have meanings correlative to the foregoing); *provided, however*, that a change in GAAP that results in an obligation of such Person that exists at such time, and is not theretofore classified as Debt, becoming Debt shall not be deemed an incurrence of such Debt; and *provided further*, however, that any Debt or other obligations of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be incurred by such Subsidiary at the time it becomes a Subsidiary.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"Indemnitee" has the meaning assigned to such term in Section 11.05(b).

"Independent Financial Advisor" means an investment banking firm of national standing, *provided* that such firm is not an Affiliate of the Borrower.

"Information" has the meaning assigned to such term in Section 11.16.

"Intellectual Property" has the meaning assigned to such term in Section 3.20.

"Interest Payment Date" means with respect to any Loan, the last day of each Interest Period and the Maturity Date.

"Interest Period" means, (a) initially, the period commencing on the Borrowing Date with respect to such Borrowing and ending one month thereafter, and (b) thereafter, each period commencing on the last day of the next preceding Interest Period applicable to such Borrowing

and ending one month thereafter; provided that, all of the foregoing provisions relating to Interest Periods are subject to the following:

(i)      if any Interest Period would otherwise end on a day that is not a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless the result of such extension would be to carry such Interest Period into another calendar month in which event such Interest Period shall end on the immediately preceding Business Day;

(ii)      any Interest Period that would otherwise extend beyond the  Maturity Date of the Loans shall end on the Maturity Date; and

(iii)      any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the relevant calendar month, that is one month thereafter.

"Interest Rate Agreement" means, for any Person, any interest rate swap agreement, interest rate cap agreement, interest rate collar agreement or other similar agreement designed to protect against fluctuations in interest rates.

"Investment" by any Person means any direct or indirect loan (other than advances to customers in the ordinary course of business that are recorded as accounts receivable on the balance sheet of such Person), advance or other extension of credit or capital contribution (by means of transfers of cash or other Property to others or payments for Property or services for the account or use of others, or otherwise) to, or incurrence of a Guarantee of any obligation of, or purchase or acquisition of Capital Stock, bonds, notes, debentures or other securities or evidence of Debt issued by, any other Person.

In determining the amount of any Investment made by transfer of any Property other than cash, such Property shall be valued at its Fair Market Value at the time of such Investment.

"Junior Financing" has the meaning assigned to such term in Section 6.12(a).

"Junior Financing Documentation" means any documentation that evidences or governs Junior Financing.

"Lender" means each Lender with a Commitment or that holds a Loan.

"LIBOR," with respect to an Interest Period, will be the rate (expressed as a percentage per annum) determined by the Administrative Agent for deposits in United States dollars for one-month periods beginning on the first day of such Interest Period that appears on Telerate Page 3750 as of 11:00 a.m., London time, on the Determination Date.  If Telerate Page 3750 does not include such a rate or is unavailable on a Determination Date, the Administrative Agent will request the principal London office of each of four major banks in the London interbank market, as selected by the Administrative Agent, to provide such bank's offered quotation (expressed as a percentage per annum), as of approximately 11:00 a.m., London time, on such Determination Date, to prime banks in the London interbank market for deposits in a Representative Amount in United States dollars for a one-month period beginning on the first day of such Interest Period. If at least two such offered quotations are so provided, LIBOR for the Interest Period will be the arithmetic mean of such quotations.  If fewer than two such quotations are so provided, the

Administrative Agent will request each of three major banks in New York City, as selected by the Administrative Agent, to provide such bank's rate (expressed as a percentage per annum), as of approximately 11:00 a.m., New York City time, on such Determination Date, for loans in a Representative Amount in United States dollars to leading European banks for a one-month period beginning on the first day of such Interest Period.  If at least two such rates are so provided, LIBOR for the Interest Period will be the arithmetic mean of such rates.  If fewer than two such rates are so provided, then LIBOR for the Interest Period will be LIBOR in effect with respect to the immediately preceding Interest Period.  Notwithstanding anything above to the contrary, in no event will LIBOR be lower than 2.00% per annum.

"<u>Licenses</u>" has the meaning assigned to such term in Section 3.15.

"<u>Lien</u>" means, with respect to any Property of any Person, any mortgage or deed of trust, pledge, hypothecation, assignment, security interest, lien, charge, easement (other than any easement not materially impairing usefulness), encumbrance, preference, priority or other security agreement (including any Capital Lease Obligation, conditional sale or other title retention agreement having substantially the same economic effect as any of the foregoing or any Sale and Leaseback Transaction).

"<u>Loan Documents</u>" means this Agreement, the Notes, the Security Documents, the Agent Fee Letter and each Guarantee Supplement.

"<u>Loan Parties</u>" means the Borrower and the Guarantors.

"<u>Loan Guarantee</u>" means a Guarantee on the terms set forth in Article IX by a Guarantor of the Borrower's obligations with respect to the Loans.

"<u>Loans</u>" means the Loans made pursuant to Section 2.01(a).

"<u>Material Adverse Effect</u>" means (a) a material adverse effect on the business, operations, assets, liabilities (actual or contingent), financial condition or prospects of the Borrower and its Subsidiaries (taken as a whole), (b) a material adverse effect on the ability of the Borrowers or the Loan Parties (taken as a whole) to perform their respective payment obligations under any Loan Document to which any Borrower or any of the Loan Parties is a party or (c) a deficiency in the rights and remedies of the Lenders under the Loan Documents (taken as a whole) which is materially adverse to the Lenders; *provided*, that a Material Adverse Effect shall not be deemed to exist as a result of the Cases or the Effect of Bankruptcy or the circumstances and events leading up thereto.

"<u>Maturity Date</u>" means the earliest of (a) the Final Maturity Date, (b) the substantial consummation (as defined in Section 1101 of the Bankruptcy Code and which for purposes hereof shall be no later than the "effective date") of a Reorganization Plan filed in the Cases that is confirmed pursuant to an order entered b y the Bankruptcy Court and (c) the date of the acceleration of the Loans and termination of the Commitments under Article VII.

"<u>Maximum Rate</u>" has the meaning assigned to such term in Section 11.09.

14

"Moody's" means Moody's Investors Service, Inc. or any successor to the rating agency business thereof.

"Mountainside Building" has the meaning assigned to such term in the definition of "Project"."

"Multiemployer Plan" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party, any Subsidiary or any ERISA Affiliate makes or is obligated to make contributions, during the preceding five plan years, has made or been obligated to make contributions or otherwise could reasonably be expected to incur liability.

"Net Available Cash" from any Asset Sale or Unit Sale means cash payments received therefrom (including any cash payments received by way of deferred payment of principal pursuant to a note or installment receivable or otherwise, but only as and when received, but excluding any other consideration received in the form of assumption by the acquiring Person of Debt or other obligations relating to the Property that is the subject of such Asset Sale or Unit Sale or received in any other non-cash form), in each case net of:

> (a)    all legal, title and recording tax expenses, commissions and other fees and expenses incurred (including legal, brokerage, advisor and accounting), and all Federal, state, provincial, foreign and local taxes required to be accrued as a liability under GAAP, as a consequence of such Asset Sale or Unit Sale; and

> (b)    the deduction of appropriate amounts provided by the seller as a reserve, in accordance with GAAP, against any liabilities associated with the Property disposed of in such Asset Sale or Unit Sale and retained by the Borrower or any Subsidiary after such Asset Sale or Unit Sale,

in the case of items (a) and (b) above (collectively, the "Sale Expenses"), to the extent approved by the Bankruptcy Court, if such approval is necessary pursuant to the Bankruptcy Code.

"Net Loss Proceeds" means the aggregate cash proceeds received by the Borrower or any of its Subsidiaries in respect of any Event of Loss, including, without limitation, insurance proceeds from condemnation awards or damages awarded by any judgment, net of the direct costs of recovery of such Net Loss Proceeds (including, without limitation, legal, accounting, appraisal and insurance adjuster fees and any relocation expenses incurred as a result thereof) and any taxes attributable to such Event of Loss paid or payable as a result thereof.

"Non-Debtor Subsidiary" means any Subsidiary of the Borrower that is not a Debtor.

"Note" means a note in substantially the form to be attached as Exhibit F on or prior to the Effective Date (which shall be satisfactory in form and substance to the Required Lenders).

"Obligations" means, with respect to any Debt, any principal, premium, if any, interest (including interest accruing on or after the filing of any petition in bankruptcy or for reorganization, at the rate specified in the applicable documents governing such Debt, whether or not a claim for post-filing interest is allowed in such proceeding), penalties, fees,

indemnification, guarantees, reimbursements, damages and other liabilities payable under the documentation governing such Debt, including, without limitation, fees and expenses of the Agents and their agents, counsels and professional advisers to the extent reimbursable or indemnifiable pursuant to the terms of this Agreement.

"OFAC" has the meaning assigned to such term in Section 3.24(b)(5).

"Officer" means the chief executive officer, president, chief financial officer, treasurer or managing member of a Loan Party (including, in the case of each Loan Party, the authorized number of managing directors or a general attorney or an attorney under a power of attorney of such Loan Party) and, as to any document delivered on the Effective Date (other than a Borrowing Request), any secretary of such Loan Party.  Any document delivered hereunder that is signed by an Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Officer's Certificate" means with respect to any Person, a certificate signed by an Officer who shall be a chief executive officer, chief financial officer or any other officer reasonably acceptable to the Administrative Agent of such Person, and delivered to the Administrative Agent.

"Operating Forecast" means a business plan and projected operating budget for the Borrower and its Subsidiaries from the Effective Date through the final day of the calendar month occurring immediately after the Final Maturity Date including a projected statement of sources and uses of cash for the Borrower and its Subsidiaries on a weekly basis and a line item for total available liquidity for the period covered thereby and setting forth the anticipated uses of the Facility for such period, which, in each case, shall be in form and substance satisfactory to the Required Lenders.

"Opinion of Counsel" means a written opinion from legal counsel who is acceptable to the Administrative Agent.  The counsel may be an employee of or counsel to the Borrower.

"Option Contract" has the meaning set forth in Section 3.25.

"Organization Documents" means (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents with respect to any non-U.S. jurisdiction); (b) with respect to any limited liability company, the certificate or articles of formation, association or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or under

16

any other Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"<u>Outside Date</u>" has the meaning assigned to such term in Section 2.08.

"<u>Parkside Building</u>" has the meaning assigned to such term in the definition of "Project"."

"<u>Participant</u>" has the meaning assigned to such term in Section 11.04(d).

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation.

"<u>Pension Plan</u>" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA or to the minimum funding standards under Section 412 of the Code or Section 302 of ERISA and is sponsored or maintained by any Loan Party, any Subsidiary or any ERISA Affiliate or to which any Loan Party, any Subsidiary or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five (5) plan years or with respect to which a Loan Party, Subsidiary or ERISA Affiliate could reasonably be expected to incur liability (including under Section 4063 or 4069 of ERISA).

"<u>Permitted Debt</u>" means each of the following:

(a)     Debt of the Borrower evidenced by the Loans and of the Guarantors evidenced by the Loan Guarantees;

(b)     Debt of a Borrower owing to a Borrower and Debt of a Non-Debtor Subsidiary owing to any other Non-Debtor Subsidiary; *provided* that any subsequent issue or transfer of Capital Stock or other event that results in any such Subsidiary ceasing to be a Subsidiary or any subsequent transfer of any such Debt (except to a Person to whom such Debt can be owing pursuant to this clause (b)) shall be deemed, in each case, to constitute the incurrence of such Debt by the issuer thereof; and

(c)     Debt outstanding on the Effective Date not otherwise described in clauses (a) and (b) above as set forth in Schedule 6.06.

"<u>Permitted Holders</u>" means Thomas DiVenere and any investment vehicles controlled by Thomas DiVenere.

"<u>Permitted Investment</u>" means Investments in:

(a)     (i) a Borrower by a Borrower, or (ii) a Non-Debtor Subsidiary by a Non-Debtor Subsidiary;

(b)     Investments in existence on the Effective Date and set forth on <u>Schedule 6.08</u> and any modification, replacement, renewal, reinvestment or extension of any such Investment that does not increase the aggregate amount thereof;

(c)     Temporary Cash Investments;

(d)     receivables owing to the Borrower or a Subsidiary, if created or acquired in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(e)     stock, obligations or other securities received in settlement of debts created in the ordinary course of business and owing to the Borrower or a Subsidiary or in satisfaction of judgments; and

(f)     any Person to the extent such Investment represents the non-cash portion of the consideration received in connection with an Asset Sale consummated in compliance with Section 6.10.

"Permitted Liens" means:

(a)     Liens for taxes, assessments or governmental charges or levies on the Property of the Borrower or any Subsidiary if the same shall not at the time be delinquent or thereafter can be paid without penalty, or are being contested in good faith and by appropriate proceedings promptly instituted and diligently concluded; *provided* that any reserve or other appropriate provision that shall be required in conformity with GAAP shall have been made therefor;

(b)     Liens imposed by law or statute, such as landlords', carriers', warehousemen's, materialmen's, suppliers', repairmen's, mechanics' and contractors' Liens and other similar Liens, on the Property of the Borrower or any Subsidiary arising in the ordinary course of business and securing payment of obligations that are not more than 30 days past due or are being contested in good faith and by appropriate proceedings;

(c)     Liens on the Property of the Borrower or any Subsidiary incurred in the ordinary course of business to secure performance of obligations with respect to statutory or regulatory requirements, performance or return-of-money bonds, surety bonds or other obligations of a like nature and incurred in a manner consistent with industry practice and in the ordinary course of business, in each case which are not incurred in connection with the borrowing of money, the obtaining of advances or credit or the payment of the deferred purchase price of Property and which do not in the aggregate impair in any material respect the use of Property in the operation of the business of the Borrower and its Subsidiaries taken as a whole;

(d)     Liens on Property at the time the Borrower or any Subsidiary acquired such Property or on Property of a Person at the time such Person becomes a Subsidiary, including any acquisition by means of a merger or consolidation with or into the Borrower or any Subsidiary and any modification, replacement or renewal thereof; *provided*, *however*, that any such Lien may not extend to any other Property of the Borrower or any Subsidiary; *provided further*, *however*, that such Liens shall not have been incurred in anticipation of or in connection with the transaction or series of

18

transactions pursuant to which such Property was acquired by the Borrower or any Subsidiary;

(e)      pledges or deposits by the Borrower or any Subsidiary under workmen's compensation laws, unemployment insurance laws or similar legislation, or good faith deposits in connection with bids, tenders, sales, contracts (other than for the payment of Debt), or leases to which the Borrower or any Subsidiary is party, or deposits to secure public or statutory obligations of the Borrower, or deposits for the payment of rent, in each case incurred in the ordinary course of business and consistent with past practices;

(f)      easements, rights-of-way, reservations, title exceptions, protrusions, building restrictions and such other encumbrances or charges against real property as are of a nature generally existing with respect to properties of a similar character, which do not in the aggregate materially detract from the value of such real property or materially interfere with the ordinary conduct of the business conducted and proposed to be conducted at such real property;

(g)      Liens existing on the Effective Date not otherwise described in this definition of "Permitted Liens" to the extent disclosed on Schedule 6.09, which in the case of a Debtor is subordinated to the Liens securing the Obligations under the Loan Documents pursuant to the Final Order;

(h)      ground leases in respect of real property on which any facility or equipment owned or leased by the Borrower or any Subsidiary is located;

(i)      Liens on the Collateral pursuant to the Security Agreements and the other Loan Documents;

(j)      encumbrances arising under leases, subleases, licenses or sub-licenses of real property which do not in the aggregate materially detract from the value of such real property or materially interfere with the ordinary conduct of the business conducted and proposed to be conducted at such real property;

(k)      financing statements evidencing a lessor's rights in and to property leased to such Person relating to leases not prohibited by this Agreement; and

(l)      licenses or sublicenses of Intellectual Property in the ordinary course of business.

"Person" means any individual, corporation, company (including any limited liability company), association, partnership, joint venture, trust, unincorporated organization, government or any agency or political subdivision thereof or any other entity.

"Petition Date" means November 29, 2010.

"Plan" means any "employee benefit plan" (as such term is defined in Section 3(3) of ERISA) established by any Loan Party or Subsidiary or, with respect to any such plan that is subject to Section 412 of the Code or Title IV of ERISA, any ERISA Affiliate.

"Platform" has the meaning assigned to such term in Section 11.17(b).

"Preferred Stock" means any Capital Stock of a Person, however designated, which entitles the holder thereof to a preference with respect to the payment of dividends, or as to the distribution of assets upon any voluntary or involuntary liquidation or dissolution of such Person, over shares of any other class of Capital Stock issued by such Person.

"Pre-Petition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition (i) Debt, (ii) "critical vendor payments" or (iii) trade payables (including, without limitation, in respect of reclamation claims), or other pre-petition claims against any Debtor.

"Project" means the development constituting a residential building located at the corner of West Durant Street and South Monarch Street in Aspen, Colorado (the "Parkside Building") and an unfinished residential building to be located across West Durant Street from the Parkside Building (the "Mountainside Building"), in each case, which are owned by the Debtors and has been previously identified to the Lenders.

"Property" means, with respect to any Person, any interest of such Person in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, including Capital Stock in, and other securities of, any other Person.  For purposes of any calculation required pursuant to this Agreement, the value of any Property shall be its Fair Market Value.

"Register" has the meaning assigned to such term in Section 11.04(c).

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, trustees, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Release" means any release, known threatened release, spill, emission, leaking, pumping, pouring, emitting, emptying, escape, injection, deposit, disposal, discharge, dispersal, dumping, leaching or migration of Hazardous Material in the indoor or outdoor environment, including the movement of Hazardous Material through or in the air, soil, surface water, ground water or property.

"Reorganization Plan" means a plan of reorganization in any of the Cases of the Debtors.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA or the regulations issued thereunder, other than events for which the thirty (30) day notice period has been waived.

"Representative Amount" means a principal amount of not less than $1,000,000 for a single transaction in the relevant market at the relevant market.

"Required Lenders" means, at any time, Lenders holding a majority in aggregate principal amount of the Loans and the aggregate unused Commitments at such time.

