UNITED STATES BANKRUPTCY COURT
DISTRICT OF COLORADO

_____
                                                    )
In re:                                              )
                                                    )       Case No. 10-25805-MER
DB CAPITAL HOLDINGS, LLC,                           )
                                                    )       Chapter: 11 (Involuntary Petition)
                              Debtor.               )
_____)

ASPEN HH VENTURES, LLC'S MOTION
FOR APPOINTMENT OF CHAPTER 11 TRUSTEE

        Aspen HH Ventures, LLC ("Aspen HH"), moves pursuant to 11 U.S.C. 1104(a)(1) and

(2), and Bankruptcy Rule 9014, for the appointment of a Chapter 11 Trustee.   In support of this

Motion, Aspen HH states as follows:

        A.      DiVenere's Lack of Authority to Act

        1.      Thomas DiVenere, through an entity he owns and controls, DB Management,

LLC, in its capacity as manager of the Debtor, has been proceeding unilaterally in this case,

purportedly on behalf of the Debtor.   Mr. DiVenere is not a member of the Debtor, does not own

or control the Debtor, and is not authorized to act in this proceeding without the consent of the

Debtor's members - Aspen HH and Dancing Bear Development, LLC ("DB Development"), an

entity in which DiVenere has a minority interest and which is also in bankruptcy.

        2.      As this Court is aware from the prior proceedings in this, and the earlier voluntary

Chapter 11 case filed by DiVenere on behalf of the Debtor, there is a dispute and deadlock

between the two members of the Debtor.   The manager of the Debtor, an entity owned and

controlled by DiVenere, previously attempted to commence a voluntary Chapter 11 case for the

Debtor without the knowledge and consent of all members of the Debtor in direct violation of the

Debtor's Operating Agreement.   On June 21, 2010, this Court dismissed the voluntary case

finding that DiVenere, as manager, lacked authority to file the voluntary petition without authorization from the Debtor's members.   This Court's decision to dismiss the voluntary case was subsequently affirmed by the United States Bankruptcy Appellate Panel for the Tenth Circuit ("BAP").

3.      In affirming this Court's order dismissing the voluntary case, the BAP expressly found that the May 2007 Amendment to the Debtor's Operating Agreement "requires the manager to '*conduct and operate its business as presently conducted.*'"   BAP Opinion at 7 (emphasis in original).   As the BAP noted, the filing of a Chapter 11 petition "with the attendant (and oftentimes expensive and time-consuming) statutory duties placed on debtors-in-possession, and thus their management, essentially makes it impossible to conduct and operate a business as it is being conducted before the filing of the petition."   BAP Opinion at 7.

4.      Moreover, as the BAP expressly found, under the terms of Section 6.4 of the Debtor's Operating Agreement, the authority of the manager to act without the consent of the Debtor's members is limited to acts undertaken by the manager "in the ordinary business of the Company."   As the BAP correctly found, the "filing of a bankruptcy petition 'constitutes an act preventing the carrying on of the ordinary business of the debtor.'"   BAP Opinion at 11, quoting this Court's ruling on the motion to dismiss the voluntary case.

5.      As this Court and the BAP have held, the filing of this involuntary case prevents the carrying on of the ordinary business of the Debtor.   Under these circumstances, DiVenere, as the Debtor's manager, has no authority to take action with respect to the continued operation of the Debtor without first seeking the consent of the Debtor's members which own and control the

Debtor.   DiVenere has made no attempt to do that and, in fact, has chosen to ignore Aspen HH.[1]

Regardless of who may be right or wrong, there are now irreconcilable differences between the

parties which make it impossible for DiVenere to continue in his role as the Debtor's manager.

