**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**

| | |
|---|---|
| In re: | Case No. 10-25805-MER |
| DB CAPITAL HOLDINGS, LLC,<br>a Colorado limited liability company,<br><br>Debtor. | Chapter 11 (involuntary petition)<br><br><br><br>Docket No. 129 |

**OBJECTION OF WESTLB AG TO THE DEBTORS' SECOND MOTION FOR AN ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364 AND 507 (1) APPROVING POSTPETITION FINANCING, (2) GRANTING LIENS AND PROVIDING SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS, (3) GRANTING ADEQUATE PROTECTION, AND (4) MODIFYING AUTOMATIC STAY**

# TABLE OF CONTENTS

**Page**

I.   Introduction ............................................................................................................. 1

II.   Factual Background ................................................................................................ 6

   A.  Continued Operating Losses ............................................................................ 6

   B.  The Debtor and the Project .............................................................................. 8

   C.  The Loans ......................................................................................................... 9

   D.  Sales Accounts Control Agreements .............................................................. 10

   E.  WestLB's Post-Default Enforcement of Remedies ........................................ 11

   F.  Valuation ........................................................................................................ 12

III.  Argument .............................................................................................................. 14

   A.  Unique Risks Posed by the DIP Loan and Development of the Project .......................... 14

   B.  Priming Loans are Extraordinary ................................................................... 20

   C.  Proof of Adequate Protection is Required to Prime Senior Liens ................... 20

   D.  Adequate Protection Requires Eliminating Risk for the Primed Lender .......................... 22

   E.  The Debtors Have Not Provided Any Evidence to Carry Their Burdens of Proof Under

IV.  Conclusion ........................................................................................................... 28

# TABLE OF AUTHORITIES

Cases                                                                                           Page(s)

*In re 495 Central Park Ave. Corp.,*
   136 B.R. 626, 631 (S.D.N.Y. 1992)................................................................22, 25, 26

*In re Chevy Devco,*
   78 B.R. 585 (Bankr. C.D. Cal. 1987)...............................................22, 23, 24, 25

*In re First South Savings Assoc.,*
   820 F.2d 700, 710 (5th Cir. 1987) .........................................................................20

*MBank Dallas, N.A., v. O'Connor (In re O'Connor),*
   808 F.2d 1393, 1396 (10th Cir. 1987) ..............................................21, 22, 26, 27

*In re Qualitech Steel Corp.,*
   276 F.3d 245, 248 (7th Cir. 2001) .........................................................................20

*Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In re Swedeland),*
   16 F.3d 552, 564 (3d Cir. 1994) (en banc)..................................................... passim

*In re Seth Co.,*
   281 B.R. 150, 153 (Bankr. D. Conn. 2002) ..........................................................20

*In re Strug-Division LLC,*
   380 B.R. 505, 514 (Bankr. N.D. Ill. 2008) ..................................................... passim

*Suntrust Bank v. Den-Mark Construction,*
   406 B.R. 683, 700 (E.D.N.C. 2009)...............................................22, 23, 24, 27

*In re YL West 87th Holdings I LLC,*
   423 B.R. 421, 442-43 (Bankr. S.D.N.Y. 2010)............................................. passim

STATUTES

11 U.S.C. § 364..........................................................................................................passim

WestLB AG, a German banking corporation acting by and through its New York Branch ("WestLB"), on behalf of its wholly owned subsidiaries, Tanzbar DB Holdings, LLC and Tanzbar CH Holdings, LLC, objects to the motion of DB Capital Holdings, LLC ("DB Capital"), for an order (1) approving postpetition DIP financing of $5,000,000, (2) granting liens and providing superpriority administrative expense status, (3) granting adequate protection, and (4) modifying the automatic stay pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 507 ("Priming Motion").  Counsel for DB Capital has filed a substantially identical version of the Priming Motion in the chapter 11 case of DB Capital's wholly owned special purpose subsidiary, Dancing Bear Land, LLC (Case No. 10-39584-MER) ("DB Land") [DB Land Docket No. 44]. Both motions seeking to prime WestLB's liens are referred to herein as the Priming Motion. Due to the identity between the motions, and in an effort to further judicial economy, an objection incorporating, by reference, this Objection and all supporting evidence will be filed in the case of DB Land.  In support of this Objection, WestLB relies on (i) the Declaration of Christian Ruehmer ("Ruehmer Decl.") [DB Land Docket No. 40-1] filed on January 7, 2011, (ii) the Declaration of Christopher T. Donaldson ("Donaldson Decl.") [DB Land Docket No. 40-49] filed on January 7, 2011, (iii) the Declaration of Jean Coulter ("Coulter Decl.") [DB Land Docket No. 40-50] filed on January 7, 2011, (iv) the Declaration of Christopher Bryan ("Bryan Decl.") [DB Land Docket No. 40-47 and 48] filed on January 7, 2011, (v) the concurrently filed Second Declaration of Jean Coulter ("Second Coulter Decl."), (vi) the concurrently filed Second Declaration of Christopher T. Donaldson ("Second Donaldson Decl.").

I.    **Introduction**

1.    DB Capital's and DB Land's (collectively, the "Debtors") Priming Motion must be denied under section 364(d) of the Bankruptcy Code.  The Debtors have failed to fulfill, and cannot fulfill, their burden of establishing that WestLB's liens are adequately protected or that they cannot find alternative financing.  Given that WestLB is substantially undersecured and its liens encumber all of the Debtors' assets, the Debtors are unable to provide adequate protection. The Debtors have no free and clear assets of value and WestLB has no equity cushion, thus the

Debtors are reduced to offering highly risky and speculative "increases in value" of WestLB's collateral as adequate protection. Offers of speculative increases in value are not adequate protection. The Debtors' offers are no different. WestLB is not adequately protected and the Priming Motion must be denied.

2.     All of the Debtors' assets are encumbered by liens in favor of WestLB and those liens are undersecured. The Debtors have no equity and WestLB has no equity cushion. DB Land's assets are the Real Property (as defined below) and the associated personal property; DB Capital's assets are its equity in DB Land. All of these assets are encumbered by validly perfected first priority liens in favor of WestLB. These assets are collectively referred to as the Project (as further defined below). The Project secures over $64,000,000 of obligations to WestLB.[1] Unfortunately, the Project has an "as developed" cumulative appraised value of $40,450,000 ($23,650,000 for Phase I and $16,800,000 for Phase II). *See* Second Donaldson Decl. ¶ 3.[2] This is not the value of the Project sold at liquidation, which is undoubtedly lower; it is instead the appraised value of the Project net of the significant amount of money required to develop and sell the Project as a completed development. Without an equity cushion, WestLB requires and must receive, under section 364(d) of the Bankruptcy Code, adequate protection for the diminution in value of its interests from the priming DIP loan. WestLB is entitled to protection worth over $5,000,000 in accessible value to protect it from the diminution of its liens by a $5,000,000 DIP loan – the Debtors have not offered, nor can provide this value. Therefore,

---

[1]  As of January 7, 2011, the Debtors and the state-court appointed receiver owed $63,990,858.11 in principal and interest to Tanzbar DB Holdings, LLC and Tanzbar CH Holdings, LLC. Each loan is secured by the two parcels of real property owned by DB Land and essentially all of the assets of DB Capital, including its equity in DB Land. The above indebtedness includes principal and interest under the senior and junior construction loans from WestLB and three of the four receivership certificates issued by the receiver. As of January 7, 2011, the fourth receivership certificate, although authorized by the state court, had not been drawn. The above indebtedness is exclusive of additional draws by the receiver and other fees and costs incurred or advanced by WestLB for which it is entitled to reimbursement under the applicable loan documents. *See* Ruehmer Decl., ¶ 25. As of January 25, 2011, the receiver borrowed an additional $240,000 under the fourth receivership certificate to fund the costs associated with preserving the Debtors' assets. *See* Second Coulter Decl., ¶ 5.

[2]  The Debtors concede that WestLB is substantially undersecured. In the Priming Motion, they estimate the current value for the Project at $25-27 million, an amount well below Mr. Donaldson's "as developed" cumulative appraised value.