"Restricted Payment" means:

20

(a)     any dividend or distribution (whether made in cash, securities or other Property) declared or paid on or with respect to any shares of Capital Stock of the Borrower or any Subsidiary (including any payment in connection with any merger or consolidation with or into the Borrower or any Subsidiary);

(b)     the purchase, repurchase, redemption, acquisition or retirement for value of any Capital Stock of the Borrower or any Subsidiary or any securities exchangeable for or convertible into any such Capital Stock, including the exercise of any option to exchange any Capital Stock;

(c)     any direct or indirect payment to a developer with respect to the Project;

(d)     any other direct or indirect payment to an equity holder or Affiliate of the Borrower or its Subsidiaries; or

(e)     any Investment (other than Permitted Investments) in any Person.

"S&P" means Standard & Poor's Ratings Service or any successor to the rating agency business thereof.

"Sale Expenses" has the meaning set forth in the definition of "Net Available Cash."

"Sale and Leaseback Transaction" means any direct or indirect arrangement relating to Property now owned or hereafter acquired whereby the Borrower or a Subsidiary transfers such Property to another Person and the Borrower or a Subsidiary leases it from such Person.

"SEC" means the U.S. Securities and Exchange Commission, or any governmental authority succeeding to any of its principal functions.

"Secured Parties" means, collectively, the Administrative Agent, the Collateral Agent, the Lenders, the Persons entitled to indemnification under the Loan Documents and each co-agent or sub-agent appointed by the Administrative Agent or Collateral Agent from time to time pursuant to the terms hereof.

"Securities Act" means the Securities Act of 1933, as amended.

"Security Agreement" means that Pledge and Security Agreement, dated as of the Effective Date, by and among the Borrower, the Guarantors, and Colbeck Capital Management, LLC, as Collateral Agent, as amended, restated or supplemented from time to time.

"Security Documents" means, collectively, the Security Agreement, the Final Order and all other mortgages, deeds of trust, pledge agreements, collateral assignments, security agreements, fiduciary transfers, debentures or other instruments evidencing or creating any security interests in favor of the Collateral Agent for the benefit of the Secured Parties. The Security Documents shall supplement, and shall not limit, the grant of Collateral pursuant to the Final Order.

"Significant Subsidiary" means any Subsidiary of the Borrower that would be a "Significant Subsidiary" of the Borrower within the meaning of Rule 1-02 of Regulation S-X promulgated by the SEC.

"Stated Maturity" means, with respect to any Debt, the date specified in the agreements, instruments or other documents governing such Debt as the fixed date on which the payment of principal of such Debt is due and payable, including pursuant to any mandatory redemption provision (but excluding any provision providing for the repurchase of such Debt at the option of the holder thereof upon the happening of any contingency beyond the control of the issuer unless such contingency has occurred).

"Subordinated Obligation" means any Debt of the Borrower or any Guarantor (whether outstanding on the Effective Date or thereafter incurred) that is subordinate or junior in right of payment (other than solely as a result of being unsecured or secured by junior liens) to the Loans or the applicable Loan Guarantee pursuant to a written agreement to that effect or otherwise pursuant to the terms of such Debt.

"Subsidiary" means, in respect of any Person, any corporation, company (including any limited liability company), association, partnership, joint venture or other business entity of which a majority of the total voting power of the Voting Stock is at the time owned or controlled, directly or indirectly, by:

(a)     such Person;

(b)     such Person and one or more Subsidiaries of such Person; or

(c)     one or more Subsidiaries of such Person.

Unless otherwise specified herein, any reference to a Subsidiary herein shall mean a Subsidiary of the Borrower.

"Superpriority Claim" means a claim against any Debtor in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

"Taxes" means all present or future taxes, levies, imposts, duties, deductions, withholdings, assessments, fees or other charges imposed by any Governmental Authority, including any interest, additions to tax or penalties applicable thereto.

"Temporary Cash Investments" means any of the following:

(a)     Investments in U.S. Government Obligations maturing within 365 days of the date of acquisition thereof;

(b)     Investments in time deposit accounts, certificates of deposit and money market deposits maturing within 90 days of the date of acquisition thereof issued by a bank or trust company organized under the laws of the United States of America or any

22

state thereof having capital, surplus and undivided profits aggregating in excess of $500.0 million and whose long-term debt is rated "A-3" or "A-" or higher according to Moody's or S&P (or such similar equivalent rating by at least one "nationally recognized statistical rating organization" (as defined in Rule 436 under the Securities Act));

(c)      repurchase obligations with a term of not more than 30 days for underlying securities of the types described in clause (a) entered into with

(1)      a bank meeting the qualifications described in clause (b) above; or

(2)      any primary government securities dealer reporting to the Market Reports Division of the Federal Reserve Bank of New York;

(d)      Investments in commercial paper, maturing not more than 90 days after the date of acquisition, issued by a corporation (other than an Affiliate of the Borrower) organized and in existence under the laws of the United States of America with a rating at the time as of which any Investment therein is made of "P-1" (or higher) according to Moody's or "A-1" (or higher) according to S&P (or such similar equivalent rating by at least one "nationally recognized statistical rating organization" (as defined in Rule 436 under the Securities Act)); and

(e)      direct obligations (or certificates representing an ownership interest in such obligations) of any state of the United States of America (including any agency or instrumentality thereof) for the payment of which the full faith and credit of such state is pledged and which are not callable or redeemable at the issuer's option, *provided* that:

(1)      the long-term debt of such state is rated "A-3" or "A-" or higher according to Moody's or S&P (or such similar equivalent rating by at least one "nationally recognized statistical rating organization" (as defined in Rule 436 under the Securities Act)); and

(2)      such obligations mature within 180 days of the date of acquisition thereof.

"Termination" has the meaning assigned to such term in Section 10.02.

"Testing Period" means, on any date of determination, the one (1)-week period then most recently ended, commencing with the period ending on the (1)-week anniversary of the Effective Date, and thereafter, each such period ending on each one (1)-week anniversary of the Effective Date.

"Unfunded Current Liability" of any Plan means the amount, if any, by which the Accumulated Benefit Obligation (as defined under Statement of Financial Accounting Standards No. 87 ("SFAS 87")) under the Plan as of the close of its most recent plan year, determined in accordance with SFAS 87 as in effect on the date hereof, exceeds the fair market value of the assets allocable thereto.

"Unit Sale" means any Disposition of an interest in the Project.

23

"U.S. Government Obligations" means direct obligations (or certificates representing an ownership interest in such obligations) of the United States of America (including any agency or instrumentality thereof) for the payment of which the full faith and credit of the United States of America is pledged and which are not callable or redeemable at the issuer's option.

"Variance Report" has the meaning assigned to such term in Section 6.04(c).

"Voting Stock" of any Person means all classes of Capital Stock or other interests (including partnership interests) of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof.

Section 1.02    Terms Generally.

(a)    The definitions in Section 1.01 shall apply equally to both the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation".  All references herein to Articles, Sections and Exhibits shall be deemed references to Articles and Sections of, and Exhibits to, this Agreement unless the context shall otherwise require.  Except as otherwise expressly provided herein, (i) any reference in this Agreement to any Loan Document means such document as amended, restated, supplemented or otherwise modified from time to time and (ii) all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time.

(b)    Unless otherwise provided herein, if any payment under this Agreement or any other Loan Document shall be due on any day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day, and in the case of any payment accruing interest, interest thereon shall be paid for the period of such extension.

ARTICLE II

THE CREDITS

Section 2.01    Commitments.

(a)    Subject to the terms and conditions hereof, each Lender severally agrees to make Loans in Dollars to the Borrower on the Effective Date and from time to time thereafter at any time prior to the Maturity Date in an aggregate principal amount equal to its Available Commitment.  Amounts of Loans prepaid or repaid may not be reborrowed.

(b)    The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; *provided* that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans.

Section 2.02    Borrowings; Continuations.

24

(a)        The Borrower may borrow Loans under the Commitments by giving the Administrative Agent notice in substantially the form to be attached as <u>Exhibit C</u> on or prior to the Effective Date (which shall be satisfactory in form and substance to the Required Lenders) (a "<u>Borrowing Request</u>"), which notice must be received by the Administrative Agent prior to 11:00 a.m., New York City time, fifteen Business Days prior to the Borrowing Date; <u>provided</u>, <u>however</u> that the Borrowing Request in respect of the initial Borrowing of Loans must be received by the Administrative Agent prior to 5:00 p.m., New York City time, on the Business Day immediately prior to the Effective Date, no more than one Borrowing may be made in any calendar month and Borrowings must be in increments of $100,000.  The Borrowing Request shall specify (i) the principal amount of the Loans to be borrowed and (ii) the location and number of the account to which funds are to be disbursed, which shall comply with the requirements of this Agreement.

(b)        Upon receipt of a Borrowing Request, the Administrative Agent shall promptly notify each Lender of the aggregate amount of the Borrowing and of the amount of such Lender's *pro rata* portion thereof, which shall be based on their respective Commitments. Each Lender will make the amount of its *pro rata* portion of the Borrowing available to the Administrative Agent for the account of the Borrower at the office of the Administrative Agent specified to the Lenders, prior to 1:00 p.m., New York City time, on the Borrowing Date in funds immediately available to the Administrative Agent.  Amounts so received by the Administrative Agent will promptly be made available to the Borrower by the Administrative Agent crediting the account of the Borrower on the books of such office with the aggregate of the amounts made available to the Administrative Agent by the Lenders and in like funds as received by the Administrative Agent.

Section 2.03   <u>Optional Prepayment of Loans</u>.  Optional prepayment of the Loans shall be permitted at any time with three (3) Business Days' prior irrevocable notice, subject to payment of Exit Fees set forth in Section 2.16(c).

Section 2.04   <u>Mandatory Prepayments</u>.

(a)   <u>Asset Sales and Unit Sales</u>.  If the Borrower or any Subsidiary consummates any Asset Sale or Unit Sale, the Borrower or the affected Subsidiary shall apply or cause to be applied an amount equal to 100% of all Net Available Cash received by the Borrower or such Subsidiary to the prepayment of the Loans as set forth in Section 2.04(d) on or prior to the date that is three (3) Business Days after the realization or receipt of such Net Available Cash; *provided that*, with respect to any Unit Sale of the Mountainside Building, any Net Available Cash shall only be required to be applied to prepay the Loans to the extent permitted by applicable law; *provided further that*, if such Net Available Cash with respect to a Unit Sale of the Mountainside Building is not permitted to be so applied pursuant to applicable law, the Borrower or the affected Subsidiary shall deposit such proceeds into a segregated escrow account that is reasonably satisfactory to the Required Lenders.

(b)   <u>Events of Loss</u>.  If any Event of Loss occurs, the Borrower or the affected Subsidiary shall apply or cause to be applied an amount equal to 100% of all Net Loss Proceeds received by the Borrower or such Subsidiary to the prepayment of the Loans as set forth in

Section 2.04(d) on or prior to the date that is three (3) Business Days after the realization or receipt of such Net Loss Proceeds.

(c)    <u>Minimum Cash</u>.  Notwithstanding anything in this Section 2.04 to the contrary, the Borrower and its Subsidiaries shall not be required to apply the Net Available Cash (or a portion thereof) from an Asset Sale or Unit Sale or Net Loss Proceeds (or a portion thereof) from an Event of Loss, as applicable, to the prepayment of Loans, if after giving effect to such prepayment, the amount of cash and Temporary Cash Investments of the Borrower and its Subsidiaries shall be less than $250,000.

(d)    <u>Application of Mandatory Prepayments</u>.  Amounts to be applied in connection with prepayments of Loans pursuant to Sections 2.04(a), (b) and (c) shall be applied ratably in accordance with each Lender's respective pro rata shares of the Loans being prepaid.

(e)    <u>Funding Losses; Payment of Fees</u>.  All prepayments under this Section 2.04 shall be accompanied by all accrued interest thereon and all Exit Fees owing in respect thereof pursuant to Section 2.16(c) and shall, in the case of any such prepayment of a Loan on a date other than the last day of an Interest Period therefor, be made together with any amounts owing in respect of such Loan pursuant to Section 2.12.

Section 2.05    <u>Repayment of Loans; Evidence of Debt</u>.

(a)    The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of the Lenders on the Maturity Date (or such earlier date as, and to the extent that, such Loan becomes due and payable pursuant to Section 2.04 or Article VII), the unpaid principal amount of each Loan held by each Lender.  The Borrower hereby further agrees to pay interest in immediately available funds at the office of the Administrative Agent (as specified in Section 11.01) on the unpaid principal amount of the Loans made to it from time to time from the date hereof until payment in full thereof at the rates per annum, and on the dates, set forth in Section 2.06.  All payments required hereunder shall be made in Dollars.

(b)    Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to the appropriate lending office of such Lender resulting from each Loan made by such lending office of such Lender from time to time, including the amounts of principal and interest payable and paid to such lending office of such Lender from time to time under this Agreement.

(c)    The Administrative Agent shall maintain the Register pursuant to Section 11.04, and a subaccount for each Lender, in which Register and subaccounts (taken together) shall be recorded (i) the amount of each such Loan, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder in respect of each such Loan and (iii) the amount of any sum received by the Administrative Agent hereunder from the Borrower in respect of each such Loan and each Lender's share thereof.

(d)    The entries made in the Register and accounts maintained pursuant to clauses (b) and (c) of this Section 2.05 and the Notes maintained pursuant to clause (e) of this Section 2.05 shall be prima facie evidence of the existence and amounts of the obligations of the

Borrower therein recorded; *provided* that the failure of any Lender or the Administrative Agent to maintain such account, such Register or such subaccount, as applicable, or any error therein, shall not in any manner affect the obligation of the Borrower to repay (with applicable interest) the Loans made to the Borrower by such Lender in accordance with the terms of this Agreement.

(e)     The Loans made by each Lender to the Borrower shall, if requested by the applicable Lender (which request shall be made to the Administrative Agent), be evidenced by a Note, with the blanks appropriately filled, payable to the order of such Lender.

Section 2.06     Interest Rates and Payment Dates.

(a)     Each Loan shall bear interest (computed on the basis of the actual number of days elapsed over a year of 360 days) for each day during each Interest Period with respect thereto at a rate per annum equal to (A) LIBOR for such Interest Period, plus (B) the Applicable Margin.

(b)     If all or a portion of (i) the principal amount of any Loan, (ii) any interest payable thereon or (iii) other amount payable hereunder shall not be paid when due (whether at the stated maturity thereof or by acceleration or otherwise), such overdue amount shall bear interest at a rate per annum (the "Default Rate") which is (x) in the case of overdue principal (except as otherwise provided in clause (y) below), the rate that would otherwise be applicable thereto pursuant to clause (a) *plus* 2.00% per annum or (y) in the case of any overdue interest or other Obligation, the rate applicable to Loans at such time pursuant to clause (a) above *plus* 2.00% per annum, in each case from the date of such nonpayment to (but excluding) the date on which such amount is paid in full (after as well as before judgment).

(c)     Interest shall be payable in arrears on each Interest Payment Date and, without duplication, on the Maturity Date; *provided* that (i) interest accrued pursuant to clause (b) of this Section 2.06 shall be payable on demand and (ii) in the event of any repayment, repurchase or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment, repurchase or prepayment.

Section 2.07     Computation of Interest.  Each determination of an interest rate by the Administrative Agent pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower and the Lenders in the absence of manifest error.

Section 2.08     Termination of Commitments.  Optional termination of the Commitments shall be permitted at any time with three (3) Business Days' prior irrevocable notice, subject to payment of Exit Fees set forth in Section 2.16(c).  In connection with any Borrowing of Loans, a corresponding amount of Commitments shall be automatically deemed to be terminated.  The Commitments shall automatically terminate to the extent that the Effective Date has not occurred on or prior to 5:00 p.m. New York City time on February 25, 2011 (the "Outside Date").

Section 2.09     Pro Rata Treatment and Payments.

(a)     Except as otherwise expressly provided herein, each payment by the Borrower on account of principal of and interest on Loans shall be made *pro rata* according to the respective outstanding principal amounts of Loans then held by the Lenders, except as otherwise provided

in this Agreement.  All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 11:00 a.m., New York time, on the due date thereof to the Administrative Agent, for the account of the Lenders, at the Administrative Agent's office specified in Section 11.01 in Dollars and in immediately available funds.  The Administrative Agent shall distribute such payments to the Lenders entitled thereto promptly upon receipt in like funds as received.  Unless specified otherwise herein, if any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day, and, with respect to payments of principal, interest thereon shall be payable at the then applicable rate during such extension.

(b)     Unless the Administrative Agent shall have been notified in writing by any Lender prior to a Borrowing that such Lender will not make the amount that would constitute its share of such Borrowing available to the Administrative Agent, the Administrative Agent may assume that such Lender is making such amount available to the Administrative Agent, and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  If such amount is not made available to the Administrative Agent by the required time on the Borrowing Date therefor, such Lender shall pay to the Administrative Agent, on demand, such amount with interest thereon at a rate equal to the daily average Federal Funds Effective Rate for the period until such Lender makes such amount immediately available to the Administrative Agent.  A certificate of the Administrative Agent submitted to any Lender with respect to any amounts owing under this Section 2.09(b) shall be conclusive in the absence of manifest error.  If such Lender's share of such Borrowing is not made available to the Administrative Agent by such Lender within three Business Days of such Borrowing Date, the Administrative Agent shall also be entitled to recover such amount with interest thereon at the rate per annum applicable the Loans hereunder, on demand, from the Borrower, but without prejudice to any right or claim that the Borrower may have against such Lender.

(c)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the Lenders entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the Lenders entitled thereto in accordance with the amounts of principal then due to such parties.

Section 2.10     Requirements of Law.

(a)     If any Change in Law shall:

(1)     impose, modify or deem applicable any reserve, special deposit, compulsory loan, insurance charge or similar requirement against assets of, deposits with or for the account of, or credit extended or participated in by, any Lender;

(2)     subject any Lender to any tax of any kind whatsoever with respect to this Agreement or any Loan made by it, or change the basis of taxation of payments to such Lender in respect thereof (except for Indemnified Taxes or Other Taxes covered by

Section 2.11 and the imposition of, or any change in the rate of, any Excluded Tax payable by such Lender); or

(3)     impose on any Lender or the London interbank market any other condition, cost or expense affecting this Agreement or Loans made by such Lender;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Loan, or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or any other amount) then, upon request of such Lender, the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     If any Lender determines that any Change in Law affecting such Lender or any lending office of such Lender or such Lender's holding company, if any, regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement, the Commitments of such Lender or the Loans made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in clause (a) or (b) of this Section 2.10 and delivered to the Borrower shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section 2.10 shall not constitute a waiver of such Lender's right to demand such compensation, *provided* that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.10 for any increased costs incurred or reductions suffered more than nine months prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor (except that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the nine-month period referred to above shall be extended to include the period of retroactive effect thereof).