6.      This case presents a unique circumstance.   There is currently no one authorized

to act on behalf of the Debtor in the Chapter 11 proceeding.   Pursuant to the Operating

Agreement, which governs the parties' relationships, the manager of the Debtor is authorized to

act only in the ordinary course of the Debtor's business.   As this Court and the BAP have

previously ruled, once the Debtor is subjected to a bankruptcy proceeding, it is no longer

functioning in the ordinary course, and the manager's authority to act, without the members'

consent, is lost.   Under these circumstances, without the members' consent, the manager cannot

act on behalf of the Debtor and, absent agreement between the members, it is imperative that

someone be appointed to fill the manager's role.

7.      Aspen HH acknowledges that under normal circumstances, where an operating

business voluntarily seeks chapter 11 protection in order to reorganize its affairs, the current

management, which is most familiar with the business, should be afforded the opportunity to

reorganize.   But this is not a normal circumstance.   The Debtor did not seek chapter 11

protection.   This is an involuntary proceeding.   The Debtor has no operating business.   It has

---

[1]   On December 13, 2010, counsel for Aspen HH telephoned DiVenere's counsel, Heidi
Sorvino, to discuss a proposal which would have authorized DiVenere to remain as manager.
Ms. Sorvino said she would discuss Aspen HH's proposal with her client and respond.   On
December 17, 2010, after Ms. Sorvino did not respond, counsel for Aspen HH telephoned her
again to discuss the proposal.   Ms. Sorvino apparently misunderstood Aspen HH's prior
proposal, and, after it was explained to her again, she said she would discuss it with her client
and respond.   She did not respond. On December 21, 2010, counsel for Aspen HH sent Ms.
Sorvino an e-mail, attached hereto as Exhibit B, asking when counsel might expect to hear from
her regarding Aspen HH's proposal.   Ms. Sorvino never responded.   More recently, counsel for
Aspen HH sent via e-mail to DiVenere's counsel, Robert Padjen, a proposal for an alternative

not engaged in any development or sales activity for almost two years.

8.     Moreover, under these circumstances, appointing a chapter 11 trustee in this case will not prejudice but will benefit the Debtor, its creditors and equity security holders.   Both DiVenere, representing DB Development (the Class B member of the Debtor), and Aspen HH, (the Class A member), have proposals to reorganize the Debtor.   Appointing a chapter 11 trustee, who can consider both proposals, and make a determination as to which, if either, makes the most sense for the Debtor, its creditors and equity holders, will benefit all stakeholders.   The Debtor is in desperate need of an independent third-party to evaluate its current affairs, and make rational and disinterested decisions which will favor neither member nor any group of creditors or other interested parties.   A chapter 11 trustee will ideally serve that role.

9.     Under these circumstances, because the Debtor's manager lacks authority to act in these proceedings without the consent of the Debtor's members, and the members are hopelessly deadlocked, a chapter 11 trustee should be appointed to represent the Debtor pursuant to 11 U.S.C. 1104(a)(1) and/or 11 U.S.C. 1104(a)(2).

**B.     DiVenere's Lack of Forthrightness and Conflicts of Interest**

10.     There are other considerations which make the appointment of a chapter 11 trustee appropriate in this case.

11.     As the Court is aware, on May 26, 2010, DiVenere filed a personal chapter 11 petition in the United States Bankruptcy Court for the Middle District of Florida, Case No. 3:10-bk-04524-PMG.   As detailed in the "Declaration of Sally S. Neeley in Support of Motion for Order Excusing Receiver from Compliance with 11 U.S.C. § 543," filed in *In re Dancing Bear Land, LLC*, Case: 10-39584-MER, Doc#18-35 ("Neeley Declaration") and incorporated

---

management structure.   The proposal was summarily rejected.

herein, DiVenere has not been forthright in connection with his personal bankruptcy.   DiVenere
failed to disclose in his Original Schedules, among other things, a bank account holding
approximately $150,000.   Neeley Declaration at ¶5.   In fact, in his Original Schedules, which
DiVenere filed on June 26, 2010, DiVenere stated under oath that he had "no cash on hand" and
no "checking, savings or other financial accounts, certificates of deposit, or share in bank,
savings and loan, thrift, building and loan, and homestead associations, or credit unions,
brokerage houses or cooperatives." *Id.* at Exhibit F.   Indeed, DiVenere did not reveal the
existence of his $150,000 personal bank account until he was questioned about it by Ms. Neeley
at the initial 341(a) meeting on July 7, 2010.   *Id.* at ¶5.