2

WestLB has not received adequate protection against the diminution of its liens and the Priming Motion must be denied.

3.      The Debtors have not offered WestLB adequate protection against the losses it will suffer from the proposed $5,000,000 priming DIP loan.[3]  Instead, the Debtors have offered the following inadequate protection: (i) "the increase in value of [WestLB's] collateral which will flow directly from the use of the DIP Facility funds"; (ii) monthly payments to WestLB of $100,000; and (iii) the transfer of $2,400,000 in a WestLB cash collateral account to WestLB.[4] Priming Motion, ¶ 47.  As demonstrated below, a speculative "increase in value" is not a recognized form of adequate protection under the law, and, in any event, is too risky to actually protect WestLB's interests.[5]  Similarly, the payment of $100,000 a month to WestLB with funds financed through a priming loan is not adequate protection – it merely transforms WestLB's own collateral into cash payments through a priming DIP loan that itself accrues interest that further primes WestLB.  While these payments reduce the accrual of unpaid interest owed to WestLB, they do so at the expense of the direct diminution of the value of WestLB's collateral.  Finally, receipt of money that is already WestLB's collateral, such as the $2,400,000 (actually over

---

[3]  The general economic terms of the DIP loan as gleaned from the Priming Motion and the Debtor-in-Possession Credit Agreement, dated as of January 11, 2011 ("Credit Agreement"), filed as Exhibit A to the Priming Motion, are that: (i) it is a $5,000,000 loan; (ii) for a 12-month term; (iii) interest accrues at a minimum of 15% per annum; (iv) the default rate is an additional 5% per annum; (v) there is a 2% commitment fee, a 2% origination fee, a 2% exit fee and a 0.10% administrative fee, (vi) the DIP loan is secured by priming liens on all asses, including avoidance actions under chapter 5 of the Bankruptcy Code; (vii) the DIP loan is given superpriority claim status with senior rights against all assets including avoidance actions under chapter 5 of the Bankruptcy Code; and (viii) the proceeds of the DIP loan are to be used to fund administrative and financing expenses and not to develop any portion of the Project.

[4]  The actual current balance of the account is in excess of $2,600,000.  *See* Ruehmer Decl., Ex. MM.

[5]  Based on the Dancing Bear Aspen Private Residence Club Financial Model ("DIP Model") DB 000103-111] produced by the Debtors on February 3, 2010, it does not appear that there will be a speculative increase in value after the Project is developed.  The DIP Model (which is not an appraisal but merely a projection of future cash flow) contains numerous defects, the most telling of which is the Debtors' failure to reduce the projected gross proceeds to a net present value.  Consequently, the approximately $54,000,000 they propose to pay WestLB under the DIP Model from October 2013 through July 2016 is worth substantially less than that today.  A true and correct copy of the DIP Model is filed under seal and is intended to be Exhibit A attached hereto.  The Debtors and WestLB are currently negotiating a confidentiality agreement to govern the production of documents.  WestLB contends that the DIP Model should not be marked CONFIDENTIAL and should not be filed under seal.

$2,600,000) in WestLB's control account, cannot protect WestLB against the $5,000,000 diminution in value to its other collateral threatened by the Debtors.

4.      The crux of the Debtors' proposed adequate protection is the speculative "increases in value" from developing the Project.  Unfortunately, even if increases in value were possible, the proposed $5,000,000 DIP loan cannot be used to develop the Project.[6]  The Debtors have agreed with the DIP lender and represented to the Court that the DIP loan will be used "*solely to pay* administrative expenses in connection with the Cases, the fees and expenses due to the [DIP agents and lenders] pursuant to the Loan Documents, expenses in connection with obtaining additional financing necessary to complete the Project and other approved expenses as set forth in the Order."  Priming Motion, ¶ 35 (emphasis added) *and* Exhibit A § 3.23 (Credit Agreement).[7]  There can be no increase in value through development (no matter how speculative) if there is no development.

5.      Even if the $5,000,000 DIP loan could be used exclusively to develop the Project (it cannot) and $5,000,000 would be sufficient to complete the Project (it is not),[8] the tremendous risks inherent in developing luxury fractional interest condominiums in Phase II prevents any reliance on a projected increase in value from being adequate protection under section 364(d) of the Bankruptcy Code.  There can be no assurances that a dollar spent will increase the value of WestLB's collateral by at least a dollar.  The successful development of the

---

[6]  Throughout the Priming Motion, the Debtors misleadingly claim that the DIP loan will be used to develop the Project.  This is patently false and should be disregarded.  *See* Priming Motion, ¶ 55 ("DIP Facility will be used, among other things, to complete construction of Building Two"); *also* ¶¶ 52, 57 and 60 (same).  The Debtors have also repeated these misleading statements in their Objection to WestLB AG's Motion for an Order Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 362(d) ("Objection to Relief from Stay") [DB Capital Docket No. 146 and DB Land Docket No. 53].  In paragraph 31, of their Objection to Relief from Stay, the Debtors disingenuously state, "WestLB will not be prejudiced by the continuation of the automatic stay.  As demonstrated in the DIP Motion, upon its approval, the Debtors will commence sales efforts and construction of Phase II of the Project."

[7]  The Debtors and their proposed DIP lenders obviously recognize that $5,000,000 dollars is inadequate to fund completion of the Project.  Hence, their agreement to use the DIP loan to finance the costs of additional debt "necessary to complete the Project."  Presumably, this financing is the $35,000,000 loan that is the subject of the Commitment Letter and Term Sheet attached to the Priming Motion as Exhibit B.

[8]  The DIP Model estimates that the costs to complete construction of Phase II and sell Phases I and II is $41,731,043 (total costs to complete of $129,241,750 less prepetition expenditures of $87,510,707).  *See* DIP Model, Ex. A, DB 000104.

4

Project involves a multiyear undertaking requiring significant developer expertise, effort and financing to accomplish.[9]   However, the Debtors currently do not have any equity in the Project and are proposing to borrow $5,000,000 to $35,000,000 more priming debt, putting themselves that much further "out of the money."   Without equity, the Debtors and Thomas DiVenere (the Debtors' putative sole manager) have no incentive to actually complete and sell the Project on time and on budget.   In addition to their lack of incentive, the development of the Project is fraught with many additional risks.   Section III.A below identifies some of these risks, including the Debtors' apparent intention to (i) borrow $35,000,000 (not just $5,000,000) to develop the Project, even though they have no assurances that after they borrow $5,000,000 that any lender will lend them $35,000,000 or that this Court will authorize such a loan, (ii) cannibalize the value of Phase I (WestLB's most valuable and liquid collateral) to fund construction of Phase II and repay the DIP, forcing WestLB to look solely to the risky development of Phase II (which is not projected to be completed until September 2016) for any recovery,[10] and (iii) hire an unknown and unidentified third-party manager "to head up development" and to make unspecified changes to the Dancing Bear "brand" and reposition "sales and marketing efforts". Priming Motion, ¶ 32.   The presence of these and other risks prevent any potential speculative increase in value from being adequate protection.   WestLB should not be required to bear these development risks for the sole purpose of giving the Debtors and Mr. DiVenere a highly speculative and unrealistic chance to develop Phase II for their personal benefit, while simultaneously depleting WestLB's collateral.

6.     Throughout this Objection, WestLB refers to the Debtors' apparent or presumed intentions.   WestLB is forced to speculate as to what the Debtors intend and what the terms of the DIP will be because of the inadequacy and inconsistency of the Debtors' disclosures and the

---

[9]  The DIP Model estimates that Phase II will not be completed until May 2013 and the Project will not be sold out until August 2016.  *See* DIP Model, Ex. A, DB 000103.