(e)     In the event that any Lender determines that any event or circumstance that will lead to a claim under this Section 2.10 has occurred or will occur, such Lender will use its best efforts to so notify the Borrower; *provided* that any failure to provide such notice shall in no way impair the rights of such Lender to demand and receive compensation under this Section 2.10, but without prejudice to any claims of the Borrower for compensation for actual damages sustained as a result of any failure to observe this undertaking.

(f)     The above provisions of this Section 2.10 shall not apply in respect of any present or future taxes, fees, duties or other charges of any nature whatsoever imposed by any taxing authority that are imposed on or measured by Lender's net income or overall gross income.

Section 2.11   Taxes.

(a)     Any and all payments by or on account of any obligation of the Borrower hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes, *provided* that if the Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section 2.11) the Administrative Agent or the Lender, as the case may be, receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Borrower shall make such deductions and (iii) the Borrower shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)     Without limiting the provisions of clause (a) above, the Borrower shall timely pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)     The Borrower shall indemnify the Administrative Agent and each Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 2.11) paid by the Administrative Agent or such Lender, as the case may be, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Administrative Agent), or by the Administrative Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Borrower to a Governmental Authority, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Administrative Agent.

(e)     Any Foreign Lender that is entitled to an exemption from or reduction of withholding tax under the law of the jurisdiction in which the Borrower is resident for tax purposes, or any treaty to which such jurisdiction is a party, with respect to payments hereunder or under any other Loan Document shall deliver to the Borrower (with a copy to the Administrative Agent), at the time or times prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent, such properly completed and executed documentation prescribed by applicable law as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if requested by the Borrower or the Administrative Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by the Borrower or the Administrative Agent as will

30

enable the Borrower or the Administrative Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.

(f)     If the Administrative Agent or a Lender determines, in its sole discretion, that it has received a refund of any Taxes or Other Taxes as to which it has been indemnified by the Borrower or with respect to which the Borrower has paid additional amounts pursuant to this Section 2.11, it shall pay to the Borrower an amount equal to such refund (but only to the extent of indemnity payments made, or additional amounts paid, by the Borrower under this Section 2.11 with respect to the Taxes or Other Taxes giving rise to such refund), net of all out-of-pocket expenses of the Administrative Agent or such Lender, as the case may be, and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund), *provided* that the Borrower, upon the request of the Administrative Agent or such Lender, agrees to repay the amount paid over to the Borrower (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) to the Administrative Agent or such Lender in the event the Administrative Agent or such Lender is required to repay such refund to such Governmental Authority.  This paragraph shall not be construed to require the Administrative Agent or any Lender to make available its tax returns (or any other information relating to its taxes that it deems confidential) to the Borrower or any other Person.

Section 2.12   Indemnity.  In the event any Lender shall incur any loss or expense (including any loss (other than lost profit) or expense incurred by reason of the liquidation or reemployment of deposits or other funds acquired by such Lender to make any Loan) as a result of any repayment or prepayment of the principal amount of any Loan on a date other than the scheduled last day of the Interest Period applicable thereto, whether pursuant to Section 2.03 or Section 2.04 or otherwise, or any failure to borrow any Loan after notice thereof shall have been given hereunder, whether by reason of any failure to satisfy a condition to Borrowing or otherwise, then, upon the written notice of such Lender to the Borrower (with a copy to the Administrative Agent), the Borrower shall, within five days of its receipt thereof, pay directly to such Lender such amount as will (in the reasonable determination of such Lender) reimburse such Lender for such loss or expense.  Such written notice (which shall include calculations in reasonable detail) shall, in the absence of manifest error, be conclusive and binding on the Borrower.

Section 2.13   Change of Lending Office.  If any Lender requests compensation under Section 2.10, or requires the Borrower to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.11, then such Lender shall use reasonable efforts to designate a different lending office for funding or booking its Loans hereunder or to assign its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.10 or Section 2.11, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable costs and expenses incurred by any Lender in connection with any such designation or assignment.

Section 2.14   Sharing of Setoffs.  If any Lender shall, by exercising any right of setoff or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans or other obligations hereunder resulting in such Lender's receiving payment of a

31

proportion of the aggregate amount of its Loans and accrued interest thereon or other such obligations greater than its *pro rata* share thereof as provided herein, then the Lender receiving such greater proportion shall (a) notify the Administrative Agent of such fact, and (b) purchase (for cash at face value) participations in the Loans and such other obligations of the other Lenders, or make such other adjustments as shall be equitable, so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans and other amounts owing to them, *provided* that:

    (i)    if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest; and

    (ii)    the provisions of this paragraph shall not be construed to apply to (x) any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or (y) any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans to any assignee or participant, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).

    The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of setoff and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

Section 2.15    [Reserved].

Section 2.16    Fees.

    (a)    On the third Business Day after commitment fees are calculated in accordance with the next succeeding sentence, the Borrower shall pay to the Administrative Agent for the account of each Lender in accordance with its pro rata share of the Commitments a non-refundable commitment fee in an amount equal to 2.0% per annum on the daily average unused amount of the Commitments.  The commitment fee shall accrue at all times from the Effective Date until such time as all Commitments have been used or terminated, including at any time during which one or more of the conditions in Section 4.01 is not met, and shall be calculated monthly in arrears on the last Business Day of each calendar month, commencing with the first such date to occur after the Effective Date, and on the Maturity Date.

    (b)    On the Effective Date, the Borrower shall pay from the proceeds of the Loans to Administrative Agent for the account of each Lender in accordance with its pro rata share of the Commitments at such time a front-end fee in an amount equal to 2.0% of the Commitments at such time. Such fee shall be fully earned when paid and shall not be refundable for any reason whatsoever.

(c)     On any date on which any Loans are prepaid or repaid (including pursuant to Section 2.03, Section 2.04 or Section 2.05) or the Commitments are terminated or reduced (including pursuant to Section 2.08), the Borrower shall pay to the Administrative Agent, in each case in cash, for the account of each Lender, such Lender's pro rata share of the Exit Fee applicable to such prepayment or repayment of Loans or termination or permanent reduction of Commitments, as the case may be.

(d)     The Borrowers shall pay to the Agents and other specified parties such fees and expenses as shall have been separately agreed upon in the Agent Fee Letter.  Such fees shall be fully earned when paid and shall not be refundable for any reason whatsoever.

Section 2.17   <u>Joint and Several Obligations</u>.  The obligations of the Loan Parties under the Loan Documents shall be joint and several.  The Agents and the Lenders may enforce against any one or more Loan Parties the obligations of the Loan Parties to make the payments due under the Loan Documents, and each Loan Party shall be responsible to the Agents and the Lenders for the full amount of such payments due.  The obligations of each of the Loan Parties under the Loan Documents shall be unconditional and absolute and, without limiting the generality of the foregoing, shall not be released, discharged or otherwise affected by:

(a)     any extension, renewal, settlement, compromise, waiver or release in respect of any obligation of any other Loan Party under any Loan Documents, by operation of law or otherwise;

(b)     any release, impairment, non-perfection or invalidity of any direct or indirect security for any obligation of any other Loan Party under any Loan Documents;

(c)     any change in the existence, structure or ownership of any other Loan Party;

(d)     any insolvency, bankruptcy, reorganization or other similar proceeding affecting any other Loan Party or its assets or any resulting release or discharge of any obligation of any other Loan Party under any Loan Documents;

(e)     any invalidity or unenforceability relating to or against any other Loan Party for any reason of any Loan Documents, or any provision of applicable Law purporting to prohibit the payment by any other Loan Party of the principal of or interest on any Note or any other amount payable by any other Loan Party under any Loan Documents; or

(f)     any other act or omission to act or delay of any kind by any other Loan Party or any other corporation or Person or any other circumstance whatsoever which might, but for the provisions of this paragraph, constitute a legal or equitable discharge of the Borrowers' obligations hereunder.

Section 2.18   <u>No Discharge; Survival of Claim</u>.  Each of the Borrower and the Guarantors agrees that (i) its obligations under the Loan Documents  shall not be discharged by the entry of an order confirming a Reorganization Plan (and each of the Borrower and the Guarantors, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Agents and the Lenders pursuant to the Final Order

33

and the Liens granted to the Agents and the Lenders pursuant to the Final Order shall not be affected in any manner by the entry of an order confirming a Reorganization Plan.

ARTICLE III

REPRESENTATIONS AND WARRANTIES

In order to induce the Lenders and the Agents to enter into this Agreement and the Lenders to extend credit hereunder on the Effective Date, the Loan Parties, jointly and severally, make the representations and warranties set forth in this Article III:

Section 3.01   Organization, etc.  Each of the Loan Parties (a) has been duly incorporated or organized and is validly existing as a corporation, limited liability company or limited partnership in good standing under the laws of the jurisdiction in which it is chartered or organized, and (b) subject to the entry by the Bankruptcy Court of the Final Order and subject to the terms thereof, has full corporate, limited liability company or partnership power and authority to own or lease, as the case may be, and to operate its properties and conduct its business substantially as currently conducted, and is duly qualified to do business as a foreign corporation, limited liability company or partnership and is in good standing under the laws of each jurisdiction which requires such qualification, except where the failure to be so qualified would not reasonably be expected to have a Material Adverse Effect.

Section 3.02   Due Authorization, Non-Contravention, etc.  Subject to the entry by the Bankruptcy Court of the Final Order and subject to the terms thereof, neither the execution and delivery of this Agreement or any other Loan Document, nor the consummation of any of the transactions contemplated thereby, nor the fulfillment of the terms hereof or thereof will conflict with, or result in a breach or violation or imposition of any lien, charge or encumbrance (other than the liens created by the Security Documents and the Final Order) upon any property or assets of the Borrower or any of its Subsidiaries pursuant to, (i) the charter (including any certificates of designation), by-laws or other organizational documents of the Borrower or any of its Subsidiaries; (ii) the terms of any indenture, contract, lease, mortgage, deed of trust, note agreement, loan agreement or other agreement, obligation, condition, covenant or instrument to which the Borrower or any of its Subsidiaries is a party or bound or to which its or their property is subject; or (iii) any statute, law, rule, regulation, judgment, order or decree applicable to the Borrower or any of its Subsidiaries of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Borrower or any of its Subsidiaries or any of its or their properties.

Section 3.03   Government Approval, Regulation, etc.  Except for the entry by the Bankruptcy Court of the Final Order and as otherwise required under the Bankruptcy Code and applicable state and federal bankruptcy rules, no consent, approval, authorization, filing with or order of any court or governmental agency or body is required in connection with the execution of this Agreement or any of the other Loan Documents or the consummation of the transactions contemplated thereby, or the fulfillment of the terms hereof or thereof, except for the approvals, consents, exemptions, authorizations, actions, notices and filings which have been duly obtained, taken, given or made and are in full force and effect.

Section 3.04     Validity, etc.  Subject to the entry by the Bankruptcy Court of the Final Order and subject to the terms thereof, this Agreement has been duly authorized, executed and delivered by each Loan Party, and each other Loan Document has been duly authorized, executed and delivered by each Loan Party and assuming the due execution and delivery by the other parties thereto, will constitute the legal, valid, binding and enforceable agreement of each Loan Party (subject, as to the enforcement of remedies, to applicable bankruptcy, reorganization, insolvency, moratorium or other laws affecting creditors' rights generally from time to time in effect and to general principles of equity and subject to the terms of the Final Order).  Subject to the Carve-Out, the Final Order will be effective to create in favor of the Secured Parties legal, valid, enforceable and fully perfected security interests in and Liens on the Collateral.

Section 3.05     Authorization of Stock of Guarantors.  With respect to those Guarantors which are corporations, all the outstanding shares of capital stock of each Guarantor have been duly and validly authorized and issued and are fully paid and nonassessable, and all outstanding shares of capital stock of the Guarantors are owned by the Borrower either directly or through other wholly owned Guarantors and on the Effective Date such ownership is free and clear of any perfected security interest or any other security interests, claims, liens or encumbrances except for Permitted Liens.

Section 3.06     Financial Information.

(a)     The forecasts of the Borrower and its Subsidiaries which have been furnished to the Administrative Agent prior to the Effective Date have been prepared in good faith on the basis of the assumptions stated therein, which assumptions were believed to be reasonable at the time of preparation of such forecasts, it being understood that actual results may vary from such forecasts and that such variations may be material.

(b)     The Loan Parties have disclosed any material assumptions with respect to the 13-Week Projection and the Operating Forecast and affirm that each of the 13-Week Projection and the Operating Forecast was prepared in good faith upon assumptions believed to be reasonable at the time of preparation.

(c)     Since December 31, 2010, there has been no event or circumstance that could, either individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 3.07     Action, Suit, etc.  Except as set forth on Schedule 3.07 hereto, no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Borrower or any of its Subsidiaries or its or their property is pending or, to the knowledge of the Loan Parties, threatened that could reasonably be expected to have a Material Adverse Effect.

Section 3.08     Properties.  Each of the Borrower and its Subsidiaries owns or leases (or licenses or has other legal right to use), in each case subject to Permitted Liens, all such properties as are used in the conduct of their respective operations as presently conducted, except where the failure to own or lease such properties could not reasonably be expected to have a Material Adverse Effect.

Section 3.09   No Violation.  Subject to the entry by the Bankruptcy Court of the Final Order and subject to the terms thereof, and except for the Effect of Bankruptcy (but only to the extent that the enforcement of any default, violation or other legal consequences arising out of or in connection with the Effect of Bankruptcy will be stayed by virtue of filing of the Cases), neither the Borrower nor any Subsidiary is in violation or default of (i) any provision of its charter (including any certificates of designation), by-laws or other organizational documents; (ii) the terms of any indenture, contract, lease, mortgage, deed of trust, note agreement, loan agreement or other agreement, obligation, condition, covenant or instrument entered into after the Petition Date or entered into prior to the Petition Date and assumed to which it is a party or bound or to which its property is subject, in each case, that is material to the Borrower and its Subsidiaries taken as a whole; or (iii) to the best of the Borrower's knowledge, any statute, law, rule, regulation, judgment, order or decree applicable to the Borrower or any of its Subsidiaries of any court, regulatory body, administrative agency, governmental body, arbitrator or other authority having jurisdiction over the Borrower or such Subsidiary or any of their properties, as applicable (including, without limitation, any order entered in the Cases), except in the case of clause (iii) for such violations or defaults which could not reasonably be expected to have a Material Adverse Effect.

Section 3.10   Stamp Taxes.  There are no stamp or other issuance or transfer taxes or duties or other similar fees or charges required to be paid in connection with the execution and delivery of this Agreement or the making of the Loans.

Section 3.11   Taxes.  Except to the extent the failure to do so is permitted by Chapter 11 of the Bankruptcy Code or pursuant to the Final Order and other than with respect to Fiscal Year 2009, each of the Loan Parties and each of their respective Subsidiaries have filed all material foreign, federal, state and local tax returns that are required to be filed or have requested extensions thereof and have paid all material taxes required to be paid by them and any other material assessment, fine or penalty levied against any of them, to the extent that any of the foregoing are due and payable.  Except as could not reasonably be expected to have a Material Adverse Effect, there are no current, pending or threatened audits, examinations or claims with respect to taxes of any Loan Party or any of their respective Subsidiaries.

Section 3.12   Labor.  No labor problem or dispute with the employees of the Borrower or any of its Subsidiaries exists or is threatened or imminent, and no Loan Party is aware of any existing or imminent labor disturbance by the employees of any of its or its Subsidiaries' principal suppliers, contractors or customers, that could have a Material Adverse Effect.

Section 3.13   Insurance.  The Borrower and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as are prudent and customary in the businesses in which they are engaged; all policies of insurance and fidelity or surety bonds insuring the Borrower or any of its Subsidiaries or their respective businesses, assets, employees, officers and directors are in full force and effect; the Borrower and its Subsidiaries are in compliance with the terms of such policies and instruments in all material respects; and there are no claims by the Borrower or any of its Subsidiaries under any such policy or instrument as to which any insurance company is denying liability or defending under a reservation of rights clause, where the failure of the Borrower or such Subsidiary to prevail on such claim would reasonably be expected to have a Material Adverse Effect; and neither the

36

Borrower nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect.

Section 3.14   Dividends or Distributions.  No Subsidiary of the Borrower is currently prohibited, directly or indirectly, from paying any dividends to the Borrower, from making any other distribution on such Subsidiary's capital stock, from repaying to the Borrower any loans or advances to such Subsidiary from the Borrower or from transferring any of such Subsidiary's property or assets to the Borrower or any other Subsidiary of the Borrower.

Section 3.15   Licenses.  The Borrower and its Subsidiaries possess all licenses, certificates, franchises, permits and other authorizations ("Licenses") issued by the appropriate federal, state, local or foreign regulatory authorities, necessary to own their respective properties and to conduct their respective businesses in all material respects, and neither the Borrower nor any such Subsidiary has received any notice of proceedings relating to the revocation or modification of any such License which, singly or in the aggregate, if the subject of an unfavorable decision, ruling or finding, would have a Material Adverse Effect; the Borrower and each of its Subsidiaries have fulfilled and performed in all material respects all of their respective obligations with respect to such Licenses and no event has occurred that allows, or after notice or lapse of time would allow, revocation or termination thereof or results in any other material impairment of the rights of the holders of any such License, except as individually or in the aggregate could not reasonably be expected to have a Material Adverse Effect; none of such Licenses contains any restriction that is materially burdensome to the Borrower or any of its Subsidiaries, taken as a whole.  There are no license renewal or rate or tariff proceedings existing, pending or, to the best knowledge of the Borrower, threatened that could reasonably be expected to have a Material Adverse Effect.