12.   Divenere also did not disclose, until questioned at the initial 341(a) meeting, that
he owned furniture and other fixtures at homes he maintains in Snowmass, Basalt and
Jacksonville. *Id.* at ¶6. He also has failed to disclose his 50% individual ownership interest in DB
Bistro, LLC, a Colorado limited liability company which operates the Brexi restaurant in the
Dancing Bear condominium building in Aspen. *See* Aspen HH's Adversary Complaint filed in
DiVenere's personal bankruptcy case, Case No. 3:10-ap-00457-PMG, Doc#1.

13.   The Neeley Declaration also details other instances in which DiVenere either
failed to disclose, or failed to properly disclose assets, or otherwise disregarded or failed to
comply with the requirements of the Bankruptcy Code. *Id.* at ¶ ¶5-9.

14.   When considering whether the appointment of a chapter 11 trustee is in the
interests of the creditors, equity security holders and other interested parties, DiVenere's lack of
candor and disregard for statutory requirements in his own personal chapter 11 case are relevant
considerations.   In a chapter 11 proceeding a debtor-in-possession has special duties and

5

obligations and serves as a fiduciary.[2]   In such circumstances, the debtor-in-possession needs to

be completely forthright and comply with the disclosure and other statutory requirement imposed

under chapter 11.   Evidence that the debtor-in-possession has not acted in such a manner in

other chapter 11 proceedings in which he is involved should be of substantial concern to the

Court and other affected parties, and mitigate in favor of the appointment of a chapter 11 trustee.

15.      Another factor which the Court should consider is the potential conflicts of

interests which exist as a result of DiVenere's close personal relationship with the estate's two

largest creditors, William Dennis and Fred Funk, and his own claim as an unsecured creditor.

Dennis and Funk have scheduled claims of $782,808 and $708,500 respectively.   DiVenere has

scheduled claims in the name of his management entity, DB Management, totaling $625,505.

Doc#100, Pages 16 and 17 of 20.

16.      As the Court will recall, in connection with the motion to dismiss this involuntary

case, Aspen HH challenged the bona fides of William Dennis' claim.   In rejecting Aspen HH's

challenge the Court held:

> While Aspen HH contends the amount of the Dennis loan was $300,000, not
>
> $500,000, Jean Coulter, the agent of Westin Capital Corporation (the state court
>
> receiver) testified that the books and records of the Debtor reflect a $500,000
>
> loan. She also stated that in December 2009, $200,000 was received from
>
> DiVenere Holdings, with the request to record the funds as part of the Dennis
>
> note.   She testified that the receiver possesses an unsigned copy of a $300,000

---

[2]   As one court explained, the willingness of Congress to leave a debtor-in-possession is
premised on an expectation that current management can be depended upon to carry out the
fiduciary responsibilities of a trustee. These obligations include "[o]pen, honest and
straightforward disclosure to the Court and creditors." *See V. Savino Oil, & Heating Co., Inc.*, 99
B.R. 518, 526 (Bankr.E.D.N.Y. 1989).

6

deed of trust, which was ultimately recorded.   However, no copy of such a
document was introduced into evidence.   Accordingly, the evidence of the
testimony and documents establishes a prima facie case of a $500,000 debt owed
by the Debtor to Dennis, not subject to a bona fide dispute as to liability or
amount.   In the absence of additional documentation, the mere assertion by
Aspen HH or the receiver that the debt was $300,000 does not rebut the prima
facie showing.   Therefore, the Dennis claim is adequate for purposes of § 303(b).