[10]  The DIP Model does not actually propose to repay the $64,000,000 in obligations to WestLB in full.  Instead, it fixes WestLB's claims at the incorrect amount of $53,912,809, failing to account for the receivership certificates, accrued interest and other fees and charges.  *See* DIP Model, Ex. A, DB 000103; Ruehmer Decl., ¶ 25; *and* Second Coulter Decl., ¶ 5.

complete absence of any evidence supporting the Priming Motion. Among other things, the Debtors failed to file a copy of their proposed DIP budget or their business plan for developing and selling the Project with the Court and only provided the DIP Model and certain other discovery to WestLB yesterday, February 3, 2011, in an untimely and incomplete response to WestLB's formal discovery request.[11] WestLB reserves the right to seek sanctions against the Debtors for their failure to respond to WestLB's discovery request in a timely manner, including the denial or continuance of the Priming Motion.

7.     For the above reasons and for the legal and factual reasons discussed below, the Priming Motion must be denied. The Debtors have failed to meet their burden under section 364(d) of the Bankruptcy Code. They have not proved that WestLB is adequately protected by the meager protections they have offered and they have not proved that they could not have secured alternative financing. Consequently, the Bankruptcy Code requires dismissal of the Priming Motion.

## II.     <u>Factual Background</u>

### A.     <u>Continued Operating Losses</u>

8.     DB Land's largest operating obligations, other than to WestLB, are to the Dancing Bear Residences Owners Association, Inc. (the "<u>DBROA</u>"), the official homeowners association for the owners of fractional interests in Phase I. *See* Second Coulter Decl., ¶ 4. DB Land's share of the annual assessments to the DBROA is $964,880. *See* Id., ¶ 4. These assessments are currently being paid by the receivership estate with WestLB's cash collateral. DB Land's failure to pay its share of the assessments to the DBROA would give rise to a claim by the DBROA, and potentially the individual residents, against DB Land. It may also cause the DBROA to become insolvent and cease operations to the detriment of all interested parties.

---

[11] WestLB served interrogatories, requests for admissions and requests for documents on the Debtors on January 19, 2011. The deadline for the Debtors to submit written responses and produce the required documents was January 28, 2011. WestLB received the first partial production of documents from the Debtors at 6:40 p.m. Mountain Time on February 3, 2011.

9.      As a result of the assessments and other expenses of maintaining the Project and the receivership estate, the Project is operating at a substantial monthly loss.  Weston Capital Corporation, the receiver for the Project (the "<u>Receiver</u>"), anticipates that the cost of preserving the Project and operating the receivership estate in 2011 will be approximately $1,683,707.  *See* Id., ¶ 4.  The Receiver anticipates funding these losses by using $246,707 of WestLB's cash collateral (comprised of cash on hand and proceeds of the lease) and by borrowing an additional $1,437,000 from WestLB through receivership certificates.  *See* Id., ¶ 5.  The Project's only known revenue comes from DB Land's lease of restaurant space in Phase I to DB Bistro, LLC, an entity affiliated with Mr. DiVenere.  *See* Id., ¶ 3.  The restaurant lease is expected to generate only $132,400 in revenue for DB Land during all of 2011.  *See* Id., ¶ 3.  DB Land has pledged the rents and proceeds of this lease to WestLB, rendering them WestLB's cash collateral.  *See* Ruehmer Decl., ¶¶ 6 & 9, <u>Exhs. C, D, R & S</u>.   The $1,683,707 operating cost for 2011 is in addition to the $2,136,700 already spent by the Receiver from March 12, 2010 to December 31, 2010 to operate the receivership estate and resolve certain mechanics lien and contract claims.  *See* Second Coulter Decl., ¶ 3.  The increase in the Project's operating expenses from 2010 to 2011 is attributable in large part to a substantial increase in DBROA assessments to fund a capital replacement reserve required under Colorado law but which had not been established prior to the Receiver assuming control.  *See* Id., ¶ 4.

10.      The Receiver is currently funding these obligations using WestLB's cash collateral and through receivership certificates with a priority senior to WestLB's liens.  *See* Id., ¶ 5.  Consequently, WestLB's liens on the collateral were impaired by $2,136,700 in receivership expenses in 2010 and the Receiver projects that WestLB's liens will be impaired by an additional $1,683,707 in receivership expenses in 2011, for a total of $3,820,407.  *See* Id., ¶¶ 3 & 4.  Another potential source of financing for the Project's expenses is the sale of fractional interests in Phase I; however, any use of sales proceeds, like the use of cash collateral, will further impair the value of WestLB's liens by consuming its collateral.

11.     Although the Receiver anticipates seeking additional receivership certificates from the state court and continuing to use WestLB's cash collateral to fund the $1,683,707 operating shortfall for 2011, it has no assurance that the receivership certificates will be authorized by the state court or that WestLB will either fund any such certificates or authorize the continued use of its cash collateral.  Furthermore, the Receiver does not anticipate that its funding of the Project's operating losses through receivership certificates or the use of cash collateral will result in an increase in value of WestLB's collateral.  *See* Id., ¶ 6.

B.     **The Debtor and the Project**[12]

12.     DB Land is a single asset real estate debtor.  *See* DB Land Petition [Docket No. 1].  DB Land is 100% owned by DB Capital.  DB Land is the owner (subject to the rights of the other owners of fractional interests) and developer of the real property and improvements (the "Real Property") associated with a luxury fractional interest residence club in Aspen, Colorado (the "Project").  The Real Property consists of two parcels of land situated across the street from one another.  DB Land's sole business is the ownership and development of the Real Property.

13.     The Project consists of two phases.  Phase I is the fractional interest residence club located at 411 S. Monarch Street in Aspen.  Phase II is the partially developed and fully entitled parcel located at 219 E. Durant Avenue in Aspen that DB Land has attempted to develop into a fractional interest residence club similar to Phase I.  At the time of the appointment of the receiver Phase I was not complete.  It has now been completed using funds loaned by WestLB.  Phase I contains a 9-unit condominium building, divided into 72 fractional interests, as well as two restricted-income housing units that have been allocated for employees, a restaurant space, underground parking and storage, a meeting space, an exercise facility, and a rooftop deck.  Only 32 of the fractional interests in Phase I have been sold, leaving 40 fractional interests still

---

[12] For purposes of judicial economy, WestLB informs the Court that the following factual recitation is substantially similar to the factual recitation found in WestLB's motion for relief from stay filed against DB Land [DB Land Docket No. 40] ("Motion for Relief from Stay") and relies on the evidence provided in support thereof.  For a more detailed recitation of the facts related to the Debtors' cases please refer to the Motion for Relief from Stay filed in the DB Land case.

available.  DB Land began construction of Phase II, conceived as an 11-unit condominium building to be divided into 88 fractional interests.  Only an incomplete steel and concrete structure has been constructed on the Phase II parcel.  *See* Coulter Decl., ¶ 5.  DB Land ceased construction on Phase II nearly two years ago and, except for some basic monitoring and maintenance for safety, drainage and snow loading, the Phase II property has been dormant since the spring of 2009.  *Id.*

C.     **The Loans**

14.     To fund the Project, the Debtors, along with LCH, LLC ("LCH"), a subsidiary of DB Capital, obtained two loans from WestLB.  The first loan, in the maximum principal amount of $53,000,000 (the "Senior Loan"), was made pursuant to that certain Loan and Security Agreement, dated as of June 15, 2006 (as amended on September 22, 2006, the "Senior Loan Agreement"), and was evidenced by that certain Promissory Note (the "Senior Loan Note"), dated as of June 15, 2006.  *See* Ruehmer Decl., ¶¶ 4 and 5, Exhs. A & B.  The second loan, in the maximum principal amount of $5,000,000 (the "Second Loan" and, together with the Senior Loan, the "Loans"), was made pursuant to that certain Second Loan and Security Agreement, dated as of September 22, 2006 (the "Second Loan Agreement" and, together with the Senior Loan Agreement, the "Loan Agreements"), and was evidenced by that certain Promissory Note, dated as of September 22, 2006 (the "Second Loan Note" and, together with the Senior Loan Note, the "Notes").  *See* Ruehmer Decl., ¶¶ 7 and 8, Exhs. P & Q.