Section 3.16   Margin Regulations.  The Loans, the use of the proceeds thereof, this Agreement and the transactions contemplated hereby will not result in a violation of or be inconsistent with any provision of the regulations of the Board, including Regulations T, U and X.

Section 3.17   Internal Accounting Controls.  The Borrower and each of its Subsidiaries maintain a system of internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

Section 3.18   Environmental.

(a)     The Borrower and its Subsidiaries (i) are in compliance with any and all applicable federal, state, local and foreign laws and regulations relating to the protection of occupational health and safety, the environment or hazardous or toxic substances or wastes, pollutants or contaminants ("Environmental Laws"); (ii) have received and are in compliance

37

with all permits, licenses or other approvals required of them under applicable Environmental Laws to conduct their respective businesses; and (iii) have not received notice of any actual or potential liability for the investigation or remediation of any disposal or release of hazardous or toxic substances or wastes, pollutants or contaminants, except where such non-compliance with Environmental Laws, failure to receive required permits, licenses or other approvals, or liability would not, individually or in the aggregate, have a Material Adverse Effect; neither the Borrower nor any of its Subsidiaries has been named as a "potentially responsible party" under the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended.

(b)     The Borrower has reasonably concluded that the costs and liabilities associated with the effect of Environmental Laws on the business, operations and properties of the Borrower and its Subsidiaries (including, without limitation, any capital or operating expenditures required for clean-up, closure of properties or compliance with Environmental Laws, or any permit, license or approval under Environmental Laws, any related constraints on operating activities imposed by Environmental Laws and any potential liabilities to third parties under Environmental Laws) would not, singly or in the aggregate, have a Material Adverse Effect.

Section 3.19    Pension and Welfare Plans.  Each of the Borrower and its Subsidiaries has fulfilled its obligations, if any, under the minimum funding standards of Section 302 of the United States Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the regulations and published interpretations thereunder with respect to each Plan in which employees of the Borrower and its Subsidiaries are eligible to participate and each such Plan is in compliance in all respects with the presently applicable provisions of ERISA and such regulations and published interpretations; the Borrower and its Subsidiaries have not incurred any unpaid liability to the Pension Benefit Guaranty Corporation (other than for the payment of premiums in the ordinary course) or to any such plan under Title IV of ERISA.

Section 3.20    Intellectual Property.  The Borrower and its Subsidiaries own, possess, license or have other rights to use, on reasonable terms, all patents, patent applications, trade and service marks, trade and service mark registrations, trade names, copyrights, licenses, inventions, trade secrets, technology, know-how and other intellectual property necessary for and material to the conduct of the Borrower's business substantially as currently conducted (collectively, the "Intellectual Property").  (a) There are no conflicting rights of third parties with respect to any such Intellectual Property; (b) there is no material infringement by third parties of any such Intellectual Property; (c) there is no pending or, to the Borrower's knowledge, threatened action, suit, proceeding or claim by others challenging the Borrower's rights in or to any such Intellectual Property owned by the Borrower and its Subsidiaries; (d) there is no pending or, to the Borrower's knowledge, threatened action, suit, proceeding or claim by others challenging the validity or scope of any such Intellectual Property owned by the Borrower or its Subsidiaries; and (e) there is no pending or, to the Borrower's knowledge, threatened action, suit, proceeding or claim by others that the Borrower infringes or otherwise violates any patent, trademark, copyright, trade secret or other proprietary rights of others, which if determined adversely to the Borrower, individually or in the aggregate, would have a Material Adverse Effect.

Section 3.21    [Reserved].

Section 3.22   Disclosure.  As of the Effective Date, to the best of the Loan Parties' knowledge, no report, financial statement, certificate or other written information furnished by or on behalf of any Loan Party to the Administrative Agent, Collateral Agent, any Lender or the Bankruptcy Court in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or any other Loan Document (as modified or supplemented by other information so furnished)(collectively, the "Disclosure Documents") when taken as a whole contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading; *provided* that, with respect to projected financial information, the Loan Parties represent only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time of preparation, it being understood that such projections may vary from actual results and that such variances may be material. No representation or warranty of any Loan Party contained in any of the Disclosure Documents contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not materially misleading. There is no contingent liability known to any Loan Party that could reasonably be expected to have a Material Adverse Effect which has not been set forth in a footnote included in the financial statements referred to in Section 3.06 or any Schedule hereto.

Section 3.23   Use of Proceeds.  The Borrower shall use the proceeds of the Loans solely to pay administrative expenses in connection with the Cases, the fees and expenses due to the Agents and Lenders pursuant to the Loan Documents, expenses in connection with obtaining additional financing necessary to complete the Project and other approved expenses as set forth in the Final Order, the Operating Forecast and the most recently delivered 13-Week Projection and in compliance with this Agreement.  No proceeds of Loans may be used to make payments, directly or indirectly, to any equity holders or Affiliates of the Borrower or its Subsidiaries or any unsecured creditors of the Borrower and its Subsidiaries, in each case, without the consent of the Required Lenders.

Section 3.24   Anti-Terrorism Laws.

(a)   To the knowledge of the Loan Parties, no Loan Party or any of its Affiliates is in violation of any laws relating to terrorism or money laundering ("Anti-Terrorism Laws"), including Executive Order No. 13224 on Terrorist Financing, effective September 24, 2001 (the "Executive Order"), and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Public Law 107-56 (the "Act").

(b)   To the knowledge of the Loan Parties, no Loan Party or any of its Affiliates or their respective brokers or other agents acting or benefiting in any capacity in connection with the Loans is any of the following:

(1)   a Person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(2)   a Person or entity owned or controlled by, or acting for or on behalf of, any Person or entity that is listed in the annex to, or is otherwise subject to the provisions of, the Executive Order;

(3)      a Person or entity with which any Lender is prohibited from dealing or otherwise engaging in any transaction by any Anti-Terrorism Law;

(4)      a Person or entity that commits, threatens or conspires to commit or supports "terrorism" as defined in the Executive Order; or

(5)      a Person or entity that is named as a "specially designated national and blocked person" on the most current list published by the U.S. Treasury Department Office of Foreign Assets Control ("OFAC") at its official website or any replacement website or other replacement official publication of such list.

(c)      To the knowledge of the Loan Parties, no Loan Party or any of its brokers or other agents acting in any capacity in connection with the Loans (i) conducts any business or engages in making or receiving any contribution of funds, goods or services to or for the benefit of any Person described in clause (b) above, (ii) deals in, or otherwise engages in any transaction relating to, any property or interests in property blocked pursuant to the Executive Order, or (iii) engages in or conspires to engage in any transaction that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions set forth in any Anti-Terrorism Law.

Section 3.25      Parkside Building.

As of the Effective Date, there are 40 one-eighth deeded fractional interests in residences in the Parkside Building that remain unsold, 80 one-eighth deeded fractional interests in residences in the Mountainside Building that remain unsold and one penthouse unit in the Mountainside Building that remains unsold.  Such interests are not subject to any option, purchase agreement or other agreement, which provides for an agreement (contingent or non-contingent) with respect to the sale of such interests, other than options outstanding with respect to 4 one-eighth deeded fractional interests in residences in the Parkside Building pursuant to a contract previously disclosed to the Lenders (the "***Option Contract***").

Section 3.26     Administrative Priority; Lien Priority.

(a)     Subject to the Final Order, the Obligations of the Borrower under the Loan Documents will, at all times after the Effective Date, constitute allowed administrative expenses in the Cases, having priority in payment over all other administrative expenses and unsecured claims against the Borrower now existing or hereafter arising, of any kind or nature whatsoever, including without limitation all administrative expenses of the kind specified in, or arising or ordered under, Sections 105, 326, 328, 503(b), 506(c) (subject to entry of the Final Order), 507(a), 507(b), 546(c)(subject to entry of the Final Order), 726 and 1114 of the Bankruptcy Code, subject, as to priority, only, upon the occurrence and continuance of an Event of Default, the payment of the Carve-Out having priority of payment over the Obligations.

(b)     At any time after entry of the Final Order, the Lien and security interest of the Collateral Agent on the Collateral shall be a valid and perfected first priority Lien, subject only to the prior payment of the Carve-Out having priority of payment over the Obligations under the Loan Documents.

(c)     No order has been entered or is pending in any of the Cases (i) for the appointment of a Chapter 11 trustee, (ii) for the appointment of an examiner under Sections 1104(d) and 1106(b) of the Bankruptcy Code or (iii) to convert any of the Cases to a Chapter 7 case or Chapter 7 cases or to dismiss any of the Cases.

ARTICLE IV

CONDITIONS

Section 4.01     Conditions to Initial Credit Extensions.

The obligations of the Lenders to make Loans on the Effective Date are subject, at the time of the making of such Loans to satisfaction of the following conditions on or prior to the Effective Date; provided, that, such conditions shall have been met to the reasonable satisfaction of the Required Lenders or waived in writing by the Required Lenders:

(a)     The Administrative Agent (or its counsel) shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of this Agreement) that such party has signed a counterpart of this Agreement.

(b)     The Administrative Agent (or its counsel) shall have received from the Borrower a Note executed in favor of each Lender that has requested a Note more than three (3) Business Days prior to the Effective Date.

(c)     The Administrative Agent (or its counsel) shall have received from the Borrower and each other Loan Party the Security Agreement, duly executed by the Borrower and each Loan Party party thereto, together with evidence that all other actions, recordings and filings that the Required Lenders reasonably deem necessary in connection with the Security Agreement

have been taken or completed, including, without limitation, control agreements with respect to each Loan Party's deposit accounts and endorsements with respect to insurance policies naming the Collateral Agent as additional insured and loss payee.

(d)      The Administrative Agent shall have received from the Borrower a Closing Certificate dated as of the Effective Date and signed on behalf of the Borrower by a Borrower Financial Officer.

(e)      The Administrative Agent shall have received such documents and certificates as the Required Lenders or their counsel may reasonably request relating to the organization, existence and good standing of each Loan Party and the authorization of the transactions contemplated hereby, all in form and substance reasonably satisfactory to the Required Lenders and their counsel.

(f)      The Final Order, which shall be in form and substance satisfactory to the Required Lenders, shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Required Lenders, and if the Final Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by any Debtor of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

(g)      The Lenders shall have received a 13-Week Projection with respect to the 13 week period beginning on the Effective Date and an Operating Forecast in form and substance satisfactory to the Required Lenders.

(h)      The Borrower shall have paid to the Administrative Agent the then unpaid balance of all accrued and unpaid fees then due and payable under and pursuant to Section 2.16 and all expenses (to the extent invoices for such expenses have been provided at least three (3) Business Days prior to the Effective Date) required to be reimbursed pursuant to Section 11.05.

(i)      The Cases shall have been commenced in the Bankruptcy Court and all of the "first day orders" and all related pleadings shall be satisfactory in form and substance to the Required Lenders.

(j)      A motion shall have been filed with the Bankruptcy Court requesting authorization of the Loan Parties to use cash collateral, which motion shall be satisfactory to the Required Lenders.

(k)      The Administrative Agent shall have received all documentation and other information mutually agreed to be required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the United States PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

(l)      No trustee, receiver or examiner shall be in place with respect to the Loan Parties or their respective properties.

(m)     The Effective Date shall have occurred no later than five (5) days after the date on which the Final Order is entered by the Bankruptcy Court.

(n)     The Cases of all the Debtors shall have been consolidated by the Bankruptcy Court and no motions to dismiss any of the Cases shall be pending.

(o)     The Borrower shall have furnished to the Administrative Agent such further information, certificates and documents as the Administrative Agent or the Required Lenders may reasonably request.

Section 4.02   Conditions Precedent to All Credit Extensions.

The obligations of the Lenders to make any Loan (including any Loans made on the Effective Date) are subject to the satisfaction of the following conditions; provided, that, such conditions shall have been met to the reasonable satisfaction of the Required Lenders or waived in writing by the Required Lenders:

(a)     The representations and warranties of the Borrower and each other Loan Party contained in Article III or any other Loan Document shall be true and correct in all material respects on and as of the date of such Borrowing; *provided* that, to the extent that such representations and warranties specifically refer to an earlier date, they shall be true and correct in all material respects as of such earlier date; *provided*, *further*, that any representation and warranty that is qualified as to "materiality," "Material Adverse Effect," or similar language shall be true and correct in all respects on such respective dates.

(b)     No Default would exist or would result from such Borrowing or from the application of proceeds therefrom.

(c)     The Administrative Agent shall have received a Borrowing Request in accordance with the requirements hereof.

(d)     After giving effect to the applicable Borrowing, the total outstanding Loans will not exceed the maximum amount of Loans contemplated to be outstanding at such time as reflected in the most recently delivered 13-Week Projection and the Operating Forecast.

Each Borrowing Request submitted by the Borrower shall be deemed to be a representation and warranty that the conditions specified in paragraphs (a) through (d) of this Section have been satisfied on and as of the date of the applicable Borrowing.

ARTICLE V

LIMITATION ON CONSOLIDATION, MERGER AND SALE OF PROPERTY.

Section 5.01   Limitation on Consolidation, Merger and Sale of Property by the Borrower.

The Borrower shall not merge or consolidate with or into any other Person (other than a merger of a Subsidiary into the Borrower) or Dispose of all or substantially all its Property in any one transaction or series of transactions, other than pursuant to the Consolidation Motion.

43

Section 5.02    Limitation on Consolidation, Merger and Sale of Property by Subsidiaries of the Borrower.

The Borrower shall not permit any Subsidiary to merge or consolidate with or into any other Person or Dispose of all or substantially all its Property in any one transaction or series of transactions; provided that, notwithstanding the foregoing:

(a)    any Subsidiary may merge into any Borrower;

(b)    any Non-Debtor Subsidiary may merge into any other Non-Debtor Subsidiary;

(c)    any Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to any Borrower;

(d)    any Non-Debtor Subsidiary may Dispose of all or substantially all of its assets (upon voluntary liquidation or otherwise) to any Non-Debtor Subsidiary; and

(e)    any Subsidiary may merge into the Borrower or another Subsidiary pursuant to the Consolidation Motion.

ARTICLE VI

COVENANTS

So long as any Lender shall have any Commitment hereunder, or any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, each Loan Party shall and shall cause each of its Subsidiaries to:

Section 6.01    Financial Statements.

(a)    Deliver (i) as soon as available, but in any event within one hundred and twenty (120) days after the end of Fiscal Year 2010, an unaudited consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year, and the related unaudited consolidated statements of income and retained earnings and cash flows for such Fiscal and (ii) as soon as available, but in any event within one hundred and twenty (120) days after the end of each Fiscal Year of the Borrower, beginning with Fiscal Year 2011, an audited consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such Fiscal Year, and the related audited consolidated statements of income and retained earnings and of cash flows for such Fiscal Year, setting forth in each case in comparative form the figures for the previous Fiscal Year, which shall be reported on by an independent registered public accounting firm of nationally recognized standing to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the Borrower and its Subsidiaries on a consolidated basis in accordance with GAAP.

(b)    Deliver to the Administrative Agent (which the Administrative Agent shall promptly distribute to each Lender), as soon as available, but in any event within forty-five (45) days after the end of the first three fiscal quarters of each Fiscal Year, a consolidated balance

44

sheet of the Borrower and its Subsidiaries as at the end of such fiscal quarter, and the related consolidated statements of income and cash flows, each for such fiscal quarter and the portion of the Fiscal Year then ended, setting forth in each case in comparative form (i) the figures for the corresponding fiscal quarter of the previous Fiscal Year and (ii) the figures for the corresponding portion of the previous Fiscal Year, all certified (subject to normal quarterly and year-end adjustments) by a Borrower Financial Officer as fairly presenting in all material respects the financial condition, results of operations and cash flows of the Borrower and its Subsidiaries in accordance with GAAP, subject only to normal quarterly and year-end audit adjustments and the absence of footnotes.

(c)     Deliver to the Administrative Agent (which the Administrative Agent shall promptly distribute to each Lender), as soon as available, but in any event within thirty (30) days after the end of each month, (i) a consolidated balance sheet of the Borrower and its Subsidiaries as at the end of such month, and the related consolidated statements of income and cash flows, each for such month and the portion of the Fiscal Year then ended, setting forth in each case in comparative form (1) the figures from the Operating Forecast for such month, (2) the figures for the corresponding month of the previous Fiscal Year and (3) the figures for the corresponding portion of the previous Fiscal Year.

Section 6.02     Certificates and Other Information.

(a)     Deliver to the Administrative Agent for prompt further distribution to each Lender:

(1)     concurrently with the delivery of the financial statements required by Sections 6.01(a), (b) and (c), a duly completed Compliance Certificate signed by a Borrower Financial Officer;

(2)     [Reserved]

(3)     within five (5) days after the same are sent, copies of all financial statements and reports that the Borrower or any Subsidiary sends to the holders of any class of its debt securities or public equity securities and, within five (5) days after the same are filed, copies of all financial statements and reports that the Borrower or any Subsidiary may make to, or file with, the SEC (it being understood that nothing in this Section 6.02(a)(3) shall obligate the Borrower or any Subsidiary to make any filing with the SEC if it is not otherwise required to do so under the rules and regulations promulgated by the SEC);

(4)     promptly, such additional information regarding the business, legal, financial or corporate affairs of the Loan Parties or any of their respective Subsidiaries, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request in good faith;

(5)     (A) as soon as practicable in advance of filing with the Bankruptcy Court or delivering to any committee appointed in the Cases of the Debtors or to the United

States Trustee for the District of Colorado, as the case may be, all proposed orders and pleadings related to the Facility (which must be in form and substance reasonably satisfactory to the Required Lenders), any Reorganization Plan and/or any disclosure statement related thereto and (B) substantially simultaneously with the filing with the Bankruptcy Court or delivering to a committee appointed in the Cases of the Debtors or to the United States Trustee for the District of Colorado, as the case may be, all other notices, filings, motions, pleadings or other information concerning the financial condition of the Borrower or any of its Subsidiaries or other Debt of the Loan Parties that may be filed with the Bankruptcy Court or delivered to a committee appointed in the Cases or to the United States Trustee for the District of Colorado, in each case, to the extent not otherwise publicly available on the Bankruptcy Court's electronic docket.

(b)      [Reserved].