Doc# 90, Page 6 of 12.

17.     Although not introduced in evidence during the hearing on the motion to dismiss,
Aspen HH has secured a copy of the recorded Deed of Trust which was given to Dennis by
DiVenere in connection with his loan to the Debtor.   The stated amount of the Deed of Trust is
$300,000, not $500,000 as claimed by Dennis.   A copy of the recorded Deed of Trust is attached
hereto as Exhibit A.   Aspen HH submits the Dennis Deed of Trust not to revisit the issues
addressed in the motion to dismiss, but to demonstrate that there is a good faith basis for an
independent disinterested representative of the Debtor to inquire further into the bona fides of the
Dennis claim.   Is Dennis owed $300,000 as reflected in the Deed in Trust, by his check to the
Debtor for that amount, and as reflected in the involuntary petition signed by Dennis under oath
and filed in this case? Or did Dennis actually give DiVenere an additional $200,000 in cash and
is therefore owed $500,000 as the Debtor's note signed by DiVenere reflects?

18.     Similarly, although Funk withdrew as a petitioning creditor prior to the hearing on
the motion to dismiss, this Court considered, in the context of whether the involuntary petition
was filed bad faith, the evidence that Funk's claim was not for services rendered, but for

7

disguised interest payments on his capital investment which were made in violation of Aspen HH's rights under the Debtor's Operating Agreement.   With respect to Funk's claim the Court stated ". . . the transactions appear confused, at best, and perhaps voidable, at worst . . ."   Doc # 90, Page 11 of 12.

19.     It is unclear exactly what DiVenere's claims are for, or whether they are valid or subject to offset.   One claim, for $225,505, is listed as "Advances," but are these the same funds which Coulter and DiVenere testified were included in the Dennis note?   There was also evidence introduced during the hearing on the motion to dismiss indicating that DiVenere used the Debtor's funds to purchase real estate held in his name, and to pay personal expenses.   If such conduct occurred, DiVenere's legitimate claims as an unsecured creditor would be subject to offset for any amounts improperly diverted.

20.     Collectively, the Dennis, Funk and DiVenere claims total $2,116,813, and represent 60% of the total unsecured claims listed in the Debtor's schedules.   If one eliminates the $500,000 "contingent" claim listed for Cappello Capital Corp., the Dennis, Funk and DiVenere claims represent approximately 70% of the total listed unsecured claims.   If all or a substantial portion of these claims were eliminated or reduced, the prospect for the other unsecured creditors and equity security holders to realize a recovery, or a more substantial recovery, would be significantly enhanced.

21.     Is it likely that DiVenere is going to actively and aggressively investigate and challenge the bona fides of his own claims and the claims of his close personal friends Dennis and Funk?   Considering the size of the Dennis, Funk and DiVenere claims, would it not be in the interests of the other creditors, the other equity security holder, and any other interested

parties to have a truly disinterested independent third-party handle the affairs of this estate?

### C.     Legal Standard

22.     Section 1104(a)(1) of the Bankruptcy Code provides that the court "shall" order the appointment of a trustee upon a finding of "cause." Once a court finds that "cause" exists, the court has no discretion and must order the appointment of a trustee.   *In re Oklahoma Refining Company*, 838 F.2d 1133, 1136 (10th Cir. 1988).[3]

23.     Section 1104(a)(1) lists four bases upon which "cause" may be found: fraud, dishonesty, incompetence, and gross mismanagement. These are not the exclusive grounds for finding cause for the appointment of a trustee.   Section 1104(a)(1) expressly provides that the appointment of a trustee shall be ordered "for cause, *including* fraud, dishonesty, incompetence, and gross mismanagement of the debtor by current management . . . " (emphasis added)   Under Section 102(3) of the Bankruptcy Code, the terms "includes" and "including" as used in the Bankruptcy Code are not limiting.   Thus, as the Tenth Circuit explained in *Oklahoma Refining* "[i]t is clear from both the language of the statute and established case law, that the court need not find any of the enumerated wrongs in order to find cause for the appointment of a trustee." 838 F.2d at 1136.   Indeed courts in this jurisdiction and others have recognized that appointment