15.     The Loans were made to DB Land, DB Capital and LCH, collectively as Borrower.  However, the Loans were made for the purpose of funding the development of a timeshare resort on, and were secured primarily by, the Real Property owned by DB Land.  Each of DB Land and LCH[13] executed two Deeds of Trust, one senior, securing the Senior Loan, and

---

[13]  Originally, one of the two parcels was owned by DB Land's affiliate, LCH.  However, on September 4, 2007, a Bargain and Sale Deed executed by LCH and conveying its interest in the Phase II parcel to DB Land was recorded. An as-recorded copy of this consolidation deed is attached to the Ruehmer Declaration as Exhibit EE.  Thus, as of the date of this Objection, DB Land is the owner in fee simple of all of the Real Property, subject to the interests of Lender under the Loan Documents or otherwise, including as beneficiary under the LCH Trust Deeds, and the other fractional interest owners.

one junior, securing the Second Loan, which were recorded against their respective properties (collectively, the "Deeds of Trust").  *See* Ruehmer Decl., ¶¶ 6(a) and (b) and 9(a) and (b), Exhs. C, D, R & S.  The Loans were further secured by, among other things: (i) separate senior and junior collateral assignments of Project-related contracts (jointly executed by all three Borrower entities), (iii) separate senior and junior pledges of all of the equity in DB Capital jointly made by Aspen HH, LLC ("Aspen HH"), and DB Development, and (iv) separate senior and junior pledges of all of the equity in DB Land and LCH by DB Capital.  *See* Ruehmer Decl., ¶¶ 6(c)-(m) and 9(c)-(l), Exhs. E-O & T-CC.

16.     The Loans, the security instruments, the Loan Agreements (as hereinafter defined), and any and all documents evidencing, securing or pertaining to the Loans, all as amended by the Senior Loan Amendment and the Second Loan Amendment (each as hereinafter defined), and all other documents executed in connection therewith, are collectively referred to herein as the "Loan Documents."

D.     **Sales Accounts Control Agreements**

17.     During the negotiation of the Loan Amendments, WestLB, the Borrower and Community Banks of Colorado ("Community Banks") entered into a Depository Agreement governing the Borrower and WestLB's respective rights to the account containing approximately $12,000,000 of proceeds from the sale of fractional interests (the "Sales Proceeds Account") maintained with Community Banks.  *See* Ruehmer Decl., ¶ 19, Ex. HH.  This agreement, originally entered into on January 20, 2009, was amended several times, with the most recent amendment occurring on March 18, 2009.  *Id.*  On March 31, 2009, WestLB, the Borrower and Community Banks entered into a Depository Agreement governing the Borrower and WestLB's respective rights to another account, entitled the "Purchase Contract Reserve Account," also maintained with Community Banks (together with the Sales Proceeds Account, the "Sales Accounts").  *See* Ruehmer Decl., ¶ 19, Ex. II.  Pursuant to these Depository Agreements, WestLB, the Borrower and Community Banks agreed that WestLB has "sole dominion and control" over the funds in the Sales Accounts and the exclusive right to make and/or authorize

10

withdrawals, disbursements or transfers from the Sales Accounts, with the latter right applicable to the Sales Proceeds Account only following an Event of Default.  *See* Ruehmer Decl., Exhs. HH & II, §§ 4, 19 thereto.

        E.      **WestLB's Post-Default Enforcement of Remedies**

        (i)      **The Receivership**

18.     When negotiations with the Debtors over providing a deed in lieu of foreclosure to WestLB appeared to be reaching an impasse, WestLB initiated an *ex parte* state court action seeking appointment of a receiver to protect its collateral.  On March 12, 2010, the District Court of Pitkin County, Colorado, appointed the Receiver.  Because the mismanagement of the Project by the Borrowers was so egregious, the Receiver was appointed by the state court judge within hours after the *ex parte* filing.  The Receiver is in full possession and control of DB Land's assets, the Real Property and associated personal property, and DB Capital's assets, and has successfully administered the Project since its appointment.

19.     The Receiver has taken important steps to protect and preserve the Real Property. These include assuming control over DB Land's seats on the Executive Board of the DBROA and assisting the DBROA in preserving the Project and meeting the needs of its members and guests.  The Receiver caused the renewal of property insurance policies and the payment of taxes for Phase II of the property.  In addition, the Receiver worked to remove the mechanic's liens on Phase I and II.  *See* Coulter Decl., ¶ 6.  The Receiver has also been paying DB Land's share of the quarterly DBROA assessments on the unsold fractional interests owned by DB Land.  As of January 7, 2011, the Receiver paid $561,000 in DBROA assessments on behalf of DB Land.  *Id.* The Receiver, to meet the receivership estate's obligations to the DBROA and others, has borrowed $1,147,000 from WestLB under three receivership certificates approved by the state court.[14]

---

[14]  A fourth receivership certificate has been authorized and $240,000 was funded on January 25, 2011.  *See* Second Coulter Decl., ¶ 5.

### (ii)  Exercising Control Over the Sales Accounts

20.   On March 5, 2010, WestLB directed the Community Banks to release into WestLB's possession, the funds on deposit in the Sales Accounts.  *See* Ruehmer Decl., ¶ 24, <u>Ex. LL</u>.  Because there was an existing Event of Default and WestLB had previously notified Community Banks of such Event of Default on December 17, 2009, WestLB was entitled to unilaterally direct Community Banks to disburse the contents of the Sales Accounts and Community Banks was obligated to comply with that instruction.  *See* Ruehmer Decl., Exhs. HH & II, §§ 4, 19 thereto.

21.   Despite Community Bank's obligation to honor WestLB's instructions with respect to the Sales Accounts after being notified of an Event of Default, Community Banks has not disbursed the funds in the Sales Accounts to WestLB.  Instead, on or about March 10, 2010, Community Banks filed a Complaint for Interpleader with the District Court of Pitkin County, Colorado, seeking a determination of WestLB's and the Borrower's respective rights to the Sales Accounts (the "<u>Interpleader Action</u>").  *See* Ruehmer Declaration, <u>Ex. MM</u>.  The complaint alleges that the Borrower notified Community Banks that the Borrower did not agree that WestLB was entitled to exclusive control of the Sales Accounts and directed Community Banks to take no action with respect to the Sales Accounts without the Borrower's consent.  *Id.*  There have been no further developments in the Interpleader Action and that action is now stayed as result of the Debtors' bankruptcy cases.  Because the Interpleader Action was pending at the time the Receiver was appointed, and remains pending as of the filing of this Objection, the Receiver has not been able to access the funds in the Sales Accounts for the operation of the Property.  The Sales Accounts currently contain approximately $2,671,903.07.  *Id.*  The funds in the Sales Accounts are the same funds that the Debtors propose to give to WestLB as adequate protection.

### F.  **Valuation**

22.   Although the Debtors admit that they have not performed a valuation or appraisal of the Project, the Debtors claim that the Project has a "total value" as a "completed project" of over $100,000,000.  *See* Priming Motion, ¶ 56; *compare* DIP Model, Ex. A, DB 000103

(estimating the "Total Remaining Cash Available for Distribution" at $97,655,625). In his testimony at the 341(a) meeting, Mr. DiVenere described the calculation of the "over $100,000,000" value as actually a $110,000,000 value and characterized that as a "gross number" derived from a "[p]retty easy" calculation based on the fractional interests available for sale and the sale prices of comparable fractional interests. Bryan Decl., Ex. A, 24:21-25:8. As a "gross number," the $110,000,000 value (and the $97,644,625 figure in the DIP Model) admittedly does not account for (i) costs to complete Phase II, (ii) sales costs for Phase I and II, (iii) financing costs, (iv) carrying costs for the Project including DBROA assessments, or (iv) the discount of the "gross number" to net present value, among other omissions. When these costs and charges are taken into account the "as developed" value proposed by the Debtors drops dramatically. Just using the figures in the DIP Model, if one subtracts the estimated development costs of $41,731,043 from the gross proceeds of $97,655,625, the resulting net sales proceeds available to creditors – without any discount to present value or the repayment of any priming DIP loans – is only $55,924,582. DIP Model, Ex. A, DB 000103-104. WestLB's claims currently exceed $64,000,000.