Section 6.03   Notices.  Promptly after an Officer of a Loan Party has obtained knowledge thereof, notify the Administrative Agent:

(a)      of the occurrence of any Default; and

(b)      of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect.

Each notice pursuant to this Section 6.03 shall be accompanied by a written statement of an Officer of the Borrower (x) that such notice is being delivered pursuant to Section 6.03(a) or (b) (as applicable) and (y) setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.

Section 6.04   13-Week Projections; Variance Reports; Operating Forecast.

(a)      On the Effective Date and on each one week anniversary of the Effective Date, furnish to the Administrative Agent, which the Administrative Agent shall promptly distribute to each Lender, (i) a new 13-Week Projection setting forth the projected sources and uses of cash on a weekly basis for the next 13 weeks, and (ii) a report by an Officer of the Borrower with respect to matters as the Administrative Agent or any Lender through the Administrative Agent may from time to time reasonably request in good faith.

(b)      [Reserved.]

(c)      On the second Business Day following the end of each Testing Period, furnish to the Administrative Agent, which the Administrative Agent shall promptly distribute to each Lender, a variance report in form and substance satisfactory to the Required Lenders (a "Variance Report") setting forth actual cash receipts and disbursements, in each case for the applicable Testing Period, setting forth all the variances, on a line-item basis, for such Testing Period from the amounts set forth for the corresponding period in the Operating Forecast; each such report shall include explanations for all material variances and shall be certified by a Borrower Financial Officer as being prepared in good faith and fairly presenting in all material respects the information set forth therein.

Section 6.05    Payment of Obligations.  In accordance with the Bankruptcy Code and subject to any required approval by an applicable order of the Bankruptcy Court, each Loan Party shall, and shall cause each of its Subsidiaries to, pay prior to delinquency all material taxes, assessments and governmental levies except as contested in good faith and by appropriate proceedings.

Section 6.06    Limitation on Debt.

Each Loan Party shall not, and shall not permit any Subsidiary to, incur, directly or indirectly, any Debt (including Acquired Debt) other than Permitted Debt.

Section 6.07    Limitation on Issuance or Sale of Capital Stock of Subsidiaries.  Each Loan Party shall not:

(a)    sell, pledge, hypothecate or otherwise dispose of any shares of Capital Stock of a Subsidiary; or

(b)    permit any Subsidiary to, directly or indirectly, issue or sell or otherwise dispose of any shares of its Capital Stock or the Capital Stock of another Subsidiary;

other than, in the case of either clause (a) or (b):

(1)    directors' qualifying shares;

(2)    to the Borrower or a Guarantor; or

(3)    a disposition of the Capital Stock of a Subsidiary; provided, however, that such disposition is effected in compliance with Section 6.10.

Section 6.08    Limitation on Restricted Payments .  Each Loan Party shall not make, and shall not permit any Subsidiary to make, directly or indirectly, any Restricted Payment, other than Restricted Payments to a Borrower without the consent of the Required Lenders.

Section 6.09    Limitation on Liens.  Each Loan Party shall not, and shall not permit any Subsidiary to, directly or indirectly, incur or suffer to exist any Lien (other than Permitted Liens) upon any of its Property, whether owned at the Effective Date or thereafter acquired, or any interest therein or any income or profits therefrom.

Section 6.10    Limitation on Asset Sales.

(a)    Each Loan Party shall not, and shall not permit any Subsidiary to, directly or indirectly, consummate any Asset Sale unless:

(1)    the Loan Party or such Subsidiary receives consideration at the time of such Asset Sale at least equal to the Fair Market Value of the Property subject to such Asset Sale (it being understood that any appraisal with respect to any Property shall not be conclusive evidence of the Fair Market Value thereof); and

47

(2)    at least 75% of the consideration paid to the Loan Party or such Subsidiary in connection with such Asset Sale is in the form of cash or cash equivalents (other than as set forth in clause (3) below) or the assumption by the purchaser of liabilities of the Loan Party or such Subsidiary (other than Subordinated Obligations) as a result of which the Loan Party or such Subsidiary is no longer obligated with respect to such liabilities.

(3)    Sale Expenses in connection with such Asset Sale shall not exceed 10% of the consideration received with respect to such Asset Sale.

(4)    the Borrower delivers an Officer's Certificate to the Administrative Agent certifying that such Asset Sale complies with the foregoing clauses (1) and (2).

(b)    The Net Available Cash (or any portion thereof) from Asset Sales shall be applied as set forth in Section 2.04(a).

(c)    Each Loan Party shall not, and shall not permit any Subsidiary to, directly or indirectly, consummate any Asset Sale if the aggregate amount of proceeds (net of costs associated with such disposition) from all Asset Sales consummated on or after the Effective Date shall exceed $100,000.

Section 6.11    Limitation on Transactions with Affiliates.

(a)    Each Loan Party shall not, and shall not permit any Subsidiary to, directly or indirectly, conduct any business or enter into or suffer to exist any transaction or series of transactions (including the purchase, sale, transfer, assignment, lease, conveyance or exchange of any Property or the rendering of any service) with, or for the benefit of, any Affiliate of the Borrower (an "Affiliate Transaction") without the consent of the Required Lenders.

Section 6.12    Prepayments, Etc. of Indebtedness.  Except as otherwise allowed pursuant to the Final Order and the "first day" orders entered by the Bankruptcy Court, each Loan Party shall not, and shall not permit any Subsidiary to:

(a)    prepay, redeem, purchase, defease or otherwise satisfy prior to the scheduled maturity thereof in any manner any Debt (other than ordinary course intercompany Debt otherwise permitted under Section 6.06) (such Debt, "Junior Financing") or make any payment in violation of any subordination terms of any Junior Financing Documentation; or

(b)    amend, modify or change, in any manner adverse to the interests of the Lenders, any term or condition of any Junior Financing Documentation without the consent of the Required Lenders.

Section 6.13    Compliance with Operating Forecast.  Not permit negative variance, in the case of cash inflows, and positive variance, in the case of cash outflows, in any line item as set forth in any Variance Report from the corresponding amount in the Operating Forecast to exceed, for each applicable Testing Period, 10% of the amount set forth in the Operating Forecast.

Section 6.14    Future Guarantors.  Subject to Bankruptcy Court approval, each Loan Party shall cause each Person that becomes a Domestic Subsidiary and each Subsidiary that becomes a

Debtor, in each case, following the Effective Date and any other entity that guarantees any Debt of a Loan Party or any of their Domestic Subsidiaries to execute and deliver to (x) the Administrative Agent a Guarantee Supplement pursuant to which such Subsidiary shall guarantee the payment and performance of the Borrower's obligations under the Loans and (y) to the Collateral Agent a supplement to the Security Agreement and any other documents required by the Security Agreement granting a security interest in all Property owned by it of the type constituting Collateral at the time such Person becomes a Domestic Subsidiary or Debtor or guarantees any such Debt.

Section 6.15    Limitation on Restrictions on Distributions from Subsidiaries.

(a)    Each Loan Party shall not, and shall not permit any Subsidiary to, directly or indirectly, create or otherwise cause or suffer to exist any consensual restriction on the right of any Subsidiary to:

(1)    pay dividends, in cash or otherwise, or make any other distributions on or in respect of its Capital Stock, or pay any Debt or other obligation owed, to the Borrower or any other Subsidiary;

(2)    make any loans or advances to the Borrower or any other Subsidiary; or

(3)    transfer any of its Property to the Borrower or any other Subsidiary.

(b)    The foregoing limitations will not apply:

(1)    with respect to clauses (1), (2) and (3) of clause (a), to restrictions in effect on the Effective Date and set forth on Schedule 6.15; and

(2)    with respect to clause (a)(3) only, to restrictions:

(A)    relating to Debt that is permitted to be incurred and secured pursuant to Section 6.06 and Section 6.09 that limit the right of the debtor to dispose of the Property securing such Debt;

(B)    encumbering Property at the time such Property was acquired by the Loan Party or any Subsidiary, so long as such restriction relates solely to the Property so acquired and was not created in connection with or in anticipation of such acquisition;

(C)    resulting from customary provisions restricting subletting or assignment of leases or customary provisions in other agreements that restrict assignment of such agreements or rights thereunder; or

(D)    customarily contained in asset sale agreements limiting the transfer of such Property pending the closing of such sale.

Section 6.16    Project Manager.  The Borrower shall engage a project manager to oversee the development, management, sales and marketing activities with respect to the Project on or prior

49

to the date that is 30 days after the Effective Date; *provided that*, such project manager and the terms of such engagement shall be satisfactory to the Required Lenders.

Section 6.17    Corporate Existence.  Subject to Article V hereof, each Loan Party shall do or cause to be done all things necessary to preserve and keep in full force and effect (i) its corporate existence, and (ii) the corporate, partnership or other existence of each Subsidiary, in accordance with the respective organizational documents (as the same may be amended from time to time) of each Subsidiary and the rights (charter and statutory), licenses and franchises of each Loan Party and its Subsidiaries; *provided*, *however*, that such Loan Party shall not be required to preserve any such right, license or franchise, or the corporate, partnership or other existence of any of its Subsidiaries, if the Board of Directors shall determine that the preservation thereof is no longer desirable in the conduct of the business of the Borrower and its Subsidiaries, taken as a whole, and that the loss thereof is not adverse in any material respect to the Lenders.

Section 6.18    Mountainside Building Construction.  The Borrower and its Subsidiaries shall (i) cause the construction of the Mountainside Building to be resumed, as determined in the reasonable judgment of the Required Lenders, and (ii) have engaged a contractor with respect to such construction with an approved maximum price, in each case, which is satisfactory to the Required Lenders, in the case of clause (i) and (ii) above, on or prior to August 31, 2011.

Section 6.19    Minimum Unit Sales.  The Borrower and its Subsidiaries may not sell fewer than (i) three (3) one-eighth deeded fractional interests in residences in the Parkside Building during the period from and including the Effective Date through August 31, 2011 and (ii) seven (7) one-eighth deeded fractional interests in residences in the Parkside Building during the period from and including the Effective Date through October 31, 2011, in each case, at prices no less than those described in Section 6.20; *provided* that, any interests sold pursuant to the Option Contract shall not be included for purposes of determining whether the Borrower and its Subsidiaries have complied with this Section 6.19.

Section 6.20    Minimum Unit Sale Prices.  Each Loan Party and its Subsidiaries shall not make any Unit Sale with respect to (i) the Project (other than with respect to any Unit Sale made pursuant to the Option Contract) at a price below that set forth on Schedule 6.20 and (ii) any interest pursuant to the Option Contract at a price below that set forth in the Option Contract, in each case, subject to the following conditions:

(a)    100% of the consideration is in the form of cash;

(b)    All sales will be in increments of one-eight deeded fractional interests in residences, other than with respect to the penthouse unit in the Mountainside Building (unless otherwise agreed to by each Lender);

(c)    Sale Expenses in connection with such Unit Sale shall not exceed the amounts set forth on Schedule 6.20;

(d)    the Net Available Cash from such Unit Sale shall be applied as set forth in Section 2.04(a).

Section 6.21   Hedging Obligations.  Each Loan Party shall not, and it shall not permit any of its Subsidiaries to, enter into any Hedging Obligations, other than Hedging Obligations that are non-speculative in nature in the ordinary course of business and consistent with past and industry practice.

Section 6.22   Maintenance of Properties.  Except if the failure to do so could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect, each Loan Party shall and shall cause each Subsidiary to maintain, preserve and protect all of their respective material properties and equipment necessary in the operation of its business in good working order, repair and condition, ordinary wear and tear excepted and casualty or condemnation excepted.

Section 6.23   Maintenance of Insurance.  The Borrower shall (i) maintain and cause to be maintained for each of its Subsidiaries insurance with responsible and reputable insurance companies or associations in such amounts and covering such risks as is usually carried by a business of the size and character of the Borrower and its Subsidiaries and, in any event, all insurance required by the Security Documents, and (ii) cause all insurance maintained with respect to any Collateral to name the Collateral Agent, for its benefit and for the benefit of the Secured Parties, as additional insured or loss payee, as appropriate.

Section 6.24   Accounting Practices; Fiscal Year.  Neither the Borrower nor any other Loan Party may make any change in (a) accounting policies or reporting practices, except as required by GAAP, or (b) fiscal year.

Section 6.25   Margin Regulations.  The Borrower shall use the proceeds of the Loans for the purposes described in Section 3.23 and shall not use the proceeds of the Loans for any purpose that would violate or be inconsistent with the regulations of the Board, including Regulations T, U and X.

Section 6.26   Chapter 11 Claims.  Subject to the Final Order, each Loan Party shall not, and shall not permit any Subsidiary to, incur, create, assume, suffer to exist or permit any other Superpriority Claim or Lien which is senior to or pari passu with, the Obligations hereunder, in each case except for (i) the Carve-Out and (ii) solely in the case of any Non-Debtor Subsidiary, pursuant to any Guarantee or Lien existing on the Petition Date.

Section 6.27   Use of Proceeds.  The Borrower shall, and shall only permit its Subsidiaries to, use the proceeds of the Loans only for the purposes set forth in Section 3.23 and in compliance with the Operating Forecast and the most recently delivered 13-Week Projection.

Section 6.28   Maintenance of Permits, etc..  Each Loan Party shall, and shall cause its Subsidiaries to, do or cause to be done all things necessary to preserve and keep in full force and effect all Licenses (including, without limitation, certificates of occupancy, construction permits and entitlements) necessary to own their respective properties and to conduct their respective businesses in all material respects.

Section 6.29   Compliance with Laws.  Except as otherwise excused by the Bankruptcy Code, comply in all material respects with the requirements of all laws and all orders, writs, injunctions

51

and decrees applicable to it or to its business or property, except to the extent the failure to comply therewith could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

Section 6.30    Books and Records.  Maintain proper books of record and account which reflect all material financial transactions and matters involving the assets and business of the Loan Parties or a Subsidiary, as the case may be.

Section 6.31    Inspection Rights.  Permit representatives, advisors and independent contractors of the Agents or the Required Lenders, to visit and inspect any of its properties (with overnight accommodations at such properties, if so requested), to examine its corporate, financial and operating records as is reasonably specified, and to make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, and independent public accountants, all at the reasonable expense of the Borrower and at such reasonable times during normal business hours, upon reasonable advance notice to the Borrower, and as often as may be reasonably desired at the expense of the Borrower.  The Agents and the Lenders shall give the Borrower the opportunity to participate in any discussions with the Borrower's independent public accountants.

Section 6.32    Further Assurances.

(a)    Promptly upon reasonable request by either Agent (i) correct any material defect or error that may be discovered in the execution, acknowledgment, filing or recordation of any Security Document or other document or instrument relating to any Collateral, and (ii) do, execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further acts, deeds, certificates, assurances and other instruments as either Agent may reasonably request in good faith from time to time in order to carry out more effectively the purposes of the Security Documents.  If the Administrative Agent, the Collateral Agent or the Required Lenders determine that they are required by applicable law to have appraisals prepared in respect of the real property of any Loan Party constituting Collateral, the Borrower shall provide to the Administrative Agent appraisals that satisfy the applicable requirements of the Real Estate Appraisal Reform Amendments of FIRREA and are otherwise in form and substance reasonably satisfactory to the Administrative Agent and the Collateral Agent.

(b)    The Borrower agrees promptly (and in any event within three (3) days of such change) to notify the Agents in writing of any change (i) in legal name of any Loan Party, (ii) in the identity or type of organization or corporate structure of any Loan Party, or (iii) in the jurisdiction of organization or organizational identification number of any Loan Party.

Section 6.33    ERISA.  Promptly after any Loan Party or any ERISA Affiliate knows or has reason to know of the occurrence of any of the following events that, individually or in the aggregate (including in the aggregate such events previously disclosed or exempt from disclosure hereunder, to the extent the liability therefor remains outstanding), could reasonably be expected to have a Material Adverse Effect, deliver to the Administrative Agent and each of the Lenders a certificate of a Borrower Financial Officer setting forth details as to such occurrence and the action, if any, that the Loan Party or such ERISA Affiliate is required or proposes to take, together with any notices (required, proposed or otherwise) given to or filed with or by the Loan

52

Party, such ERISA Affiliate, the PBGC, a Plan participant (other than notices relating to any individual participant's benefits) or the Plan administrator with respect thereto: that a Reportable Event has occurred; that an accumulated funding deficiency has been incurred or an application is to be made to the Secretary of the Treasury for a waiver or modification of the minimum funding standard (including any required installment payments) or an extension of any amortization period under Section 412 of the Code (or Section 430 of the Code as amended by the Pension Protection Act of 2006) with respect to a Plan; that a Plan having an Unfunded Current Liability has been or is to be terminated, reorganized, partitioned or declared insolvent under Title IV of ERISA (including the giving of written notice thereof); that a Plan has an Unfunded Current Liability that has or will result in a lien under ERISA or the Code; that proceedings will be or have been instituted to terminate a Plan having an Unfunded Current Liability (including the giving of written notice thereof); that a proceeding has been instituted against a Loan Party or an ERISA Affiliate pursuant to Section 515 of ERISA to collect a delinquent contribution to a Plan; that the PBGC has notified a Loan Party or any ERISA Affiliate of its intention to appoint a trustee to administer any Plan; that a Loan Party or any ERISA Affiliate has failed to make a required installment or other payment pursuant to Section 412 of the Code with respect to a Plan; or that a Loan Party or any ERISA Affiliate has incurred or will incur (or has been notified in writing that it will incur) any liability (including any contingent or secondary liability) to or on account of a Plan pursuant to Section 409, 502(i), 502(l), 515, 4062, 4063, 4064, 4069, 4201 or 4204 of ERISA or Section 4971 or 4975 of the Code.

Section 6.34   Change in Nature of Business; Organizational Documents.  Each Loan Party shall not, and shall not permit any Subsidiary to, engage in any material line of business substantially different from a line of business conducted on the Effective Date or in the case of any Loan Party, except as required by the Bankruptcy Code or otherwise approved by the Bankruptcy Court, make any material change to its Organization Documents.