---

[3]   Section 1104(a)(1) of the Bankruptcy Code provides in pertinent part:

> (a)     At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the court shall order the appointment of a trustee-

> (1)     for cause, including fraud, dishonesty, incompetence, or gross mismanagement of the affairs of the debtor by current management, either before or after the commencement of the case, or similar cause, but not including the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor;

of a trustee "for cause" under Section 1104(a)(1) may be warranted even where there is no showing of any of the enumerated factors under that Section.   For instance, in *Matter of Tahkenitch Tree Farm Partnership*,156 B.R. 525, 527- 528 (Bkrtcy.E.D.La.1993), the court appointed a trustee "for cause" on the basis that, similar to this case, there was a conflict between two general partners of the debtor partnership, one of which was acting as the agent of the debtor.   In *In re Bellevue Place Associates*,171 B.R. 615, 624 (Bkrtcy.N.D.Ill. 1994), the court held that although none of the enumerated factors under Section 1104(a)(1) had been established, "cause" under Section 1104(a)(1) existed because the debtor-in-possession (which was effectively controlled by one creditor) could not satisfy its fiduciary duties to all creditors.

24.     There is "cause" for the appointment of a trustee in this case.   There is no current management authorized to represent the Debtor in this proceeding and no one who may competently decide how the Debtor should proceed.   As this Court and the BAP found, under the terms of Section 6.4 of the Debtor's Operating Agreement, the authority of the manager to act without the consent of the Debtor's members is limited to acts undertaken by the manager "in the ordinary business of the Company."   The filing of a bankruptcy petition, which places the Debtor under the auspices of the bankruptcy court "with the attendant (and oftentimes expensive and time-consuming) statutory duties placed on debtors-in-possession, and thus their management, essentially makes it impossible to conduct and operate a business as it is being conducted before the filing of the petition."   BAP Opinion at 7.   As such, the commencement of a bankruptcy case "'constitutes an act preventing the carrying on of the ordinary business of the debtor.'"   BAP Opinion at 11, quoting this Court's ruling on the motion to dismiss the voluntary case.   Once that occurs, the manager's authority to act unilaterally is lost and the Debtor's

10

members must be consulted.

25.     The provisions of the Debtor's Operating Agreement which limit the authority of the manager to act in extraordinary circumstances is not trumped by the filing of this bankruptcy case.   Under the Colorado Limited Liability Act, an operating Agreement between the members of a limited liability company is to be considered the controlling governing document in all circumstances with few limited circumstances not applicable here, and is to be given full force and effect.   Specifically, Section 7-80-108 of the Colorado Limited Liability Act provides:

(4)     It is the intent of this article to give the maximum effect to the principle of

freedom of contract and to the enforceability of operating agreements.

C.R.S.A. § 7-80-108.   There is nothing in the Bankruptcy Code which supplants or overrides the enforceability of the Debtor's Operating Agreement.

26.     Moreover, the provisions of the Debtor's Operating Agreement, which limit the authority of the manager to act without member consent in matters which are outside the ordinary course of business, are completely consistent with Colorado law.    Section 7-80-401(2)(c) of the Colorado Limited Liability Company Act, C.R.S.A. § 7-80-401(2)(c), requires the consent of all members of a Colorado limited liability company in order to authorize any acts which are not in the ordinary course of the company's business.   Specifically, section 7-80-401(2)(c) provides:

"(2)     The consent of each member is necessary to :

*     *     *     *     *     *

(c) Authorize an act of the limited liability company that is not in the

ordinary course of the business of the limited liability company."

11

C.R.S. § 7-80-401(2)(c)..