23.     WestLB is in the process of securing an appraisal of the Project on an "as developed" basis. When the appraisal is finalized, WestLB expects to file it with the Court. WestLB's counsel engaged Christopher T. Donaldson, MAI, CCIM, with the firm Cushman & Wakefield of Colorado, Inc. to perform the appraisal. *See* Donaldson Decl., ¶¶ 1-5. Although Mr. Donaldson's appraisal is currently being finalized, he has concluded that the present value of the Project to a hypothetical buyer that desires a completed fractional unit development of the kind existing on Phase I and planned for Phase II is $40,450,000 ($23,650,000 for Phase I and $16,800,000 for Phase II). *See* Second Donaldson Decl., ¶ 3. To arrive at this value, Mr. Donaldson calculated a gross sales revenue value for the Project of approximately $116,335,000 (substantially higher than the Debtors' projection in the DIP Model of $97,655,625). *See* Id., ¶ 4. However, once Mr. Donaldson deducts the expenses and discounts required for a FIRREA-compliant appraisal, which are designed to quantify the deductions a reasonable buyer would

13

apply to the gross sales revenue amount when valuing the Project (such as the costs of construction, sales costs and commissions, DBROA assessments and a market discount rate), he arrives at an appraised value for the Project, as developed, of only $40,450,000. *See* Id., ¶ 3. Given that the obligations currently owed to WestLB under the Loan Documents and the receivership certificates exceed $64,000,000 and the Project has a total value of $40,450,000, WestLB is undersecured by $23,550,000.[15]

III.   **Argument**

     A.   **Unique Risks Posed by the DIP Loan and Development of the Project**

     24.   The Debtors' proposed priming loan imposes tremendous risks on WestLB. The Debtors cannot use the $5,000,000 of DIP proceeds to fund development of the Project or attempt to improve the value of WestLB's collateral. Consequently, it appears that the Debtors are trying to manipulate the court into ultimately approving a $35,000,000 DIP loan to actually develop the Project once WestLB has been primed by the current proposed DIP loan. Even if the current proposed DIP loan could be used to develop the Project, $5,000,000 is patently insufficient to meaningfully commence, let alone complete, the Project. It is only through the proposed $35,000,000 of priming debt that the Debtors will have the financing necessary to attempt to develop the Project in accordance with their DIP Model. As a result, the terms of both the $5,000,000 loan found in the Credit Agreement and the subject of the Priming Motion and the terms of the $35,000,000 loan found in the Term Sheet (but not the subject of the Priming Motion) are relevant when assessing the tremendous risks the Debtors are seeking to impose on WestLB. *See* Priming Motion, Exhibit A (Credit Agreement) & Exhibit B (Term Sheet). Instead of protecting WestLB against the risks to its liens caused by the proposed DIP, the Debtors' efforts to develop the Project exacerbate them. As a result of these risks, WestLB is not

---

[15]   In addition to the value of the Project, WestLB also retains a first priority perfected security interest in the approximately $2,670,000 in the Sales Account. When WestLB's liens are validated and the Interpleader Action is resolved in WestLB's favor, the funds in the Sales Account shall increase the amount of WestLB's secured claim.

adequately protected as required by section 364(d) of the Bankruptcy Code and the Priming Motion must be denied.

<strong>(i)      <u>Risks Related to the Proposed Financing</u></strong>

25.    The terms of the $5,000,000 and $35,000,000 loans, as described by the Debtors in the Priming Motion, Credit Agreement and Term Sheet, contain various significant risks, including:

(a)    **No Commitment** – There is essentially no commitment from Colbeck Capital Management, LLC ("<u>Colbeck</u>") or BPC Opportunities Fund LP ("<u>BPC</u>"), the two purported lenders under the Credit Agreement, to make either the $5,000,000 loan or $35,000,000 loan to the Debtors. Consequently, even if the $5,000,000 loan were approved, there are no assurances that all of it would be funded, let alone that the $35,000,000 to develop the Project would be funded.[16]  Any failure to fund would then compound the risk to WestLB.  Leaving it impaired by the funded amount of the DIP, but preventing any possibility of a successful development of the Project that could potentially protect WestLB against the diminution in value of its liens.

(b)    **Extreme Interest Rate** - Although the Project has no meaningful cash flow and the proposed DIP will have a first priority priming lien, the DIP loan carries a very high annual minimum interest rate of 15% (13% plus

---

[16]    Each draw under the Credit Agreement is contingent on, among other things: (i) the lenders' approval of the Debtors' 13-week projections and budgets in their sole discretion; (ii) entry of certain unspecified "first day orders"; (iii) authorization of the Debtors' use of WestLB's cash collateral (although no motion seeking to authorize the use of cash collateral has been filed); (iv) turnover of the Project from the receiver to the Debtors; (v) the substantive consolidation of the Debtors; and (vi) the denial of all motions to dismiss the Debtors' cases.  *See* Credit Agreement, § 4.01.  The Commitment Letter accompanying the Term Sheet is similarly contingent.  Any obligation to lend up to $35,000,000 is contingent on variables such as "(iii) the accuracy and completeness of all representations that the Company made to [Colbeck]", "(iv) the Company's . . . payment in full of all fees, expenses and other amounts payable under this Commitment Letter" and most importantly, "(v) *[Colbeck's] completion of legal, business, financial, accounting and other due diligence reviews with respect to the Company, which shall be in all respects satisfactory to [Colbeck] in its sole discretion.*"  Commitment Letter, § 1 (emphasis added).

15

LIBOR with a floor of 2%). The summary in the Priming Motion misleadingly represents that the rate is LIBOR plus 13%. In addition, although not disclosed in the Priming Motion, the default rate for the DIP loan is an additional 5% per annum, and the DIP loan is subject to a 2% commitment fee, a 2% origination fee, a 2% exit fee and a 0.10% administrative fee. With all of these fees, the APR for the proposed 12-month DIP loan will exceed 21%. It should be noted that the DIP Model incorrectly applies an interest rate of 15% and fails to take into account the additional fees imposed under the Credit Agreement (other than the 2% origination fee). With such extreme interest rates and fees, a large portion of the DIP loan will have to be set aside to fund interest expenses, further diminishing the funds available to develop the Project and hypothetically benefit WestLB.

(c)    **Diversion of WestLB's Collateral** - Although not disclosed by the Debtors in the Priming Motion, the Credit Agreement requires that 100% of all net sale proceeds from the sale of the 40 fractional interests in Phase I (and any other sales at the Project) be applied to repay the DIP loan. *See* Credit Agreement § 2.04. None of the value from the sale of Phase I, WestLB's most valuable collateral, would actually be paid to WestLB. Instead, the Debtors are attempting to force WestLB to wait until the value in Phase I is exhausted, Phase II is successfully developed and sold, and the DIP fully repaid before it sees any recovery. The DIP Model projects that Phase I will be completely sold out by September 2013, after which WestLB will begin receiving proceeds from Phase II and will not be repaid until July 2016.[17]

---

[17]   As noted in footnote 10 above, the DIP Model does not actually propose to repay the $64,000,000 owed to WestLB, but instead uses a lower and unsubstantiated value of $53,912,809 for WestLB's secured claim. *See* DIP

(d)     **Risk of Foreclosure** – The proposed DIP has numerous potential events of default that could trigger the exercise of remedies before the Debtors commence repayment of WestLB in October 2013, let alone before WestLB is allegedly fully repaid in July 2016.  This presents a significant risk that the DIP lender will seek to foreclose out WestLB's liens for a fraction of what they are worth because WestLB cannot or will not expend the millions of dollars required to pay off the priming debt to preserve the value of its current collateral.  Requiring WestLB to repay the DIP and the accruing default interest (at over 20% per annum) to avoid losing its liens, irrefutably demonstrates that WestLB is not adequately protected by the priming loans.