ARTICLE VII

DEFAULTS AND REMEDIES

Section 7.01   Events of Default.  An "Event of Default" occurs if:

> (1)     there is a default in the payment of any interest on any Loan when the same becomes due and payable and the default continues for a period of three (3) Business Days;

> (2)     there is a default in the payment of any principal of, or premium, if any, on the Loans when the same becomes due and payable at its Stated Maturity, upon acceleration, optional prepayment, mandatory prepayment or otherwise;

> (3)     any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party under or in connection with a Loan Document shall prove to have been incorrect or misleading in any material respect when made or deemed made;

(4)     the Borrower or any Guarantor defaults in the observation or performance of its obligations under the provisions of Article V and Article VI hereof;

(5)     the Borrower or any Guarantor defaults in the observance or performance of any other covenant or agreement in this Agreement or the other Loan Documents (other than a failure that is the subject of the foregoing clauses (1), (2) or (3)) and such default or failure continues for five (5) days after the earlier of (i) the date the Borrower receives written notice thereof specifying the default from the Administrative Agent or Required Lenders and (ii) the actual knowledge of an Officer of the Borrower;

(6)     except to the extent resulting or arising from the Cases, there is (x) a default under any Debt or other liability of the Borrower or any Subsidiary, the effect of which default would be to cause, or permit the holder or holders of such Debt or other liability (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required (but after the expiration of all grace periods applicable thereto), such Debt or other liability to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay defease or redeem such Debt or other liability to be made, prior to its Stated Maturity, in each case, if the aggregate amount of such Debt or other liability is greater than $1.0 million or its foreign currency equivalent at the time, or (y) a failure to pay any Debt or other liability at maturity, in an aggregate amount greater than $1.0 million or its foreign currency equivalent at the time;

(7)     any judgment or judgments for the payment of money in an aggregate amount in excess of $1.0 million (or its foreign currency equivalent at the time) shall be rendered against the Borrower or any Subsidiary thereof and shall not be waived, satisfied or discharged for any period of 30 consecutive days during which a stay of enforcement of such judgment shall not be in effect;

(8)     an ERISA Event occurs which, together with all other ERISA Events that have occurred, has resulted or could reasonably be expected to result in a Material Adverse Effect;

(9)     any loss, suspension or revocation of, or failure to renew, any license or permit now held or hereafter acquired by any Loan Party or any of its Subsidiaries shall occur, if such loss, suspension, revocation or failure to renew in the aggregate could reasonably be expected to have a Material Adverse Effect;

(10)    any Non-Debtor Subsidiary pursuant to or within the meaning of any Bankruptcy Law:

(A)     commences a voluntary case;

(B)     consents to the entry of an order for relief against it in an involuntary case;

(C)     consents to the appointment of a Custodian of it or for all or substantially all of its property;

(D)     makes a general assignment for the benefit of its creditors; or

(E)     generally is not paying its debts as they become due;

(11)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(A)     is for relief against any Non-Debtor Subsidiary in an involuntary case;

(B)     appoints a Custodian of any Non-Debtor Subsidiary or for all or substantially all of the property of any Non-Debtor Subsidiary; or

(C)     orders the liquidation of any Non-Debtor Subsidiary;

and the order or decree remains unstayed and in effect for 30 days;

(12)     Loan Guarantees provided by DB Development or Guarantors that individually or together would constitute a Significant Subsidiary cease to be in full force and effect (other than in accordance with the terms of such Loan Guarantees) or any Guarantor denies or disaffirms its obligations under its Loan Guarantee;

(13)     so long as the Security Documents have not otherwise been terminated in accordance with their terms or the Collateral as a whole of the Borrower or any Guarantor has not otherwise been released from the Lien of the Security Documents in accordance with the terms thereof and the Final Order, (a) default by the Borrower or any such Guarantor in the performance of the Security Documents which adversely affects the enforceability, validity, perfection or priority of the Lien on the Collateral securing the Obligations under this Agreement and the Loans or which adversely affects the condition or value of the Collateral, in each case taken as a whole, in any material respect, (b) repudiation or disaffirmation by the Borrower or any of such Guarantors that individually or together would constitute a Significant Subsidiary of its obligations under the Security Documents or (c) the determination in a judicial proceeding that all or any material portion of the Security Documents, taken as a whole, are unenforceable or invalid, for any reason, against the Borrower or any of such Guarantors that individually or together would constitute a Significant Subsidiary;

(14)     There occurs or shall exist any Change of Control;

(15)     Any of the Cases of the Debtors shall be dismissed or converted to a case under Chapter 7 of the Bankruptcy Code or any Debtor shall file a motion or other pleading seeking the dismissal of any of the Cases of the Debtors under Section 1112 of the Bankruptcy Code or otherwise without the consent of the Required Lenders; a trustee under Chapter 7 or Chapter 11 of the Bankruptcy Code, a Custodian, a responsible officer or an examiner with enlarged powers relating to the operation of the business (powers

beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code shall be appointed in any of the Cases of the Debtors; the Board of Directors of any Loan Party shall authorize a liquidation of such Loan Party's business; or an application shall be filed by any Debtor for the approval of any other Superpriority Claim (other than the Carve-Out and other than as contemplated in the Final Order) in any of the Cases of the Debtors which is pari passu with or senior to the claims of the Administrative Agent and the Lenders against the Borrower or any other Debtor hereunder or under any of the other Loan Documents, or there shall arise or be granted any such pari passu or senior Superpriority Claim;

(16)   The Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to (i) permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of any of the Debtors which have a value in excess of $100,000 in the aggregate or (ii) permit other actions that would have a Material Adverse Effect;

(17)   (i) an order of the Bankruptcy Court shall be entered reversing, amending, supplementing, staying, vacating or otherwise amending, supplementing or modifying the Final Order, or the Borrower or any Subsidiary shall apply for authority to do so, without the prior written consent of the Required Lenders, (ii) the Final Order shall cease to create a valid and perfected Lien or to be in full force and effect or (iii) any of the Loan Parties or any Subsidiary shall fail to comply with the Final Order;

(18)   Except as permitted by the Final Order or as otherwise agreed to by the Required Lenders, any Debtor shall make any Pre-Petition Payment other than Pre-Petition Payments authorized by the Bankruptcy Court in accordance with orders of the Bankruptcy Court entered with the consent of (or non-objection by) the Required Lenders;

(19)   A plan shall be confirmed in any of the Cases of the Debtors that does not provide for termination of the Commitments and payment in full in cash of the Obligations under the Loan Documents (unless otherwise agreed to by each Lender) on the effective date of such plan of reorganization or liquidation or any order shall be entered which dismisses any of the Cases of the Debtors and which order does not provide for termination of the Commitments and payment in full in cash of the Obligations under the Loan Documents (unless otherwise agreed to by each Lender) or any of the Debtors shall seek support, or fail to contest in good faith the filing or confirmation of such a plan or the entry of such an order;

(20)   The Cases of the Debtors shall cease to be consolidated;

(21)   Any Loan Party or other Subsidiary shall take any action in support of any matter set forth in paragraphs (15) through (20) above or any other Person shall do so and the relief requested is granted in an order that is not stayed pending appeal; or

(22)     The Borrower or any Subsidiary shall file a motion, pleading or proceeding which could reasonably be expected to result in a material impairment of the rights or interests of the Lenders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment.

The term "Bankruptcy Law" means Title 11, U.S. Code or any similar Federal or state law for the relief of debtors.  The term "Custodian" means any receiver, trustee, assignee, liquidator or similar official under any Bankruptcy Law.

Section 7.02     Acceleration.  If an Event of Default occurs and is continuing, the Administrative Agent, by notice to the Borrower, or the Required Lenders, may, by written notice to the Borrower and the Administrative Agent, terminate the Commitments and declare to be immediately due and payable the entire principal amount of all the Loans then outstanding plus accrued but unpaid interest to the date of acceleration and such amounts shall become immediately due and payable.

Section 7.03     Other Remedies.  If an Event of Default occurs and is continuing, the Administrative Agent or the Required Lenders, may (i) pursue any available remedy by proceeding at law or in equity to collect the payment of principal of or premium, if any, and interest on the Loans or to enforce the performance of any provision of this Agreement, (ii) take any necessary action requested of it as Administrative Agent to settle, compromise, adjust or otherwise conclude any proceedings to which they are parties or (iii) instruct the Collateral Agent to exercise any available remedies under the Security Documents (including, without limitation, the Collateral Agent's rights and remedies under Section 5.7 of the Security Agreement), in each case, without further order of or application to the Bankruptcy Court, provided that, with respect to the enforcement of Liens or other remedies with respect to Collateral, the Administrative Agent shall provide the Borrower with five (5) Business Days' written notice prior to taking the contemplated action.

Section 7.04     Priorities.  After the exercise of remedies provided for in this Article VII, any amounts received on account of the Obligations under the Loan Documents shall be applied by the Administrative Agent in the following order (to the fullest extent permitted by mandatory provisions of applicable law) subject in all respect to the applicable provisions of the Final Order:

> FIRST:  to the Administrative Agent for amounts due and owing to the Agents hereunder, including, without limitation, fees and expenses of their agents, counsels and professional advisers;

> SECOND:  to Lenders for due and unpaid amounts of principal, premium, if any, and interest on the Loans, ratably, without preference or priority of any kind, according to the amounts due and payable on the Loans held by each Lender;

> THIRD:  to the Borrower or any other Person legally entitled thereto or as a court of competent jurisdiction may direct.

Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations under this Agreement or any other Loan Document, the Lenders shall, subject to the provisions of Article VII and the applicable provisions of the Final Order, be entitled to immediate payment of such Obligations, and to enforce the remedies provided for hereunder without further application to or order by the Bankruptcy Court.

ARTICLE VIII

THE AGENTS

Section 8.01    Appointment and Authority.  Each of the Lenders hereby irrevocably appoints Colbeck Capital Management, LLC  to act on its behalf as the Administrative Agent and Collateral Agent hereunder and under the other Loan Documents and authorizes the Agents to take such actions on its behalf and to exercise such powers as are delegated to the Agents by the terms hereof or thereof, together with such actions and powers as are reasonably incidental thereto.  Each Agent agrees that, subject to the limitations set forth in this Article VIII, it shall, if requested by any Lender with respect to any action that may be taken by Lenders under the Security Documents, provide to such Agent, as applicable, a report as to the amount of Loans held by Lenders requesting such action.  The provisions of this Article are solely for the benefit of the Agents and the Lenders, and neither the Borrower nor any other Loan Party shall have rights as a third party beneficiary of any of such provisions.

Section 8.02    Rights as a Lender.  The Person serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent and the term "Lender" or "Lenders" shall, unless otherwise expressly indicated or unless the context otherwise requires, include the Person serving as the Administrative Agent hereunder in its individual capacity. Such Person and its Affiliates may accept deposits from, lend money to, hold securities of, act as the financial advisor or in any other advisory capacity for and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if such Person were not the Administrative Agent hereunder and without any duty to account therefor to the Lenders.

Section 8.03    Exculpatory Provisions.  Neither Agent shall have any duties or obligations except those expressly set forth herein and in the Security Documents.  Without limiting the generality of the foregoing, the Agents:

(a)    shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing;

(b)    shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the Security Documents that such Agent is required to exercise as directed in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be expressly provided for herein or in the Security Documents), *provided* that neither Agent shall be required to take any action that, in its opinion or the opinion of its counsel, may expose such Agent to liability or that is contrary to any Security Document or applicable law; and

58

(c)      shall not, except as expressly set forth herein and in the Security Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Person serving as the Administrative Agent or any of its Affiliates in any capacity.

Without limiting the foregoing, neither Agent shall be required to act hereunder or to advance its own funds or otherwise incur any financial liability in the performance of its duties or the exercise of its rights hereunder and under any other agreements or documents to which it is a party, and shall in all cases be fully justified in failing or refusing to act hereunder unless it shall receive further assurances to its satisfaction from the Secured Parties (other than the Agents) of their indemnification obligations under and in accordance with the provisions of Section 11.05 against any and all liability and expense that may be incurred by it by reason of taking or continuing to take or refraining from taking any such action.  Each Agent shall be fully justified in requesting direction from the Required Lenders in the event this Agreement or any other Loan Document is silent or vague with respect to such Agent's duties, rights or obligations. Neither Agent shall be liable for any action taken or not taken by it (i) with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders and/or Holders as shall be necessary, or as such Agent shall believe in good faith shall be necessary, under the circumstances as provided in Section 11.08, Section 7.02 or Section 7.03) or (ii) in the absence of its own gross negligence or willful misconduct, as determined by a court of competent jurisdiction in a final and non-appealable decision.  Neither Agent shall be deemed to have knowledge of any Default unless and until notice describing such Default is given to such Agent by the Borrower or a Lender.

Neither Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any Security Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any Security Document, or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to such Agent.

Section 8.04    Reliance by Agents.  Each Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing (including any Officer's Certificate, electronic message, Internet or intranet website posting or other distribution) believed by it to be genuine and to have been signed, sent or otherwise authenticated by the proper Person.  Each Agent also may rely upon any statement made to it orally or by telephone and believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon.  In determining compliance with any condition hereunder to the making of a Loan that by its terms must be fulfilled to the satisfaction of a Lender, the Administrative Agent may presume that such condition is satisfactory to such Lender unless the Administrative Agent shall have received notice to the contrary from such Lender prior to the making of such Loan.  In determining compliance with any condition hereunder, the Administrative Agent shall be entitled to receive, and shall not incur

any liability for relying upon, an Officer's Certificate or an Opinion of Counsel or both certifying as to compliance with such condition. Each Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.

Section 8.05   <u>Delegation of Duties</u>.  Each Agent may perform any and all of its duties and exercise its rights and powers hereunder or under any Loan Document by or through any one or more sub-agents appointed by such Agent.  The Agents and any such sub-agent may perform any and all of its duties and exercise its rights and powers by or through their respective Related Parties.  The exculpatory provisions of this Article shall apply to any such sub-agent and to the Related Parties of the Agents and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent. Neither Agent shall be responsible for the negligence or misconduct of any agents or attorneys in fact selected by it with reasonable care.

Section 8.06   <u>Resignation and Replacement of Agent</u>.  Each Agent may at any time give thirty (30) days' prior written notice of its resignation to the Lenders and the Borrower, and any Lender may at any time upon written notice to the other Lenders, the Agents and the Borrower request the removal of an Agent.  Upon receipt of any such notice of resignation or removal, the Required Lenders shall have the right, in consultation with the Borrower, to appoint a successor. If no such successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation or the notice of removal is delivered, then the retiring or removed Administrative Agent may on behalf of the Lenders, appoint a successor Administrative Agent; *provided* that if the Administrative Agent shall notify the Borrower and the Lenders that no Person has accepted such appointment, then such resignation or removal shall nonetheless become effective in accordance with such notice and (1) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Loan Documents (except that in the case of any collateral security, if any, held by the Collateral Agent on behalf of the Lenders under this Agreement or any of the Security Documents, the retiring or removed Collateral Agent shall continue to hold such collateral security until such time as a successor Collateral Agent is appointed) and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to each Lender directly, until such time as the Required Lenders appoint a successor Administrative Agent as provided for above in this paragraph.  Upon the acceptance of a successor's appointment as Agent hereunder, such successor shall succeed to and become vested with all of the rights, powers, privileges and duties of the retiring (or retired) or removed Agent, and the retiring or removed Agent shall be discharged from all of its duties and obligations hereunder or under the other Loan Documents (if not already discharged therefrom as provided above in this paragraph).  After the retiring or removed Agent's resignation or removal hereunder and under the other Loan Documents, the provisions of this Article and Section 11.05 shall continue in effect for the benefit of such retiring or removed Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the retiring or removed Agent was acting as Agent.

Section 8.07    Non-Reliance on Administrative Agent and Other Lenders.  Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement.  Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender or any of their Related Parties and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any other Loan Document or any related agreement or any document furnished hereunder or thereunder.

Section 8.08    No Other Duties, etc.  Anything herein to the contrary notwithstanding, none of the agents listed on the cover page hereof shall have any powers, duties or responsibilities under this Agreement or any of the Security Documents, except in its capacity, as applicable, as the Administrative Agent or a Lender hereunder. For the avoidance of doubt, neither Agent shall be responsible for the perfection of any Lien or for the filing, form, content or renewal of any UCC financing statements, fixture filings, mortgages, deeds of trust and such other documents or instruments, provided that the Agents shall effect such filings and renewals as instructed by the Required Lenders in writing.

Section 8.09    Collateral Agent. Notwithstanding anything herein to the contrary, except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder or under any of the other Loan Documents, the Collateral Agent shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not the Collateral Agent is deemed to have knowledge of such matters, or as to taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral (including, without limitation, with respect to the validity, enforceability, perfection or priority of the Liens in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part hereunder or with respect to the filing of UCC continuation statements).  The Collateral Agent shall be deemed to have exercised appropriate and due care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which other collateral agents accord similar property.  Each Loan Party will furnish such information about the Collateral, the Loan Parties and any other information the Collateral Agent deems necessary to exercise any of the rights or powers vested in it by the Loan Documents as the Collateral Agent may reasonably request from time to time.

   In the event of any conflict between this Agreement and any other Loan Document (other than the Final Order) with respect to the rights, duties, powers and responsibilities of the Agents, the terms of this Agreement shall govern and control.

ARTICLE IX

LOAN GUARANTEE

Section 9.01    Loan Guarantee.  Subject to the provisions of this Article IX, each Guarantor hereby jointly and severally unconditionally guarantees to each Lender and to the Administrative Agent, on behalf of the Lenders, (i) the due and punctual payment of the principal of, premium,

if any, and interest on the Loans, when and as the same shall become due and payable, whether at maturity, by acceleration or otherwise, the due and punctual payment of interest on the overdue principal of, and premium, if any, and interest on the Loans, to the extent lawful, and the due and punctual performance of all other Obligations of the Borrower to the Lenders or the Administrative Agent all in accordance with the terms of this Agreement, and (ii) in the case of any extension of time of payment or renewal of the Loans or any of such other Obligations, that the same will be promptly paid in full when due or performed in accordance with the terms of the extension or renewal, at stated maturity, by acceleration or otherwise.  Each Guarantor hereby agrees that its obligations hereunder shall be absolute and unconditional, irrespective of, and shall be unaffected by, any invalidity, irregularity or unenforceability of any Loan or this Agreement, any failure to enforce the provisions of this Agreement, any waiver, modification or indulgence granted to the Borrower with respect thereto by the Lender holding such Loan or the Administrative Agent, or any other circumstances which may otherwise constitute a legal or equitable discharge of a surety or such Guarantor.