27.     Because the commencement of this case prevents the Debtor from operating in the ordinary course, the current manager of the Debtor is not authorized to act without the consent of the Debtor's members.   And because the members of the Debtor are hopelessly deadlocked, there is no one who is competent to act on behalf of the Debtor, and as such, there is very good "cause" for the appointment of a trustee.

28.     Unlike § 1104(a)(1) of the bankruptcy Code, which provides for mandatory appointment upon a specific finding of cause, Section 1104(a)(2) "envisions a flexible standard" which gives the court discretion to appoint a trustee "when to do so would serve the parties' and estate's interests." *In re Sharon Steel Corp*, 871 F.2d 1217, 1226 (3rd Cir. 1989).[4]

29.     In *In re Colorado-Ute Electric Association, Inc.,* the court held that "[a]s to whether the appointment of a trustee is in the best interest of creditors pursuant to Section 1104(a)(2), the court should 'eschew rigid absolutes and look to the practical realities and necessities.'"   The court further suggested that a court should also consider the following four factors:

        (i) the trustworthiness of the debtor;

---

[4]   Section 1104(a)(2) of the Bankruptcy Code provides in pertinent part:

>        (a)     At any time after the commencement of the case but before confirmation of a plan, on request of a party in interest, and after notice and a hearing, the court shall order the appointment of a trustee-
>
>                        *        *        *
>
>        (2)     if such appointment is in the interests of creditors, any equity security holders, and other interests of the estate, without regard to the number of holders of securities of the debtor or the amount of assets or liabilities of the debtor.

(ii) the debtor in possession's past and present performance and prospects for the

debtor's rehabilitation;

(iii) the confidence-or lack thereof-of the business community and of creditors in

present management;

(iv) the benefits derived by the appointment of a trustee, balanced against the

costs of appointment."

120 B.R. 164, 176 (Bkrtcy. D. Colo. 1990).   It is well established that when "the board of

directors of a corporation is effectively deadlocked, appointment of a trustee is in the best

interest of the estate." *Tahkenitch* 156 B.R. at 528; citing *In re Advanced Electronics, Inc.,* 99

B.R. 249 (Bankr.M.D.Pa.1989) (holding that deadlock among board of directors of debtor

corporation required appointment of trustee under Section 1104(a)(2)); also citing *In re Petralex*

*Stainless, Ltd.,* 78 B.R. 738, 745 (Bankr.E.D.Pa.1987); see also *Bellevue*, 171B.R. at 625.

Applying this reasoning, and holding that appointment of a trustee was warranted under Section

(a)(2) (as well as "for cause" under Section 1104(a)(1) as discuss above), the court in *Tahkenitch*

held:

> In the pending case the two general partners of the partnership are actively involved in
> litigation over their ownership interests in the partnership, and are deadlocked on
> management and control issues related to *Tahkenitch*.

156 B.R. at 528.   On this basis, appointment of a trustee was warranted under Section

1104(a)(2).

30.     In *Colorado-Ute*, a trustee was appointed where "serious conflicts ... between and

among the debtor, its board and creditors [made] the prospect for gridlock seem more probable

than the ability to rehabilitate the debtor." *Colorado-Ute*, 120 B.R. at 176.   Specifically the

13

court ruled:

> The Court has carefully reviewed the law and evidence in this case, and even after focusing on the current management's efforts, finds that cause does exist to appoint a trustee.   First, the Court finds that the conflicts between and among Colorado-Ute and the board of directors are formidable.   The co-op members are divided on the issue of the appointment of a trustee, several members desire to seek alternative power sources and there appears to be a division on whether the members would consider a rate increase.   The former chairman and vice chairman resigned due to conflict between what their respective co-ops desired and what was best for Colorado-Ute.   Notwithstanding the employment of numerous professionals, the Court cannot envision management and the board functioning effectively and efficiently to reorganize Colorado-Ute.

*Id.* at 175.