(ii)     <u>**Risks Related to the Development Itself**</u>

26.     In addition to the above risks related specifically to the proposed financing, the development of the Project imposes various additional risks on WestLB, including:

(a)     **Change in Vision** – The Debtors' first order of business after securing the $5,000,000 DIP is to "(i) bring in a targeted third party manager to head up development, management, and sales and marketing activities; (ii) analyze rebranding the Project and repositioning of sales and marketing efforts; (iii) prepare for an initial soft opening of sales; and (iv) administer the bankruptcy process."  Priming Motion, ¶ 32.  Without identifying the proposed manger or describing their qualification and compensation, the Debtors want to hire an unknown party to perform essential services for the preservation and development of the Project.  In addition, the Debtors want that party to potentially rebrand the Project and reposition the sales

---

Model, Ex. A, DB 000103-111.  If the correct amount of WestLB's obligations were inserted into the Debtors' chart "Remaining Cash Flow Distribution" the projected funds "Remaining for Distribution" of $5,089,033 in that chart would actually become a deficit owed to WestLB of -$4,998,159.  *See* Id., DB 000103.

and marketing efforts, imposing yet more development risk on WestLB if the rebranding and repositioning are unsuccessful.

(b)  **Continuing Operating Losses** – The Project is anticipated to lose over $1,600,000 in 2011, whether or not any development occurs.  This loss, coupled with the dead weight of the Debtors' administrative expenses and financing costs, makes the likelihood of an increase in value in excess of any priming liens even more unlikely.  With all of the non-development expenses the Debtors will incur, the new value created will have to be multiples higher than the money spent for WestLB to receive adequate protection from being primed.

(c)  **No Equity** – The Debtors have no equity in the Project and will be further underwater if the DIP loan is allowed.  Without equity, the Debtors have no incentive to actually complete construction of the Project once they conclude that they have drained the available value out of the Project and that there is no hope of selling the Project for more than the DIP loan and WestLB's claims.[18]  Requiring a borrower to have equity is crucial to lenders, as it aligns the borrower's and lender's interests in the collateral.  Without any equity cushion, like in these cases, there can be no alignment and more importantly, there can be no protection for the lender against further declines in the value of their collateral.

(d)  **Unreasonable Development Projections** – For the Debtors to avoid defaulting on the DIP loan and for the Debtors to have any hope of generating enough value to repay the DIP loan and WestLB's claims (even at the reduced erroneous amounts in the DIP Model), the Debtors will

---

[18]  Although the Debtors have no equity in the Project, they have still budgeted $2,680,000 in project management fees and $1,260,000 in sales overhead (excluding commissions and marketing), some or all of this $3,940,000 in fees is likely to be paid to Mr. DiVenere or affiliated entities for their alleged services.  *See* DIP Model, Ex. A, DB 000104.

need to execute the development and sale of the Project flawlessly. The DIP Model contemplates that the Debtors will develop the Project for over five and one half years before WestLB is repaid. Even if (i) the development and sale proceeds exactly as budgeted in the DIP Model, which is highly unlikely, (ii) the incorrect $53,912,809 amount for WestLB's claims in the DIP Model are used, and (iii) the sale proceeds are not discounted to present value, then WestLB, after all construction is completed and the Project is fully sold in July 2016, will only have a projected equity cushion of 5% - a wholly inadequate number. Of course, if the correct amount of WestLB's $64,000,000 claim is used, let alone if the proceeds are discounted to present value, WestLB has no equity cushion and is projected to suffer a substantial loss. Given the Debtors' and Mr. DiVenere's historic inability to develop the Project on time and on budget, there is nothing to suggest that either they or any new manager they hire could complete the herculean task of meeting the DIP Model over a five and one half year period– especially when the only beneficiary (other than the  insiders receiving fees) would be WestLB due to the size of its claims.

(e)   **Traditional Development Risk** – Like all complicated real estate developments, the successful development of the Project is subject to construction uncertainty, labor shortages, engineering issues, cost overruns (including increases in the cost of building supplies), environmental challenges, changes to entitlements (including expiration of current entitlements), and shifts in market value and market conditions, among other risks. In addition, fractional interest developments like the Project have a relatively short and unproven track record that subjects their future

19

value to further uncertainty.  The potential for the development to fail, as
has already occurred under the Debtors' stewardship, is substantial.

27.     As these and other risks demonstrate, no increase in value from the development
of the Project can ever be adequate protection under the Bankruptcy Code.  Section III.D below
further supports this conclusion by describing the many cases that have held that speculative
increases in value cannot constitute adequate protection under section 364(d) of the Bankruptcy
Code.

B.      **Priming Loans are Extraordinary**

28.     The Bankruptcy Code recognizes the importance and fragility of senior
prepetition loans and requires that the senior interest be protected from any loss before a priming
lien is allowed.  Priming financing under section 364(d) of the Bankruptcy Code is "a last
resort."  *In re Qualitech Steel Corp.*, 276 F.3d 245, 248 (7th Cir. 2001).  The "ability to prime is
extraordinary."  *In re Seth Co.,* 281 B.R. 150, 153 (Bankr. D. Conn. 2002) (citing 3 *Collier on
Bankruptcy § 364.05* (15th ed. rev. 2002)).  Given the significant and irreversible consequences
for the secured creditor of losing its priority, the court must be "particularly cautious" when
evaluating whether the secured creditor is adequately protected.  *See In re First South Savings
Assoc.*, 820 F.2d 700, 710 (5th Cir. 1987) ("super priority financing displaces liens on which
creditors have relied in extending credit, a court that is asked to authorize such financing must be
particularly cautious when assessing whether the creditors so displaced are adequately
protected").  Under section 364(d) of the Bankruptcy Code, the Debtors have "the burden of
proof on the issue of adequate protection" and must also prove that they are unable to obtain
alternative non-priming financing.  The Debtors failed to satisfy either burden.  Consequently,
the Priming Motion must be denied under section 364(d).

C.      **Proof of Adequate Protection is Required to Prime Senior Liens**

29.     Adequate protection functions "to insure that the creditor receives the value for
which he bargained prebankruptcy."  *Resolution Trust Corp. v. Swedeland Dev. Group, Inc. (In
re Swedeland)*, 16 F.3d 552, 564 (3d Cir. 1994) (en banc) (*quoting MBank Dallas, N.A., v.*

*O'Connor (In re O'Connor)*, 808 F.2d 1393, 1396 (10th Cir. 1987). Adequate protection must provide the secured creditor with "the same level of protection it would have had if there had not been post-petition superpriority financing." *Swedeland*, 16 F.3d at 564. "Whether protection is adequate depends directly on how effectively it compensates the secured creditor for loss of value caused by the superpriority given to the post-petition loan." *Id.* (quotations omitted). In determining whether a secured interest is adequately protected, "care must be exercised to insure that the *vested property rights of the secured creditor* and the *values and risks bargained for by that creditor* prior to bankruptcy *are not detrimentally affected*." *In re O'Connor*, 808 F.2d at 1398 (emphasis added). "Adequate protection under § 364(d) requires that a first secured creditor be given protection equivalent to that which it would receive if it were voluntarily making a mixed secured and unsecured loan in a junior position." *In re Strug-Division LLC*, 380 B.R. 505, 514 (Bankr. N.D. Ill. 2008).

30.     The Debtors are now seeking to subvert section 364(d) to force WestLB to make "a mixed secured and unsecured loan in a junior position" that no lender would voluntarily make. *Id.* This is impermissible as a matter of law. The Debtors simply cannot provide WestLB with "protection equivalent to that which it would receive if it were voluntarily making a mixed secured and unsecured loan in a junior position." *Id.* No lender, let alone WestLB, would ever make a voluntary loan to the Debtors of $64,000,000 secured by a junior lien on collateral that has an as developed value of $40,450,000, and which is encumbered with either a $5,000,000 or $35,000,000 priming DIP lien. It is inconceivable that a lender would make such a loan with (i) the tremendous risks facing the collateral – particularly the risk associated with the Debtors' incremental and lengthy projected development and the Debtors' lack of equity, (ii) the inadequate "adequate protection" offered, and (iii) the intended use of the DIP proceeds to fund administrative expenses, debt service and the costs of pursing additional financing to develop the Project, instead of actually developing the Project.