Each Guarantor hereby waives diligence, presentment, filing of claims with a court in the event of merger or bankruptcy of the Borrower, any right to require a proceeding first against the Borrower, protest or notice with respect to any such Loan and all demands whatsoever, and covenants that this Loan Guarantee will not be discharged as to any such Loan except by payment in full of the principal thereof, premium if any, and interest thereon.  Each Guarantor further agrees that, as between such Guarantor, on the one hand, and the Lenders and the Administrative Agent, on the other hand, (i) the maturity of the Obligations guaranteed hereby may be accelerated as provided in Article VII hereof for the purposes of this Loan Guarantee, notwithstanding any stay, injunction or other prohibition preventing such acceleration in respect of the Obligations guaranteed hereby, and (ii) in the event of any declaration of acceleration of such Obligations as provided in Article VII hereof, such Obligations (whether or not due and payable) shall forthwith become due and payable by each Guarantor for the purpose of this Loan Guarantee.  In addition, without limiting the foregoing provisions, upon the effectiveness of an acceleration under Article VII hereof, the Administrative Agent shall promptly make a demand for payment on all Obligations under the Loan Guarantee provided for in this Article IX and not discharged.

Section 9.02    Limitation of Loan Guarantee.  The obligations of each Guarantor pursuant to Section 9.01 are limited to the maximum amount as will, after giving effect to all other contingent and fixed liabilities of such Guarantor and after giving effect to any collections from or payments made by or on behalf of any other Guarantor in respect of the obligations of such other Guarantor under its Loan Guarantee or pursuant to its contribution obligations under this Agreement, result in the obligations of such Guarantor under the Loan Guarantee not constituting a fraudulent conveyance or fraudulent transfer under federal or state law.  Each Guarantor that makes a payment or distribution under a Loan Guarantee shall be entitled to a contribution from each other Guarantor and the Borrower in a pro rata amount based on the proportion that the net worth of the Borrower or the relevant Guarantor represents relative to the aggregate net worth of the Borrower and all of the Guarantors combined.

Section 9.03    Additional Guarantors.  Each Loan Party covenants and agrees that it will cause any Person which becomes obligated to guarantee the Loans, pursuant to the terms of Section

6.14, to execute a Guarantee Supplement pursuant to which such Guarantor shall guarantee the obligations of the Borrower under this Agreement and the Loans in accordance with this Article IX with the same effect and to the same extent as if such Person had been named herein as a Guarantor.

Section 9.04   Release of Guarantor.  A Guarantor shall be released from all of its obligations under its Guarantee if:

      (i)     the Borrower or such Guarantor has sold all or substantially all of the assets of such Guarantor in a transaction in compliance with Section 6.10;

      (ii)     a Loan Party has sold all of the Capital Stock of the Guarantor owned by them, in each case in a transaction in compliance with Article V or Section 6.10 hereof (as applicable); or

      (iii)     the Loans have been repaid in full and all obligations due and owing to the Administrative Agent and the Lenders at such time in respect of this Agreement and the Loans have been paid;

and in each such case, the Guarantor has delivered to the Administrative Agent an Officer's Certificate and an Opinion of Counsel, each stating that all conditions precedent herein provided for relating to such transactions have been complied with.

ARTICLE X

COLLATERAL

Section 10.01  Security Documents; Additional Collateral.

      (a)     Security Documents.  In order to secure the due and punctual payment of the principal of, premium, if any, and interest on and any other Obligations with respect to the Loans, in the case of the Borrower, and the Loan Guarantees, in the case of the Guarantors, when and as the same shall be due and payable, the Borrower, the Guarantors, the Collateral Agent and the other parties thereto have simultaneously with the execution of this Agreement entered into the Security Documents to create the security interests securing such obligations.

      (b)     Additional Collateral.  With respect to any property acquired after the Effective Date by any Loan Party that is intended to be subject to the Lien created by any of the Security Documents but is not so subject, such Loan Party shall promptly (and in any event within thirty (30) days after the acquisition thereof or such later time as the Required Lenders, acting reasonably and in good faith, agree to) (i) execute and deliver to the Administrative Agent and the Collateral Agent such amendments or supplements to the relevant Security Documents or such other documents as the Required Lenders shall reasonably deem necessary or advisable in good faith to grant to the Collateral Agent, for its benefit and for the benefit of the other Secured Parties or to the relevant Secured Parties directly, as applicable, a Lien on such property subject to no Liens other than Permitted Liens, and (ii) take all commercially reasonable actions necessary to cause such Lien to be duly perfected to the extent required by such Security

Document in accordance with all applicable law, including the filing of financing statements in such jurisdictions as may be reasonably requested in good faith by the Collateral Agent. The Borrower shall otherwise take such commercially reasonable actions and execute and/or deliver to the Collateral Agent such documents as the Collateral Agent shall reasonably require in good faith to confirm the validity, perfection and priority of the Lien of the Security Documents on such after-acquired properties.

(c)      Real Property. Each Loan Party shall grant to the Collateral Agent, as soon as practicable but in any event within sixty (60) days of the acquisition thereof or such longer period as the Required Lenders may determine, in their sole discretion, a mortgage on each parcel of real property owned in fee or otherwise with legal title or ground leased by such Loan Party as is acquired by such Loan Party after the Effective Date and that, together with any improvements thereon, individually has a fair market value of at least $100,000 as additional security for the Obligations hereunder. Such mortgages or instruments related thereto shall be duly recorded or filed in such manner and in such places as are required by law to establish, perfect, preserve and protect the Liens in favor of the Collateral Agent for its benefit and for the benefit of the other Secured Parties required to be granted pursuant to the mortgages and all taxes, fees and other charges payable in connection therewith shall be paid in full. Such Loan Party shall otherwise take such commercially reasonable actions and execute and/or deliver to the Collateral Agent such documents as the Required Lenders shall reasonably require in good faith to confirm the validity, perfection and priority of the Lien of any existing mortgage or new mortgage against such after-acquired real property (including, to the extent the Required Lenders determine in their reasonable good faith judgment that there is an issue of state law that should be addressed by a legal opinion, a local counsel opinion in form and substance reasonably satisfactory to the Required Lenders in respect of such mortgage).

Section 10.02  Releases of Collateral. The Borrower and the Guarantors shall be entitled to obtain (x) a full release of all of the Collateral from the Liens of the Security Documents securing the Loans and the Loan Guarantees upon payment in full of the Obligations hereunder and the termination of all Commitments (the "Termination") and (y) a full automatic release from the Liens of the Security Documents in respect of any item of Collateral that is the subject of a Disposition expressly permitted by the terms of the Loan Documents upon the consummation of such Disposition. Upon the release of any Guarantor from its obligations under this Agreement and its Loan Guarantee pursuant to Section 9.04 hereof, such Guarantor shall be entitled to obtain the release of all of its Collateral from the Liens of the Security Documents securing the Loan Guarantee of such Guarantor. Upon the Termination and upon receipt of an Officer's Certificate stating that all conditions precedent herein provided for relating to such release have been complied with, the Administrative Agent shall forthwith take all necessary action (at the written request of and the expense of the Borrower) to instruct the Collateral Agent to release the Liens securing the Obligations under this Agreement of the Loan Parties in accordance with this Section 10.02. The Administrative Agent and the Lenders also acknowledge that the Collateral may be released from the Liens of the Security Documents as provided by such Security Documents and hereby consent to any such release in compliance with the terms thereof. The Lenders hereby instruct the Administrative Agent and the Collateral Agent to perform in accordance with the foregoing and expressly authorize such Agents to take all necessary action in compliance with the foregoing.

Section 10.03  <u>Authorization of Receipt of Funds by the Administrative Agent Under the Security Agreement</u>.  The Administrative Agent is authorized to receive any funds for the benefit of Lenders distributed under the Security Documents to the Administrative Agent, to apply such funds as provided in this Agreement and to make further distributions of such funds in accordance with the provisions of Section 7.04 of this Agreement.

Section 10.04  <u>Powers Exercisable by Receiver or Collateral Agent</u>.  In case the Collateral shall be in the possession of a receiver or trustee, lawfully appointed, the powers conferred in this Article X upon the Borrower or any Guarantor, as applicable, with respect to the release, sale or other disposition of such Property may be exercised by such receiver or trustee, and an instrument signed by such receiver or trustee shall be deemed the equivalent of any similar instrument of the Borrower or any Guarantor, as applicable, or of any officer or officers thereof required by the provisions of this Article X.

ARTICLE XI

<u>MISCELLANEOUS</u>

Section 11.01  <u>Notices</u>.

(a)  Except as set forth in Section 11.17, notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by telecopy or electronic mail, as follows:

(1)  if to the Borrower or any Guarantor, to it at:

c/o Thomas DiVinere
70 River Bend Road
Snowmass, Colorado 81654

with a copy to:

Lewis, Brisbois, Bisgaard & Smith LLP
77 Water Street
Suite 2100
New York, NY 10005
Attention: Heidi Sorvino
Fax Number: 212-232-1399
E-mail: hsorvino@lbbslaw.com

(2)  if to the Administrative Agent:

Colbeck Capital Management, LLC
888 7th Avenue
New York, NY 10106
Attention: Jason Beckman
E-mail: jbeckman@colbeckllc.com

65

with a copy to:

> Akin Gump Strauss Hauer & Feld LLP
> One Bryant Park
> New York, New York 10036
> Attention: Ira S. Dizengoff
> Fax Number: 212-872-1002
> E-mail: idizengoff@akingump.com

(3)     if to a Lender, to it at its address (or telecopy number) set forth on its Administrative Questionnaire or in the Assignment and Assumption pursuant to which such Lender shall have become a party hereto.

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received; notices sent by facsimile shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in clause (b) below, shall be effective as provided in such clause (b).

(b)     Notices and other communications to the Lenders hereunder may be delivered or furnished by electronic communication (including e-mail and Internet or intranet websites) pursuant to procedures approved by the Administrative Agent, *provided* that the foregoing shall not apply to notices to any Lender pursuant to Article II if such Lender has notified the Administrative Agent that it is incapable of receiving notices under such Article by electronic communication.  The Administrative Agent or the Borrower may, in its discretion, agree to accept notices and other communications to it hereunder by electronic communications pursuant to procedures approved by it, *provided* that approval of such procedures may be limited to particular notices or communications.

Unless the Administrative Agent otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient, and (ii) notices or communications posted to an Internet or intranet website shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the website address therefor.

(c)     The Borrower shall forthwith on demand indemnify each Lender against any loss or liability which that Lender incurs (and that Lender shall not be liable to the Borrower in any respect) as a consequence of:

(i)      any Person to whom any notice or communication under or in connection with this Agreement is sent by the Borrower by telecopy failing to receive that notice or communication (unless directly caused by that Person's gross negligence or willful default); or

(ii)      any telecopy communication which reasonably appears to that Lender to have been sent by the Borrower having in fact been sent by a Person other than the Borrower.

Nothing in this Agreement or in any other Loan Document shall be construed to limit or affect the obligation of the Borrower or any other Person to serve upon the Agents and the Lenders in the manner prescribed by the Bankruptcy Code any pleading or notice required to be given to the Agents and the Lenders pursuant to the Bankruptcy Code.

Section 11.02   <u>Survival of Agreement</u>.  All covenants, agreements, representations and warranties made by the Loan Parties herein and in the certificates or other instruments prepared or delivered in connection with or pursuant to this Agreement or any other Loan Document shall be considered to have been relied upon by Lenders hereto and shall survive the making by the Lenders of the Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or Event of Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on any Loan or any fee or any other amount payable under this Agreement or any other Loan Document is outstanding and so long as the Commitments have not been terminated.  The provisions of Section 2.10, Section 2.11, Section 2.12, Section 11.05 and Section 11.16 and Article III shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans, the expiration or termination of the Commitments or the termination of this Agreement or any provision hereof.

Section 11.03   <u>Binding Effect</u>.  Subject to Article IV, this Agreement shall become effective when it shall have been executed by the Borrower and the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective permitted successors and assigns.

Section 11.04   <u>Successors and Assigns</u>.

(a)      The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby (including, except for the right to request Loans, any trustee succeeding to the rights of the Borrower or any Guarantor pursuant to Chapter 11 of the Bankruptcy Code or pursuant to any conversion to a case under Chapter 7 of the Bankruptcy Code) except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with the provisions of clause (b) of this Section 11.04, (ii) by way of participation in accordance with the provisions

of clause (d) of this Section 11.04 or (iii) by way of pledge or assignment of a security interest subject to the restrictions of clause (f) of this Section 11.04 (and any other attempted assignment or transfer by any party hereto shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in clause (d) of this Section 11.04 and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it); *provided* that any such assignment shall be subject to the following conditions:

(1)     Required Consents.  Assignments shall require the consent of the Administrative Agent (such consent not to be unreasonably withheld or delayed) for assignments to a Person who is not a Lender, an Affiliate of a Lender or an Approved Fund.

(2)     Assignment and Assumption.  The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, and the assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(3)     Restrictions on Assignees.  No such assignment shall be made to a natural person, the Borrower or any of the Borrower's Subsidiaries or Affiliates.

Subject to acceptance and recording thereof by the Administrative Agent pursuant to clause (c) of this Section 11.04, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Section 2.11 and Section 11.05 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph or clause (f) of this Section 11.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with clause (d) of this Section 11.04.

(c)     Register.  The Administrative Agent, acting solely for this purpose as an agent of the Borrower, shall maintain at one of its offices a  copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitments of, and principal amounts of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive,

and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(d)      Participations.  Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural person or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "Participant") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of its Commitment and/or the Loans owing to it); *provided* that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations and (iii) the Borrower, the Administrative Agent and the Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; *provided* that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in clauses (1) through (11) of Section 11.08(b) that affects such Participant.  Subject to clause (e) of this Section 11.04, the Borrower agrees that each Participant shall be entitled to the benefits of Section 2.11 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to clause (b) of this Section 11.04.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 11.06 as though it were a Lender.

(e)      Limitations upon Participant Rights.  A Participant shall not be entitled to receive any greater payment under Section 2.11 and Section 2.12 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent or such greater payment arises due to a Change in Law that occurs after such Person has become a Participant.

(f)      Certain Pledges.  Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; *provided* that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

(g)      The Borrower shall not assign or delegate any of its rights or duties hereunder without the prior written consent of the Administrative Agent and each Lender, and any attempted assignment without such consent shall be null and void.

Section 11.05  Expenses; Indemnity.

(a)      The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Collateral Agent, their respective Affiliates and the Lenders, in connection with the preparation, negotiation, execution, delivery and administration of this Agreement and the other Loan Documents or any amendments, modifications or waivers of the provisions hereof or thereof (including fees, charges and disbursements of Akin Gump Strauss Hauer & Feld LLP (whether or not the transactions contemplated hereby or thereby shall be consummated) and the fees, charges and disbursements of advisors or consultants reasonably required to monitor and evaluate the Project), (ii) all out-of-pocket expenses incurred by the Administrative Agent, Collateral Agent or any Lender (including the fees, charges and disbursements of any counsel and financial and other advisors for the Administrative Agent, Collateral Agent or any Lender) in connection with the enforcement or protection of its rights (A) in connection with this Agreement and the other Loan Documents, including its rights under this Section 11.05, or (B) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans, and (iii) all out-of-pocket costs and expenses related to the Final Order or the Cases incurred by the Administrative Agent, the Collateral Agent and any other Lender and, in each case, their respective Affiliates, including, without limitation, the on-going monitoring of the Cases, including attendance at hearings or other proceedings and the on-going review of documents filed with the Bankruptcy Court (including fees, charges and disbursements of Akin Gump Strauss Hauer & Feld LLP).

(b)      The Borrower shall indemnify the Agents (and any sub-agent thereof), each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Borrower or any other Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or Release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the Borrower or any other Loan Party, and regardless of whether any Indemnitee is a party thereto, *provided* that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses (x) are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee or (y) result from a claim brought by the Borrower or any other Loan Party against an Indemnitee for breach in bad faith of such Indemnitee's obligations hereunder or under any other Loan Document, if the Borrower or such Loan Party has obtained a final and nonappealable judgment in its favor on such claim as determined by a court of competent jurisdiction.

(c)     To the extent that the Borrower for any reason fails to indefeasibly pay any amount required under clause (a) or (b) of this Section 11.05 to be paid by it to the Agents (or any sub-agent thereof) or any Related Party of any of the foregoing, each Lender severally agrees to pay to such Agent (or any such sub-agent) or such Related Party, as the case may be, such Lender's pro rata share (based on the amount of Loans held by each Lender as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount, *provided* that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against such Agent (or any such sub-agent) in its capacity as such, or against any Related Party of any of the foregoing acting for such Agent (or any such sub-agent) in connection with such capacity.

(d)     To the fullest extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement, any other Loan Document or any agreement or instrument contemplated hereby, the transactions contemplated hereby or thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in clause (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems in connection with this Agreement or the other Loan Documents or the transactions contemplated hereby or thereby.

(e)     The provisions of this Section 11.05 shall remain operative and in full force and effect regardless of the expiration of the term of this Agreement, the consummation of the transactions contemplated hereby, the repayment of any of the Loans, the expiration of the Commitments, the invalidity or unenforceability of any term or provision of this Agreement or any other Loan Document, or any investigation made by or on behalf of the Administrative Agent or any Lender.  All amounts due under this Section 11.05 shall be payable on written demand therefor.

Section 11.06  <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, subject to the applicable requirements of the Final Order, each Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender to or for the credit or the account of the Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement and other Loan Documents held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement or such other Loan Document and although such obligations may be unmatured.  In connection with exercising its rights pursuant to the previous sentence, a Lender may at any time use any of the Borrower's credit balances with the Lender to purchase at the Lender's applicable spot rate of exchange any other currency or currencies which the Lender considers necessary to reduce or discharge any amount due by the Borrower to the Lender, and may apply that currency or those currencies in or towards payment of those amounts.  The rights of each Lender under this Section 11.06 are in addition to other rights and remedies (including other rights of setoff) which such Lender may

have.  Each Lender agrees promptly to notify the Borrower and the Administrative Agent after making any such setoff.