31.      In *Colorado-Ute*, there was no question about the authority of current management to act in the bankruptcy proceeding.   Nevertheless, the mere prospect of gridlock due to disagreements among the members of the Colorado-Ute board of directors as to the direction to take in the bankruptcy case was significant enough to persuade the court to appoint a trustee under Section 1104(a)(2).

32.      Here, unlike in *Colorado-Ute*, there is no management in place which is authorized to act on behalf of the Debtor.   There is, however, a complete deadlock among the members of the Debtor - they are barely speaking to each other.   This is not a healthy situation. As in *Colorado-Ute*, it is impossible to "envision management and the [members] functioning

14

effectively and efficiently to reorganize [the Debtor]."   *Id.* at 175.

33.     Further, as discussed above, there are serious and legitimate issues regarding the trustworthiness of DiVenere both in connection with his management of the Debtor, and in connection with his own recently filed chapter 11 case.

34.     Second, DiVenere's past performance in managing the project was abysmal.   He exceeded the original budget for the entire project by approximately $36.7 to $38.3 million, and was only able to complete one nine-unit condominium building.   The second ten-unit building has been sitting abandoned for two years as a vacant shell.   *See* "Declaration of Christian Ruehmer in Support of Motion for Order Excusing Receiver from Compliance with 11 U.S.C. § 543" filed in *In re Dancing Bear Land, LLC*, Case: 10-39584-MER, Doc#18-5 at ¶12, incorporated herein by reference.

35.     Third, DiVenere lacks the trust of the Debtor's most important creditor - WestLB. As the Court is aware from the hearing on the motion to dismiss, Divenere was sued by WestLB for misappropriating the Debtor's assets. *See* Aspen HH, Exhibit 29.   DiVenere is also in a bitter dispute with the Debtor's Class A member, Aspen HH.

36.     Fourth, the prospects for DiVenere's reorganization plan, which would require the Debtor to borrow an additional $35,000,000 on a super-priority basis and prime WestLB's secured loan, are not good.   A more conservative and focused plan, which would require less borrowing and which should not result in $5,000,000 in administrative expenses as DiVenere's plan anticipates, would likely be much more palatable to WestLB and provide a much greater

prospect for a recovery for the legitimate unsecured creditors and equity security holders.[5]

37.    Finally, the benefit of appointing a trustee at this juncture is obvious.   The trustee will actually consider the members' alternative plans, and will make an independent disinterested and informed decision regarding what would be in the interests of creditors, equity security holders, and other interests of the estate.   Because there is no operating business, and a trustee would only have to consider alternative financing plans, there would be no significant expense to the estate.   In fact, eliminating the acrimony and litigation between the parties will no doubt save the estate substantial administrative expense.

### Conclusion

For all the foregoing reasons, Aspen HH respectfully requests that the Court appoint a Chapter 11 trustee.

**ASPEN HH VENTURES, LLC**

By: */s/    Lawrence Bass_____
        One of its attorneys

Lawrence Bass
Elizabeth Flaagen
Faegre & Benson LLP
3200 Wells Fargo Center
1700 Lincoln Street
Denver, CO 80203-4532
(telephone)303-607-3678
(fax) 303-607-3600
LBass@Faegre.com
EFlaagen@Faegre.com

---

[5]  Aspen HH previously negotiated a non-bankruptcy resolution with WestLB which would have been administered through the state court receivership proceedings and would have provided the Debtor's legitimate unsecured creditors with a prompt recovery.   That opportunity has now been lost.   The Debtor's creditors and equity holders can now only hope that the Debtor is able to avoid WestLB's aggressive efforts to foreclose on the Debtor's assets because if WestLB succeeds in foreclosing, there will be no recovery for anyone.

16

Michael H. Moirano
Claire E. Gorman
Nisen & Elliott, LLC
200 W. Adams, Suite 2500
Chicago, IL 60606
(telephone) 312-346-7800
(fax) 312-346-9316