D.    **Adequate Protection Requires Eliminating Risk for the Primed Lender**

31.    The core issue when determining if the offered protection is "adequate protection" involves "insur[ing] that the vested property rights of the secured creditor and the *values and risks* bargained for by that creditor prior to bankruptcy are not detrimentally affected."  *In re O'Connor*, 808 F.2d at 1398 (emphasis added) (*citing In re Martin*, 761 F.2d 472, 476-477 (8th Cir. 1985)); s*ee also Strug-Division*, 380 B.R. at 513 ("The important question, in determination of whether the protection to a creditor's secured interest is adequate, is whether that interest, whatever it is, is being unjustifiably jeopardized.") (quotations omitted).  "When the effect of the new borrowing with a senior lien is *merely to pass the risk of loss to the holder of the existing lien*, the request for authorization should be denied absent the lien holder's consent."  3 *Collier on Bankruptcy* § 364.05[1] (15th Ed. Rev'd) (emphasis added).

32.    Courts have consistently held that the risks inherent in speculative developments prevent a projected "increase in value" from being adequate protection.  *Swedeland*, 16 F.3d at 567 (reversing grant of a priming lien where the offered adequate protection was derived from a projected increase in value from development).  In *Swedeland*, the court admonished, "We cannot close this portion of our opinion without pointing out that what happened here is quite disturbing.  There, of course, is no doubt that the policy [of reorganization] underlying Chapter 11 is quite important.  Nevertheless, Congress did not contemplate that a creditor could find its priority position eroded and, as compensation for the erosion, *be offered an opportunity to recoup dependent upon the success of a business with inherently risky prospects*."  *Id.* (emphasis added); *see also Suntrust Bank v. Den-Mark Construction*, 406 B.R. 683, 700 (E.D.N.C. 2009) (reversing grant of a priming lien relying on increase in value for adequate protection); *In re YL West 87th Holdings I LLC*, 423 B.R. 421, 442-43 (Bankr. S.D.N.Y. 2010) (denying DIP motion relying on increase in value for adequate protection); *Strug-Division LLC*, 380 B.R. 505, 514 (same); *In re Chevy Devco*, 78 B.R. 585 (Bankr. C.D. Cal. 1987) (same); *but see In re O'Connor*, 808 F.2d at 1398 (relying on bankruptcy court's finding that there was no "significant" risk that the collateral would not increase in value, and that any risk was mitigated

by substantial additional collateral); *and In re 495 Central Park Ave. Corp.,* 136 B.R. 626, 631 (S.D.N.Y. 1992) (finding that the projected increase in value was adequate protection because "there is no question that the property would be improved" by an amount exceeding the priming debt).

33.     The fact patterns of *Swedeland*, *Suntrust*, *YL West*, *Strug-Division* and *Chevy Devco* are all very similar to the Debtors' attempts to prime WestLB in the Priming Motion.  In each of the cases, the debtor sought to prime DIP loans to develop or renovate their assets.  In *Swedeland*, for example, the debtor sought a priming DIP loan to finish construction on a project with an "as-is" value less than the amount of the senior debt but with an as completed value higher than the senior debt.  *Swedeland*, 16 F.3d at 556.  Only by successfully finishing the development would the senior lender have an equity cushion.  The Third Circuit rejected the offered "increase in value" adequate protection, stating "We reject the notion that development property is increased in value simply because a debtor may *continue with construction which might or might not prove to be profitable*."  *Id.* at 566 (emphasis added).  Like the court in *Swedeland* and this Court with the Priming Motion, the courts in *Suntrust, YL West*, *Strug-Division* and *Chevy Devco* were each faced with an attempt to use a speculative increase in value as adequate protection.  Each of these courts rejected these efforts in the strongest terms.

### (i)     Suntrust Bank v. Den-Mark Construction

34.     In *Suntrust*, the district court reversed the bankruptcy court and held that even though based on the debtor's "as-constructed" valuation there would be an equity cushion between 4.55% and 11%, the increase in value to achieve that equity cushion was too speculative to be adequate protection.  *Suntrust*, 406 B.R. at 699 ("The court finds these bases [monthly interest payment and increase in value] are not sufficient as SunTrust's interest is being *unjustifiably jeopardized in that it must look to an undeveloped subdivision - its least valuable collateral - for repayment of its loan*.") (emphasis added).   There are numerous telling similarities between the Debtors' proposal in these cases and the debtor in *Suntrust*.

23

35.     Like the debtor in *Suntrust*, the Debtors here are relying on a gross revenue number of "over $100,000,000" for the completed Project as their primary source of adequate protection – even though their own "Remaining Cash Flow Distribution" in their DIP Model shows a speculative increase in value, that if all goes perfectly, will only create a 5% equity cushion for WestLB.[19]  *See* DIP Model, Ex. A, DB 000103.  In addition, like the debtor in *Suntrust* the Debtors (i) plan to finance their risky endeavor by selling WestLB's most valuable collateral, Phase I, to fund the development of Phase II and the repayment of the DIP loan, while relegating WestLB to wait until Phase II is completed before it can begin recovering its claim, and (ii) do not have any financing in place to actually complete construction of Phase II (the very portion of the Project that WestLB and the unsecured creditors are supposed to look to for their recoveries).  The court in *Suntrust* noted these risks in denying the DIP motion, finding that the debtor "has no horizontal funding plans for the completion of either phase" of the project allocated to the original senior lender for its recovery and "[h]ere, the risk in this venture is arguably great as funding for the remaining projects is contingent upon the sale of lots in Phases I and IIA [the primary collateral for the DIP loan].  Moreover, with each lot sale [and the use of proceeds to fund construction and the DIP], SunTrust's collateral declines in value; thereby deteriorating SunTrust's lien position."  *Id.* at 699-700.[20]

### (ii)      YL West, Strug-Division, and Chevy Devco

36.     The courts in *YL West*, *Strug-Division*, and *Chevy Devco* each also rejected priming DIP motions similar to the Priming Motion in this case, finding that the senior lender did not receive adequate protection.  In *YL West,* the debtor sought funds to convert apartments to

---

[19]  Due to the material errors in the DIP Model, including the failures to (i) use the correct amount for WestLB's claim, (ii) account for all fees and cost of the proposed DIP loan, and (iii) discount the projected sale proceeds to their net present value, WestLB does not actually have an equity cushion and instead has a deficiency far in excess of $5,000,000.

[20]  The court continued "In this case, SunTrust is compensated only in the form of monthly interest payments with repayment of principal deferred until (1) the priming lien is paid in full via the sale of [the debtor's] most valuable collateral and (2) financing is secured for the completion of site preparation and infrastructure in Phases II-B and III [the undeveloped collateral]; thereby bringing these lots into a marketable condition.  Given the equity cushion is small and the enhancement of value is too speculative, SunTrust has not been sufficiently assured of the indubitable equivalence of its existing security."  *Id.*

condominiums and offered the increase in value as adequate protection. The court rejected this adequate protection, holding, "Even if the Court were persuaded by the [debtor's] valuation of the Subject Property and found that the Debtor had some equity in the Collateral, priming would still be denied under *section 364(d) because it is highly speculative whether the Project can be completed in the first instance*." *YL West*, 423 B.R. at 443 (emphasis added).

37.     In *Strug-Division,* the proposed adequate protection came from repairing water damage and making other improvements. The court held, "If there is any equity cushion in the properties, it is eroding on a daily basis. Debtors are trying to reorganize on a shoe-string budget, and the *potential success of the proposed renovation project is too speculative. . . . With nonexistent, or at most a small and eroding equity cushion*, [the senior lender] *should not be required to bear the risk of whether the renovations will generate income necessary to service its loan and the new [DIP] loan*, or whether the ultimate increased value will protect its loans if subordinated." *Strug-Division*, 380 B.R. at 514 (emphasis added).

38.     Finally, in *Chevy Devco* the court rejected the debtor's efforts to finance the renovation of a commercial space at the senior lender's expense. The court held "[a]fter the new financing, [the senior lender] would be behind both the tax lien and a new construction loan in the amount of $1,200,000.00. The property would be under construction for some length of time and [the senior lender] would have no control over the construction, its decisions, its completion or the time involved. Should *the construction be unsuccessful, the property may not increase in value and, in fact, it might decrease in value. Even if the property were to increase in value, it may not be sufficient to collateralize [the senior lender] to the extent that it is currently collateralized*. Further, [the senior lender] may have to pay $1,200,000.00 to Union Bank [the DIP lender] to protect itself against foreclosure upon [a DIP] default." *Chevy Devco*, 78 B.R. at 588 (emphasis added).