Section 11.07  <u>Applicable Law</u>.  THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS (OTHER THAN AS EXPRESSLY SET FORTH IN OTHER LOAN DOCUMENTS) SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, EXCEPT AS GOVERNED BY THE BANKRUPTCY CODE.

Section 11.08  <u>Amendments, Supplements and Waivers</u>.

(a)    <u>Without Consent of Lenders</u>.  The Borrower and the Guarantors and the Administrative Agent (and, in the case of the Security Documents, any other Person whose consent is required thereunder) may amend or supplement this Agreement or the Security Documents without notice to or consent of any Lender:

(1)    to cure any ambiguity, omission, defect or inconsistency;

(2)    to provide for additional Guarantees with respect to the Loans or release Guarantors from Loan Guarantees in accordance with Section 9.03 and 9.04, respectively;

(3)    to provide additional security for the Loans, add to the covenants of the Borrower for the benefit of the Lenders or surrender any right or power conferred upon the Borrower; or

(4)    to make any change that does not adversely affect the rights of any Lender.

The Administrative Agent is hereby authorized to join with the Borrower and the Guarantors in the execution of any amendment or supplement to this Agreement or to the Security Documents authorized or permitted by the terms of this Agreement or the Security Documents and to make any further appropriate agreements and stipulations which may be therein contained, but the Administrative Agent shall not be obligated to enter into any such amendment or supplement which adversely affects its own rights, duties or immunities under this Agreement.

(b)    <u>With Consent of Lenders</u>.  The Borrower, the Administrative Agent (and, in the case of the Security Documents, any other Person whose consent is required thereunder), the Guarantors and the Required Lenders may amend this Agreement or any other Loan Document and may waive any past default or compliance with any provisions; *provided* that without the consent of each Lender affected thereby, however, an amendment, supplement or waiver may not:

(1)    reduce the rate of or change the time for payment of interest on any Loan or amend the definition relating to interest in the Loans;

        (2)      reduce the principal or extend the Maturity Date of any Loan or increase the Commitment of any Lender;

        (3)      make any Loan payable in money other than Dollars;

        (4)      impair the right of any Lender to receive payment of principal of and interest on such Lender's Loans on or after the due dates therefor or to institute suit for the enforcement of any payment on or with respect to such Lender's Loans or any Loan Guarantee;

        (5)      release all or substantially all of the aggregate value of the Loan Guarantees or release all or substantially all of the Collateral;

        (6)      reduce the premium payable upon the prepayment of any Loan or change the time at which any Loan may be optionally prepaid;

        (7)      at any time after the Borrower is obligated to make a mandatory prepayment, change the time at which such mandatory prepayment must be made;

        (8)      make any change to the ranking of the Loans or this Agreement that would adversely affect the Lenders;

        (9)      make any change in any Loan Guarantee or Security Document that would adversely affect the Lenders;

        (10)    make any change to any provision of Section 11.05, Section 11.08 or the definition of "Required Lenders"; or

        (11)    alter the pro rata requirements of Section 2.09, Section 2.14 or Section 7.04 in a manner adverse to such Lender;

*provided further* that, no amendment, waiver or consent shall, unless in writing and signed by the Administrative Agent or Collateral Agent, as applicable, in addition to the Lenders required above, affect the rights or duties of, or any fees or other amounts payable to, the Administrative Agent or the Collateral Agent, as applicable, under this Agreement or any other Loan Document.

        (c)    <u>Revocation and Effect of Consents</u>.  Subject to the approval requirements of clause (b), after an amendment, supplement, waiver or other action becomes effective, it shall bind every Lender.  In the case of any amendment, supplement or waiver specified in clauses (1) through (11) of the first paragraph of clause (b) above, the amendment, supplement, waiver or other action shall bind each Lender who has consented to it and every subsequent Lender holding all or a portion of a Loan that evidences the same debt as the consenting Lender's Loan.

Section 11.09  <u>Interest Rate Limitation</u>.  Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to any Loan, together with all fees, charges and other amounts which are treated as interest on such Loan under applicable law (collectively the "<u>Charges</u>"), shall exceed the maximum lawful rate (the "<u>Maximum Rate</u>") which may be

contracted for, charged, taken, received or reserved by the Lender holding such Loan or participation in accordance with applicable law, the rate of interest payable in respect of such Loan or participation hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of such Loan or participation but were not payable as a result of the operation of this Section 11.09 shall be cumulated and the interest and Charges payable to such Lender in respect of other Loans or participations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by such Lender.

Section 11.10   Entire Agreement.  This Agreement and the other Loan Documents constitute the entire contract between the parties relative to the subject matter hereof.  Any previous agreement among the parties with respect to the subject matter hereof is superseded by this Agreement and the other Loan Documents.  Nothing in this Agreement or in the other Loan Documents, expressed or implied, is intended to confer upon any party other than the parties hereto and thereto any rights, remedies, obligations or liabilities under or by reason of this Agreement or the other Loan Documents.  Notwithstanding anything herein to the contrary, the terms and conditions hereunder shall be subject to the terms and conditions of the Final Order.

Section 11.11   WAIVER OF JURY TRIAL.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS.  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS, AS APPLICABLE, BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS Section 11.11.

Section 11.12   Severability.  In the event any one or more of the provisions contained in this Agreement or in any other Loan Document should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein and therein shall not in any way be affected or impaired thereby.  The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 11.13   Counterparts.

(a)      This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents, and any separate letter agreements with respect to fees payable to the Administrative Agent, constitute the entire contract among the parties relating to the subject matter hereof and

supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Subject to Article IV, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

(b)     The words "execution," "signed," "signature," and words of like import in any Assignment and Assumption shall be deemed to include electronic signatures or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 11.14  Headings.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and are not to affect the construction of, or to be taken into consideration in interpreting, this Agreement.

Section 11.15  Jurisdiction; Consent to Service of Process.

EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY:

(1)     SUBMITS FOR ITSELF AND ITS PROPERTY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS AGREEMENT AND THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR FOR RECOGNITION AND ENFORCEMENT OF ANY JUDGMENT IN RESPECT THEREOF, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF THE BANKRUPTCY COURT AND, IF THE BANKRUPTCY COURT DOES NOT HAVE (OR ABSTAINS FROM) JURISDICTION, TO THE NON-EXCLUSIVE GENERAL JURISDICTION OF ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION SITTING IN NEW YORK COUNTY, NEW YORK;

(2)     WAIVES ANY OBJECTION, INCLUDING ANY OBJECTION TO THE LAYING OF VENUE OR BASED ON THE GROUNDS OF *FORUM NON CONVENIENS*, WHICH IT MAY NOW OR HEREAFTER HAVE TO THE BRINGING OF ANY ACTION OR PROCEEDING IN SUCH JURISDICTION IN RESPECT OF ANY LOAN DOCUMENT OR OTHER DOCUMENT RELATED THERETO;

(3)     CONSENTS TO SERVICE OF PROCESS IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENTS IN THE MANNER PROVIDED FOR NOTICES (OTHER THAN TELECOPIER) IN SECTION 11.01; AND

(4)      AGREES THAT NOTHING HEREIN SHALL AFFECT THE RIGHT TO EFFECT SERVICE OF PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR SHALL LIMIT THE RIGHT TO SUE IN ANY OTHER JURISDICTION.

Section 11.16  Confidentiality.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its and its Affiliates' respective partners, directors, trustees, officers, employees, agents, advisors and other representatives (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority purporting to have jurisdiction over it (including any self-regulatory authority, such as the National Association of Insurance Commissioners), (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party hereto, (e) in connection with the exercise of any remedies hereunder or under any other Loan Document or any action or proceeding relating to this Agreement or any other Loan Document or the enforcement of rights hereunder or thereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section 11.16, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement or (ii) any actual or prospective counterparty (or its advisors) to any swap or derivative transaction relating to the Borrower and its obligations, (g) with the consent of the Borrower, or (h) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section 11.16 or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than the Borrower. Notwithstanding the foregoing, each Agent and each Lender may disclose to any and all Persons, without limitation of any kind, the tax treatment and tax structure of the financing contemplated by this Agreement or the Facility, and all materials of any kind (including opinions or other tax analyses) that are provided to any Agent or any Lender relating to such tax treatment and tax structure.  Each Agent and each Lender agrees that, upon receipt of a request or identification of the requirement for disclosure pursuant to subsections (b) or (c) of this Section 11.16, it will make reasonable efforts to keep the Borrower informed of such request or identification; provided that the Borrower acknowledges that each Agent and each Lender may make disclosure as required or requested by any Governmental Authority or representative thereof and that each Agent and each Lender may be subject to review by regulatory agencies and may be required to provide to, or otherwise make available for review by, the representatives of such parties or agencies any such non-public information.

For purposes of this Section 11.16, "Information" means all information marked "Confidential" and received from the Borrower or any of its Subsidiaries relating to the Borrower or any of its Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower or any of its Subsidiaries, provided that, in the case of information received from the Borrower or any of its Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section 11.16 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of

care (or greater) to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 11.17  <u>Website Communications</u>.

(a)      Each Loan Party hereby agrees that it will provide to the Administrative Agent all information, documents and other materials that it is obligated to furnish to the Administrative Agent pursuant to the Loan Documents, including, without limitation, all notices, requests, financial statements, financial and other reports, certificates and other information material, but excluding any such communication that (i) relates to a request for a new, or a conversion of an existing, Borrowing or other extension of credit (including any election of an interest rate or interest period relating thereto), (ii) relates to the payment of any principal or other amount due under this Agreement prior to the scheduled date therefore, (iii) provides notice of any Default or Event of Default under this Agreement or (iv) is required to be delivered to satisfy any condition precedent to the effectiveness of this Agreement and/or any borrowing or other extension of credit hereunder (all such non-excluded communications being referred to herein collectively as "<u>Communications</u>"), by transmitting the Communications in an electronic/soft medium in a format reasonably acceptable to the Administrative Agent.  In addition, each Loan Party agrees to continue to provide the Communications to the Administrative Agent in the manner specified in the Loan Documents but only to the extent requested by the Administrative Agent.

(b)      Each Loan Party further agrees that the Administrative Agent may make the Communications available to the Lenders by posting the Communications on Intralinks, Fixed Income Direct or a substantially similar electronic transmission systems (the "<u>Platform</u>").  Each Loan Party acknowledges that the distribution of material through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution.

(c)      THE PLATFORM IS PROVIDED "AS IS" AND "AS AVAILABLE".  THE AGENT PARTIES (AS DEFINED BELOW) DO NOT WARRANT THE ACCURACY OR COMPLETENESS OF THE COMMUNICATIONS, OR THE ADEQUACY OF THE PLATFORM AND EXPRESSLY DISCLAIM LIABILITY FOR ERRORS OR OMISSIONS IN THE COMMUNICATIONS.  NO WARRANTY OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NON-INFRINGEMENT OF THIRD-PARTY RIGHTS OR FREEDOM FROM VIRUSES OR OTHER CODE DEFECTS, IS MADE BY THE AGENT PARTIES IN CONNECTION WITH THE COMMUNICATIONS OR THE PLATFORM.  IN NO EVENT SHALL THE ADMINISTRATIVE AGENT OR ANY OF ITS AFFILIATES OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, ADVISORS OR REPRESENTATIVES (COLLECTIVELY, "<u>AGENT PARTIES</u>") HAVE ANY LIABILITY TO THE LOAN PARTIES, ANY LENDER OR ANY OTHER PERSON OR ENTITY FOR DAMAGES OF ANY KIND, INCLUDING, WITHOUT LIMITATION, DIRECT OR INDIRECT, SPECIAL, INCIDENTAL OR CONSEQUENTIAL DAMAGES, LOSSES OR EXPENSES (WHETHER IN TORT, CONTRACT OR OTHERWISE) ARISING OUT OF THE LOAN PARTIES' OR THE ADMINISTRATIVE AGENT'S TRANSMISSION OF COMMUNICATIONS THROUGH THE INTERNET, EXCEPT TO THE EXTENT THE

LIABILITY OF ANY AGENT PARTY IS FOUND IN A FINAL, NON-APPEALABLE JUDGMENT BY A COURT OF COMPETENT JURISDICTION TO HAVE RESULTED PRIMARILY FROM SUCH AGENT PARTY'S GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     The Administrative Agent agrees that the receipt of the Communications by the Agent shall constitute effective delivery of the Communications to the Administrative Agent for purposes of the Loan Documents.  Each Lender agrees that notice to it (as provided in the next sentence) specifying that the Communications have been posted to the Platform shall constitute effective delivery of the Communications to such Lender for purposes of the Loan Documents. Each Lender agrees (i) to notify the Administrative Agent in writing (including by electronic communication) from time to time of such Lender's e-mail address to which the foregoing notice may be sent by electronic transmission and (ii) that the foregoing notice may be sent to such e-mail address.

(e)     Nothing herein shall prejudice the right of the Administrative Agent or any Lender to give any notice or other communication pursuant to any Loan Document in any other manner specified in such Loan Document.

Section 11.18  Collateral Agent as Joint Creditor and Party-in-Interest.  Each of the Loan Parties and each of the Lenders agree that the Collateral Agent shall be the joint creditor (together with the relevant Lender) of each and every obligation of the Loan Parties towards each of the Lenders under or in connection with the Loan Documents, and that accordingly the Collateral Agent will have its own independent right to demand performance by the Loan Parties of those obligations.  However, any discharge of any such obligation to the Collateral Agent or the relevant Lender shall, to the same extent, discharge the corresponding obligation owing to the other. The Borrower hereby stipulates and agrees that each of the Collateral Agent and Administrative Agent is and shall remain a party in interest in the Cases and shall have the right to participate, object and be heard in any motion or proceeding in connection therewith.  Nothing in this Agreement or any other Loan Document shall be deemed to be a waiver of any of the Collateral Agent's or the Administrative Agent's rights or remedies under applicable law or documentation.  Without limitation of the foregoing, the Collateral Agent or the Administrative Agent shall have the right to make any motion or raise any objection it deems to be in its interest (specifically including but not limited to objections to use of proceeds of the Loans, to payment of professional fees and expenses or the amount thereof, to sales or other transactions outside the ordinary course of business or to assumption or rejection of any executory contract or lease), provided that the Collateral Agent and the Administrative Agent will not exercise such right if the action or inaction by the Borrower which is the subject of such motion or objection is expressly permitted by any covenant or provision of this Agreement.

Section 11.19  USA PATRIOT Act Notice.  Each Lender that is subject to the Act and the Administrative Agent (for itself and not on behalf of any Lender) hereby notifies Borrower that pursuant to the requirements of the Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name, address and tax identification number of the Borrower and other information regarding the Borrower that will allow such Lender or the Administrative Agent, as applicable, to identify the Borrower in accordance with

the Act.  This notice is given in accordance with the requirements of the Act and is effective as to
the Lenders and the Administrative Agent.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**DB CAPITAL HOLDINGS, LLC,**
as a Borrower

By: _____

Name: THOMAS M. DIVENERE

Title: MANAGER


**DANCING BEAR LAND, LLC,**
as a Borrower

By: _____

Name:

Title:


**GUARANTORS**:

**DANCING BEAR DEVELOPMENT, LP**

By: _____

Name:

Title:


**DANCING BEAR REALTY, LLC**

By: _____

Name:

Title:

**LCH, LLC**

By: _____

    Name:

    Title:

**COLBECK CAPITAL MANAGEMENT, LLC,**
as Administrative Agent and Collateral Agent

By:_____

Name:
Title:          Jason Colodne
                Managing Partner

**LENDERS:**

**COLBECK CAPITAL MANAGEMENT, LLC**

By: _____

Name: _____

Title: _____

Jason Colodne
Managing Partner

**BPC OPPORTUNITIES FUND LP**

By: BPC Opportunities Fund GP LP, its General Partner

By: BPC Opportunities Management LLC, its General Partner

By: Beach Point Advisors LLC, its sole member

By: _____

Name: Carl Goldsmith
Title: Managing Member

**Schedule 1.01**

**Commitments**

| Lender | Commitment |
|---|---|
| Colbeck Capital Management, LLC | $2,500,000 |
| BPC Opportunities Fund LP | $2,500,000 |

**Schedule 3.07**

**Actions, Suits, Etc.**

WestLB, AG v. DB Capital Holdings, LLC, et al., Case No. 10-CV-98 (Dist. Ct. of Pitkin County).

**Schedule 6.06**

**Debt Existing on Effective Date**

As disclosed in the schedules filed with the Bankruptcy Court in:

In re DB Capital Holdings, LLC, Case No. 10-25805-MER, Docket No. 100

In re Dancing Bear Land, LLC, Case No. 10-39584-MER, Docket No. 25

In re Dancing Bear Development, LP, Case No. 10-39493-MER, Docket No. 21

**Schedule 6.08**

**Investments Existing on Effective Date**

None.

**Schedule 6.09**

**Liens Existing on Effective Date**

None.

**Schedule 6.11**

**Affiliate Transactions**

None.

**Schedule 6.15**

**Limitation on Restrictions on Distributions from Subsidiaries**

None.

**Schedule 6.20**

**Minimum Sale Prices**

Parkside Building (Prices are for 1/8 fractional interests)

| | | |
|---|---|---|
| Interests 1-32: | Already Sold | |
| Interests 33-41 | $600,000 | per 1/8 interest |
| Interests 42-50 | $650,000 | per 1/8 interest |
| Interests 51-59 | $700,000 | per 1/8 interest |
| Interests 60-72 | $750,000 | per 1/8 interest |

Mountainside Building (Prices are for 1/8 fractional interests)

| | | |
|---|---|---|
| Interests 1-21: | $800,000 | per 1/8 interest |
| Interests 22-42 | $850,000 | per 1/8 interest |
| Interests 43-62 | $900,000 | per 1/8 interest |
| Interests 63-80 | $950,000 | per 1/8 interest |
| Penthouse | $15,000,000 | For entire penthouse |

Maximum Fees and Commissions

Parkside and Mountainside (other than penthouse) commissions/closing costs: 8.75%

Mountainside penthouse commissions/closing costs: 3.50%