### (iii)     495 Central Park and In re O'Connor

39.     The Debtors rely extensively on *In re 495 Central Park Avenue Corp*., 136 B.R. 626 (Bankr. S.D.N.Y. 1992), as authority that an increase in value constitutes adequate

25

protection.  *495 Central Park* is inapposite.  The defining element of *495 Central Park* is that the increase in value was risk free to the primed lender.  The court held, "*there is no question that the property would be improved by the proposed renovations and that an increase in value will result*.  In effect, a substitution occurs in that the money spent for improvements will be transferred into value.  This value will serve as adequate protection for [senior lender's] secured claim."  *See Id.* at 631 (emphasis added).  The courts in *Swedeland* and *YL West* distinguished *495 Central Park* on this exact basis.  The *Swedeland* court summarized the holding and facts of *495 Central Park* as involving a case where "projected property improvements . . . *would increase value* of real estate securing pre-petition loan *by at least* $800,000, and superpriority post-petition loan financing the projected improvements amounted to only $650,000."  *Swedeland*, 16 F.3d at 566 (emphasis added).  Similarly, the court in *YL West* stated, "The court [in *495 Central Park*] ultimately concluded that the renovation *will cause the subject property to increase in value* by approximately $800,000.  The key finding is that '*there is no question* that the property would be improved by the proposed renovations and that an *increase in value will result*.'"  *YL West*, 423 B.R. at 442 (emphasis added).  The Debtors cannot give the same assurances.  The development of Phase II is not risk free and, presently, no portion of the proposed DIP loan may be used to develop the Project.  As such, *495 Central Park* does not support the argument that the Debtor's speculative proposed increase in value is adequate protection for WestLB's senior liens.

40.      Although not relied on by the Debtors as extensively as *495 Central Park*, *In re O'Connor*, also does not support the Debtors' Priming Motion.  In *In re O'Connor*, the Tenth Circuit was careful to caution, "care must be exercised to insure that the *vested property rights of the secured creditor* and the *values and risks bargained for by that creditor* prior to bankruptcy *are not detrimentally affected*."  808 F.2d at 1398 (emphasis added).  After this caution, when the court ultimately affirmed the bankruptcy court's finding of adequate protection, it did so on the basis that the risk to the secured creditor was not significant.  The Tenth Circuit stated, "The bankruptcy court found . . . the *risk to the Bank was not significant*.  That determination *is*

*supported by substantial evidence, and it is critical to the issue of adequate protection* that exists in this case." *Id.* (emphasis added). Significantly, the federal appellate court also noted that whatever risk there was, was "set off somewhat, however, by the additional substitute lien . . . [with] its present worth [of] more than half the value of the cash collateral Debtors wanted to use." *Id.* at fn. 6. Of course, in the Debtors' cases, the risk to WestLB from any future development is significant and there is no evidence, let alone "substantial evidence" to the contrary. To render *In re O'Connor* that much more inapposite, unlike there, the Debtors are not attempting to provide WestLB with a new source of collateral to offset its risk from the development.

E.    **The Debtors Have Not Provided Any Evidence to Carry Their Burdens of Proof Under Section 364(d)**

41.    The Debtors have failed to provide any evidence to carry their burdens of proof under section 364(d) of the Bankruptcy Code. The Debtors have not filed any exhibits, affidavits or declarations in support of the Priming Motion. The Debtors are obligated to demonstrate two things. First, that they were not able to secure alternate financing under section 364(d)(1)(A). Second, that WestLB's senior secured liens are adequately protected under section 364(d)(1)(B). They have failed on both counts.

42.    The Debtors' self-serving and unsupported statements in the Priming Motion are not evidence and do not satisfy either of their statutory burdens under section 364(d). Simply stating that the Debtors attempted to negotiate financing with various parties and that "Prior to the Petition Date [i.e. June 24, 2010 – over seven months ago], the Debtors and their advisors canvassed approximately twenty sources of prospective postpetition financing" does not prove either the extent of the Debtors' efforts or that it "is unable to obtain [non-priming] credit otherwise." Priming Motion, ¶ 41; 11 U.S.C. § 364(d)(1)(A). As the court in *Suntrust* held when denying the debtor's DIP motion, "the record does not clearly indicate[] that [the debtor] contacted other financial institutions in the immediate geographic area [but to no avail]. In fact, [the debtor] identified no specific investor or lending institution it approached except for [the

27

secured creditor] and [the proposed DIP lender]."  *Suntrust*, 406 B.R. at 692 (quotations omitted).

43.     Similarly, specious and unsubstantiated statements like "WestLB will be provided additional adequate protection during the entirety of the case by virtue of the Debtors' ability to better protect and even to enhance the value of the Property" and "WestLB is adequately protected under the proposed DIP Facility by the increase in the value of their collateral which will flow directly from the use of the DIP Facility funds" are grossly inadequate to prove that WestLB is adequately protected.  Priming Motion, ¶¶ 40 & 47.  Saying something does not make it so.  The Debtors have not introduced any evidence of (i) the current value of the Project or its value on an as developed basis, (ii) the nature, value and risk inherent in the proposed adequate protection, including the substantial risk that the alleged increase in value will not materialize (let alone evidence of the size of the projected increase), or (iii) the economic justification for the Debtors' highly risky attempts to develop the Project.

## IV.     **Conclusion**

44.     Permitting priming debt under section 364(d) of the Bankruptcy Code is an extraordinary remedy that is not permissible in these cases.  The Debtors have not met their statutory obligation to provide WestLB with adequate protection for the diminution in value of its interests.  Without adequate protection, the Priming Motion must be denied.  WestLB's senior liens are not adequately protected against the diminution caused by the proposed $5,000,000 priming loan to be used to fund the Debtors' administrative expenses and financing costs.  An offer of protection in the form of (i) a speculative increase in value, (ii) monthly payments of $100,000 financed through the priming DIP loan, and (iii) payment of $2,400,000 from an account that is already WestLB's collateral, is not adequate protection.  The Debtors rely on a speculative increase in value as their primary form of adequate protection.  Since the DIP loan cannot be used to fund any improvements to the Project, the offer of an increase in value is illusory.  However, even if the Debtors were authorized to develop the Project, the speculative and highly risky nature of the development prevents any hypothetical increase in value from

constituting adequate protection.  For the reasons set forth herein, the Priming Motion should be denied.[21]

Dated: February 4, 2011                          Respectfully submitted,

                                                 By:   /s/ Christopher D. Bryan

                                                 Matthew C. Ferguson (# 25687)
                                                 Christopher D. Bryan (#35522)
                                                 GARFIELD & HECHT, P.C.
                                                 601 East Hyman Avenue
                                                 Aspen, Colorado 81611
                                                 Telephone:  (970) 925-1936
                                                 Facsimile:   (970) 925-3008
                                                 Email: ferguson@garfieldhecht.com
                                                         cbryan@garfieldhecht.com

                                                 *Local Counsel for WestLB AG*

                                                 Richard W. Havel
                                                 Jeremy E. Rosenthal
                                                 Ariella T. Simonds
                                                 SIDLEY AUSTIN LLP
                                                 555 West Fifth Street, Suite 4000
                                                 Los Angeles, California 90013
                                                 Telephone:  (213) 896-6000
                                                 Facsimile:   (213) 896-6600
                                                 Email: rhavel@sidley.com
                                                         jrosenthal@sidley.com

                                                 *Counsel for WestLB AG*

---

[21] WestLB expressly reserves the right to seek sanctions against the Debtors and to amend or supplement this Objection in response to any new arguments raised or evidence presented by or on behalf of the Debtors.  WestLB further reserves the right to introduce evidence supporting this Objection at the hearing on the Priming Motion.

29

**EXHIBIT A**


**DIP MODEL**
**DB 000103-111**


**[FILED UNDER SEAL]**