

> Signed/Docketed
> May 25, 2011

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
### The Honorable Michael E. Romero

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Case No. 10-25805 MER |
| DB CAPITAL HOLDINGS, LLC, | ) | (Involuntary Petition) |
| | ) | Chapter 11 |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| In re: | ) | Case No. 10-36493 MER |
| | ) | |
| DANCING BEAR DEVELOPMENT, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| | ) | |
| In re: | ) | Case No. 10-39584 MER |
| | ) | |
| DANCING BEAR LAND, LLC, | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |

## ORDER ON OUTSTANDING MOTIONS

The above-captioned cases come before the Court on the following matters:

- West LB, AG's Motion for an Order Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 361(d) in all cases;
- Debtors' Second Motion for an Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 502 (1) Approving Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, (3) Granting Adequate Protection, and (4) Modifying Automatic Stay filed in Case No. 10-25805 MER, *In re DB Capital Holdings, LLC* and Case No. 10-39584 MER, *In re Dancing Bear Land, LLC.*
- Aspen HH Ventures, LLC's Motion for Appointment of Chapter 11 Trustee filed in Case No. 10-25805 MER, *In re DB Capital Holdings, LLC.*

(collectively, the "Motions").

The Court held an evidentiary hearing on the Motions, and permitted the parties to file post-trial written closing statements. The Motions are now at issue and the Court makes the following findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1334(a) and (b) and 157(a) and (b). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (D), and (G), as it concerns the administration of the estate, obtaining credit, and motions to terminate, annul, or modify the automatic stay.

## BACKGROUND FACTS[1]

The three "Dancing Bear" cases pending before this Court are as follows: (1) *In re Dancing Bear Land, LLC*, Case No. 10-39584 MER, a voluntary Chapter 11 case filed November 23, 2010; (2) *In re Dancing Bear Development,* Case No. 10-36493 MER, a voluntary Chapter 11 case filed October 19, 2010; and (3) *In re DB Capital Holdings, LLC,* Case No. 10-25805 MER, an involuntary Chapter 11 case filed June 24, 2010, in which the order for relief was entered November 29, 2010.[2]

- Land is a single asset real estate debtor. Land is the owner, subject to the rights of owners of fractional interests, of the real property and improvements (the "Real Property") associated with a luxury fractional interest residence club in Aspen, Colorado (the "Project"). The Real Property consists of two parcels of real estate situated across the street from one another. Land's sole business is the ownership and development of the Real Property. Land does not currently have equity in the Project.

- Capital owns 100% of the membership interests in Land.

- Development owns 55.6% of the membership interests in Capital. Development's equity interests are Class B interests. Aspen HH Ventures, LLC ("Aspen HH") owns 44.4% of the membership interests in Capital. Aspen HH's equity interests are Class A interests. Aspen HH is the Class A Member of Capital and, pursuant to Sections 4.2 and 7.2 of Capital's Operating Agreement, is entitled to receive 100% of the cash available for distribution until it has received a return of its $6 million capital contribution, plus 12% interest.

- The present manager of Land is Thomas M. Di Venere ("Di Venere"), and the present manager of Capital is Dancing Bear Management, LLC ("Management"). The general partner of Development is Management.

---

[1]   The background information is gleaned from the pleading entitled "Stipulated Facts" filed by the parties on February 14, 2011, at Docket No. 191 in Case No. 10-25805, MER at Docket No. 75 in Case No. 10-35984 MER, at Docket No. 41 in Case No. 10-36493 MER and from testimony.

[2]   For purposes of this Opinion, the Debtors in the above cases shall be referred to herein as Dancing Bear Land, LLC ("Land"), Dancing Bear Development ("Development") and DB Capital Holdings, LLC ("Capital").

- The Project consists of two phases.  Phase I, or the Parkside Building, is the fractional interest residence club located at 411 S. Monarch Street in Aspen.  Phase II, or the Mountainside Building, is the partially developed parcel located at 219 E. Durant Avenue in Aspen.  Phase I contains a 9-unit condominium building, divided into 72 fractional units, as well as two restricted-income housing units that have been allocated for employees, a restaurant space, underground parking and storage, a meeting space, an exercise facility, and a rooftop deck.  Thirty-two of the fractional units in Phase I have been sold, leaving 40 units still available.  Phase II was conceived as an 11-unit condominium building to be divided into 80 fractional interests and one penthouse which itself may be divided into 8 fractional interests.  Construction on Phase II was halted in mid-2009 and, except for some basic monitoring and maintenance for safety, drainage and snow-loading, the Phase II property has been dormant since construction was halted.

- To fund the development of the Project, Land, Capital and a subsidiary of Capital, LCH, LLC ("LCH"), obtained two loans from West LB AG ("West LB").

  - The first loan, in the maximum principal amount of $53,000,000 (the "Senior Loan"), was made through a Loan and Security Agreement dated June 15, 2006 (as amended on September 22, 2006, the "Senior Loan Agreement"), evidenced by a Promissory Note also dated June 15, 2006.

  - The second loan, in the maximum principal amount of $5,000,000 (the "Second Loan" and, together with the Senior Loan, the "Loans"), was made pursuant to a Second Loan and Security Agreement dated September 22, 2006 (the "Second Loan Agreement" and, together with the Senior Loan Agreement, the "Loan Agreements"), and was evidenced by a Promissory Note, dated September 22, 2006.

- The Loans were made to Land, Capital and LCH, collectively as "Borrower."  Land and LCH[3] executed two Deeds of Trust, one senior, securing the Senior Loan, and one junior, securing the Second Loan, which were recorded against their respective properties (collectively, the "Deeds of Trust").  The Loans were further secured by, among other things: 1) separate senior and junior collateral assignments of Project-related contracts (jointly executed by all three Borrower entities), 2) separate senior and junior pledges of all of the equity in Capital jointly made by Aspen HH and Development, and 3) separate senior and junior pledges of all of the equity in Land and LCH by Capital.

---

[3] Originally, one of the two parcels was owned by LCH.  However, on September 4, 2007, a Bargain and Sale Deed executed by LCH and conveying its interest in the Phase II parcel to Land was recorded.  Thus, presently, Land is the owner in fee simple of all of the Real Property, subject to the interests of West LB under the Loan Documents or otherwise, including as beneficiary under the LCH Trust Deeds, and the interests of other fractional interest owners.

- On or about March 19, 2009, West LB, Land, Capital and LCH entered into an Amendment to Loan and Security Agreement ("Senior Loan Amendment") and an Amendment to Second Loan and Security Agreement ("Second Loan Amendment" and, together with the Senior Loan Amendment and related Loan documents, the "Loan Amendments"). During the negotiation of the Loan Amendments, West LB, the Borrower and Community Banks of Colorado ("Community Banks") entered into Depository Agreements (the "Depository Agreements") governing the Borrower's and West LB's respective rights to funds held in the Sales Proceeds Account and the Purchase Contract Reserve Account (the "Sales Accounts") maintained with Community Banks.

- On June 1, 2009, Land failed to make a required interest payment and thereafter failed to make any subsequent monthly interest payments required under the Loan Documents. On October 15, 2009, the maturity date of the Loans, Land failed to repay the obligations due under the Loans. West LB declared an Event of Default under the Loan Documents by letter dated October 19, 2009.

- West LB notified Community Banks of the Event of Default under the Loan Documents and directed Community Banks to release the funds on deposit in the Sales Accounts to West LB. The Debtors instructed Community Banks to not release the funds to West LB.[4] To date, Community Banks has not disbursed the funds in the Sales Accounts to West LB.

- As a result of this default, on or about March 12, 2010, West LB filed an action in the District Court for Pitkin County, Colorado. As part of that case, a receiver was put in place to manage the Project (the "Receiver"). Aspen HH was granted leave to intervene in the West LB receivership action on May 21, 2010, and to file its own cross-complaint for dissolution and appointment of a receiver. On May 27, 2010, the Pitkin County District Court entered an order scheduling a hearing on Aspen HH's motion to appoint a receiver.

- On or about March 10, 2010, West LB filed a Complaint for Interpleader with the District Court for Pitkin County, Colorado, seeking a determination of West LB's and the Borrower's respective rights to the Sales Accounts (the "Interpleader Action"). There have been no developments in the Interpleader Action and that action is now stayed as a result of Land's and Capital's bankruptcy cases. Because the Interpleader Action was pending at the time the Receiver was appointed and currently remains pending, the Receiver has not been able to access the funds in the Sales Accounts for the operation of the Real Property. The Sales Accounts currently contain approximately $2,672,000 of West LB's cash collateral.

---

[4] This statement was contained in the parties' "Stipulated Facts." It is not clear whether the "Debtors" included Development, as well as Land and Capital, or whether LCH, as the other constituent of "Borrower," also gave the instruction to Community Bank.

- On May 27, 2010, Capital filed a voluntary Chapter 11 petition in Case No. 10-23242 MER.  This case was dismissed by the Court on June 21, 2010.

- Immediately thereafter, on June 24, 2010, creditors GBDS at Snowmass, William Dennis, Fred Funk, Realty Financial Resources, Inc., and O'Bryan Partnership, filed an involuntary Chapter 11 petition against Capital, Case No. 10-25805 MER.  The Court entered an order for relief in that case on November 26, 2010.

- Development and Land filed their voluntary Chapter 11 petitions on October 19, 2010, and November 23, 2010, respectively.

- The current Motions to Borrow were filed on January 11, 2011.  On February 4, 2011, West LB filed an objection to the Motions to Borrow.

- In the meantime, West LB had filed its Motions for Relief from Stay which have been opposed by the Debtors.

- In addition, on January 17, 2011, Aspen HH filed a Motion to Appoint a Trustee in the Capital case, to which the three Debtors have objected.

- The Motion to Borrow filed by Land and Capital seeks approval to borrow $5,000,000 (the "DIP Facility") on a first priority priming basis secured by all assets of the Debtors including all avoidance actions under the Bankruptcy Code.  The Motion to Borrow also seeks to grant superpriority claims to Colbeck Capital Management, LLC ("Colbeck"), as Administrative Agent (in such capacity, together with its successors in such capacity, the "DIP Agent"), and the lenders party thereto from time to time (collectively, the "DIP Lenders"), which will prime all of West LB's liens and claims against the Debtors' estates and all assets of their estates.  The Debtors intend to finance the development of the Project and the repayment of the DIP Facility through a subsequent $35,000,000 priming facility and then repay that facility through the sale of remaining inventory in the Project.

- The annual minimum interest rate on the DIP Facility is 15% per annum.  The DIP Facility accrues interest at LIBOR plus 13% with a LIBOR floor of 2%.  The default rate for the DIP Facility is 2% over the applicable interest rate.  The DIP Facility is also subject to a 2% commitment fee, a 2% origination fee, a 2% exit fee, and an undetermined administrative fee to be set forth in a separate fee letter.

- The Debtors believe unless they are permitted to borrow the currently proposed $5,000,000 DIP Facility, they will not be able to reorganize under Chapter 11 of the Bankruptcy Code.

- The Debtors believe without at least approximately $19,173,594 of priming financing and the ability to sell West LB's collateral to fund development expenses they cannot successfully develop the Project.

- Under Section 4.01 of the Credit Agreement, the obligations of the DIP Lenders to make Loans on the Effective Date (as such terms are defined in the Credit Agreement) are subject to (1) the satisfaction of fifteen enumerated conditions to the reasonable satisfaction of the Required Lenders[5] or (2) the written waiver of such condition(s) by the Required Lenders. The following conditions precedent in Section 4.01 to the DIP Lenders' obligations to make Loans under the Credit Agreement have not been satisfied or waived as of the date of the Stipulated Facts:

> (a) The Administrative Agent (or its counsel) shall have received from the Borrower and each other Loan Party the Security Agreement, duly executed by the Borrower and each Loan Party, together with evidence that all other actions, recordings and filings that the Required Lenders reasonably deem necessary in connection with the Security Agreement have been taken or completed, including, without limitation, control agreements with respect to each Loan Party's deposit accounts and endorsements with respect to insurance policies naming the Collateral Agent as additional insured and loss payee.

> (b) The Administrative Agent shall have received from the Borrower a Closing Certificate dated as of the Effective Date and signed on behalf of the Borrower by a Borrower Financial Officer.

> (c) The Administrative Agent shall have received such documents and certificates as the Required Lenders or their counsel may reasonably request relating to the organization, existence and good standing of each Loan Party and the authorization of the transactions contemplated hereby, all in form and substance reasonably satisfactory to the Required Lenders and their counsel.

> (d) The Final Order, which shall be in form and substance satisfactory to the Required Lenders, shall be in full force and effect and shall not have been vacated, stayed, reversed, modified or amended in any respect without the prior written consent of the Required Lenders, and if the Final Order is the subject of a pending appeal in any respect, neither the making of the Loans nor the performance by any Debtor of any of their respective obligations under any of the Loan Documents shall be the subject of a presently effective stay pending appeal.

---

[5] See West LB Exh. 6, Credit Agreement dated January 11, 2011, p. 20, defining "Required Lenders" as "at any time, Lenders holding a majority in aggregate principal amount of the Loans and the aggregate unused Commitment at such time."

(e)  The Borrower shall have paid to the Administrative Agent the then unpaid balance of all accrued and unpaid fees then due and payable under and pursuant to Section 2.16 of the Credit Agreement and all expenses (to the extent invoices for such expenses have been provided at least three (3) Business Days prior to the Effective Date) required to be reimbursed pursuant to Section 11.05 of the Credit Agreement.

(f)  The Administrative Agent shall have received all documentation and other information mutually agreed to be required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including the United States Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)).

(g)  No trustee, receiver or examiner shall be in place with respect to the Loan Parties or their respective properties.

(h)  The Effective Date shall have occurred no later than five (5) days after the date on which the Final Order is entered by the Bankruptcy Court.

(i)  The Cases of all the Debtors shall have been consolidated by the Bankruptcy Court and no motions to dismiss any of the Cases shall be pending.

(j)  The Borrower shall have furnished to the Administrative Agent such further information, certificates and documents as the Administrative Agent or the Required Lenders may reasonably request.

• Colbeck presently expects that all of the conditions precedent in Section 4.01 to the Lenders' obligations to make Loans will be satisfied in a timely manner or waived by the Required Lenders.

• Under Section 4.02 of the Credit Agreement, the obligations of the DIP Lenders to make any Loan[6] (including any Loans on the Effective Date) are subject to (1) the satisfaction of four enumerated conditions to the reasonable satisfaction of the Required Lenders or (2) the written waiver of such condition(s) by the Required Lenders.  Assuming the Borrower makes a Borrowing Request on the Effective Date in accordance with the Credit Agreement and the conditions in Section 4.01 of the Credit Agreement have otherwise been satisfied, Colbeck is not presently aware of any condition in Section 4.02

---

[6]  See West LB Exh. 6, Credit Agreement dated January 11, 2011, p. 14 defining "Loans" as "the Loans made pursuant to Section 2.01(a) [of the Credit Agreement]."  The Loans referred to in this and the following paragraphs are therefore the prospective loans to be made under the Motion to Borrow, not the loans already made by West LB.

that is not likely to be satisfied or waived by the Required Lenders as of the date of the Borrowing Request.

•      The Commitment Letter filed with the Priming Motion reflects a contingent commitment to lend an additional $35,000,000 to permit the Debtors to complete the development of the Project and refinance the DIP Facility. The commitment of Colbeck, as "Arranger" under the Commitment Letter and the other obligations under the Commitment Letter are subject to the satisfaction of eight enumerated conditions precedent in Section 1 of the

Commitment Letter, including the satisfaction of additional conditions precedent to the initial extension of credit contained on pages A-3 through A-5 of the Term Sheet attached to the Commitment Letter as Exhibit A. The conditions precedent in the Commitment Letter and Term Sheet have not been satisfied at this time. The Debtors and West LB have been informed that Colbeck remains committed to providing financing pursuant to the Commitment Letter, subject to satisfaction of the conditions precedent therein at the appropriate time.[7]

## MOTIONS FOR RELIEF FROM STAY

**The Motions and Objections**:

     In the Land case, West LB's motion for relief from stay alleges the Debtor has no equity in the Real Property, and West LB's debt is now over $60 million. West LB asserts the bankruptcy was filed on the eve of foreclosure in the state court receivership case for the purpose of hindering and delaying West LB. Moreover, West LB alleges Land and Capital, as part of an out of court workout, waived the automatic stay and waived the right to seek super-priority financing, although they are now seeking the protection of the stay and are seeking super priority financing. West LB asserts Land cannot provide adequate protection, and cannot promulgate a feasible plan to finish the Project. Therefore, West LB seeks relief from stay to continue with its state court proceedings.

     In the Capital case, West LB's motion for relief from stay asserts Capital owns 100% of Land, an insolvent single asset real property debtor. As part of the loans on the Project, West LB holds a security interest in Capital's equity in Land (the "Membership Interest"). As in the Land stay motion, West LB contends Capital waived, prepetition, any ability to seek the protection of the stay against West LB. In addition, according to West LB, Capital has no equity in its membership interest in Land, and such membership interest is not necessary to an effective reorganization because the value of the Real Property is much less than West LB's debt, and because Capital has no real prospects for reorganization.

---

[7] See Case No. 10-25805 MER, Docket No. 191; Case No. 10-36493 MER, Docket No. 41; Case No. 10-39584 MER, Docket No. 75.

With respect to Development, West LB, on generally the same grounds as the other motions, seeks relief from stay as to the Development Collateral, that is, Development's equity ownership interest in Capital.  Specifically, West LB asserts Development, prepetition, waived any ability to seek protection of the automatic stay, and has no equity in the collateral, which is not necessary for an effective reorganization.

The Debtors' objections allege relief from stay is not appropriate because the Debtors' prepetition waiver of their rights to claim protection of the automatic stay is unenforceable, because West LB is adequately protected, and because the Real Property is necessary for an effective reorganization the Debtors have in prospect.  Aspen HH's response states the Motions should be denied because there has not been a breach of contract by Land or Capital, and because the prepetition waiver is unenforceable.  In addition, Aspen HH maintains the only way the  Project could have incurred cost overruns which exceeded the budget is if West LB breached the Loan Agreements.  Specifically, Aspen HH asserts West LB did not require evidence prior to each loan advance that the loan proceeds would be sufficient to cover all Project costs.

**Discussion:**

**A**.      **Have the Debtors Waived Application of the Automatic Stay?**

According to West LB, it agreed to forebear exercising its remedies against its collateral, to extend the deadline for the completion of the Project, and to provide an additional $11,964,331 in funds to pay the Debtors' obligations, and the Debtors, in return, agreed not to oppose any motion for relief from stay by West LB.[8]  The Loan Amendments entered into by the Debtors and West LB state:

> If, for any reason, any Borrower Party becomes a debtor in a case under any chapter of the Bankruptcy Code, then the Borrower Parties (including any of them that is a debtor in such case) hereby agree as follows:

> [West LB] shall be entitled to receive immediate relief from the automatic stay provisions of the Bankruptcy Code following any bankruptcy petition which any Borrower Party may file, or which may be filed against any Borrower Party, and no borrower party shall contest any motion for relief from the automatic stay which may be filed by [West LB].  The Borrower Parties hereby consent to any such termination or modification of the automatic stay as may be requested by [West LB], and hereby

---

[8]  See West LB Exhibits 49 and 50, Amendment to Loan and Security Agreement, and Amendment to Second Loan and Security Agreement, dated March 19, 2009.  West LB notes the Loan Amendments also contain agreements by the Debtors not to seek postpetition financing on a priming basis. It should be noted the Debtors allege they received no consideration for the Loan Amendments, and the Loan Amendments served to benefit only West LB while leaving the Debtors with no working capital.  However, the conclusion of the Court on this issue would be the same whether consideration was received or not.

expressly waive any and all rights, protections, and benefits of the automatic stay or similar injunctive relief available under the Bankruptcy Code.[9]

Many courts addressing the issue of waiver with respect to the automatic stay have held a waiver may be enforced in appropriate circumstances.[10]  Courts finding prepetition waivers of the automatic stay to be enforceable point out the enforcement furthers the legitimate public policy of encouraging out-of-court restructuring and settlements.[11]

However, other courts have declined to enforce such agreements.[12]  The United States District Court for the Southern District of Texas stated enforcement was generally allowable only if the agreement was part of a previous bankruptcy case, not part of the non-bankruptcy loan agreement, explaining:

> It is against public policy for a debtor to waive the pre-petition protection of the Bankruptcy Code. *In re Huang*, 275 F.3d 1173, 1177 (9th Cir. 2008).  As to waivers of the automatic stay, however, the majority view, and the trend in bankruptcy decisions, is that pre-bankruptcy waivers of the automatic stay are sometimes

---

[9]  West LB Exhibit 49, ¶ 6.1, and West LB Exhibit 50, ¶ 6.1.

[10]  *In re Bryan Road, LLC*, 382 B.R. 844, 849 (Bankr. S.D. Fla. 2008) (setting forth factors for a bankruptcy court to consider in deciding whether to enforce a stay relief agreement); *In re Frye*, 320 B.R. 786 (Bankr. D. Vt. 2005) (although such an agreement is not *per se* enforceable, the creditor in that case could obtain enforcement unless the debtor, after an evidentiary hearing, could  show sufficient equity in the property, sufficient likelihood of effective reorganization, or sufficient prejudice to other creditors); *In re Excelsior Henderson Motorcycle Mfg. Co.*, 273 B.R. 920 (Bankr. S.D. Fla. 2002) (enforcing a prepetition agreement); *In re Shady Grove Tech Ctr. Assoc. Ltd. P'ship*, 216 B.R. 386 (Bankr. D. Md. 1998) (setting forth several factors as to whether cause exists to warrant relief from stay); *In re Atrium High Point Ltd. Ptnrshp.*, 189 B.R. 599 (Bankr. M.D. N.C. 1995) (prepetition waivers by debtor of automatic stay protection are enforceable in appropriate cases where enforcement does not violate public policy concerns, but are not binding on third-party creditors); *In re Cheeks*, 167 B.R. 817 (Bankr. D. S.C. 1994) (prepetition agreements are enforceable on policy grounds of encouraging out-of-court restructuring and settlements, but waivers are not self-executing and are not binding on third parties);  *In re Darrel Creek Associates, L.P.,* 187 B.R. 908, 910 (Bankr. D. S.C. 1995) (prepetition waiver-of-stay agreements are enforceable in appropriate circumstances, and such agreements function as a factor in determining whether relief from stay may be granted); *In re Powers*, 170 B.R. 480 (Bankr. D. Mass. 1994) (same); *In re Club Tower L.P.*, 138 B.R. 307 (Bankr. N.D. Ga. 1991) (prepetition agreement granting creditor relief from the automatic stay was binding on the parties where bankruptcy was filed in bad faith); *In re Citadel Properties, Inc.*, 86 B.R. 275 (Bankr. M.D. Fla. 1988) (same); *In re Gulf Beach Dev. Corp.*, 48 B.R. 40 (Bankr. M.D. Fla. 1985) (while the debtor cannot be contractually precluded from filing bankruptcy, the stay would be lifted for cause).

[11]  *See In re Cheeks*, 167 B.R. at 818 ("Perhaps the most compelling reason for enforcement of the [waiver] is to further the public policy in favor of encouraging out-of-court restructuring and settlement . . . . Bankruptcy courts may be an appropriate forum for resolving many of society's problems, but some disputes are best decided through other means.") (citation omitted); *In re Powers*, 170 B.R. at 483; *In re Club Tower, L.P.*, 138 B.R. at 311.

[12]  *In re Jenkins Court Assoc. Ltd. P'ship*, 181 B.R. 33 (Bankr. E.D. Pa. 1995) (a pre-petition agreement would not be enforced without further development of the facts); *Farm Credit of Cent. Florida, ACA v. Polk*, 160 B.R. 870 (M.D. Fla. 1993) (same);  *In re Sky Group Int'l, Inc.*, 108 B.R. 86 (Bankr. W.D. Pa. 1989) (a prepetition waiver was not self-executing or per se enforceable);

enforceable. *In re Pease*, 195 B.R. 431, 433 (Bankr. D. Neb. 1996) (collecting cases); *see also In Re Bryan Road, LLC*, 382 B.R. 844, 848 (Bankr. S.D. Fla. 2008). Some courts have dissented, however, and held that waivers of the automatic stay are unenforceable. *Id.* (collecting cases). Bankruptcy courts have typically enforced the waiver agreements arising from forbearance agreements or previous Chapter Eleven filings. In *dicta*, these courts have expressed a general proposition that pre-petition waivers of stay of relief will be given no particular effect if they are part of the original loan documents but will be given greater effect if they are entered into during the course of prior bankruptcy proceedings. *In Re Bryan Road*, 328 B.R. at 848; *In re Atrium High Point Ltd. Partnership*, 189 B.R. 599, 607 (Bankr. M.D. N.C. 1995) (noting that a pre-petition waiver the court held enforceable was not contained in the original loan documents but rather in the debtor's reorganization plan).[13]

Further, in discussing the fact that automatic stay waivers are often enforced in single asset real estate cases, the Bankruptcy Court for the Eastern District of Pennsylvania opined: "As a practical matter, there may be little significant distinction between the enforcement of a pre-petition waiver of the automatic stay in a single asset case and the enforcement of a provision prohibiting the filing of a bankruptcy case in the first place."[14]

The Bankruptcy Court for the District of Nebraska found an agreement to waive the automatic stay unenforceable *per se*.[15]  In that case, Bankruptcy Judge Minihan reasoned as follows:

First, before the bankruptcy case is filed, the debtor does not have the capacity to waive the rights bestowed by the Bankruptcy Code upon a Chapter 11 debtor in possession.  Prior to the commencement of the bankruptcy case, the debtor entity has the capacity to enter into an agreement binding upon the debtor under applicable non-bankruptcy law.  Upon the commencement of a Chapter 11 bankruptcy case, the debtor becomes a "debtor in possession" with a fiduciary duty to creditors and rights and obligations under federal law.  See §§ 1101, 1107.  Those rights include the enforcement of the automatic stay, which protects the debtor in possession and property of the bankruptcy estate.  See § 362(a).  In this sense, the Chapter 11 debtor is a separate and distinct entity from the pre-bankruptcy debtor.  Before the bankruptcy case is filed, the debtor does not hold the rights of a debtor in possession and does not hold fiduciary duties to creditors.  The debtor certainly has capacity to enter into agreements which define the rights and obligations of the debtor under applicable non-bankruptcy law, and those agreements are generally given force and

---

[13] *Wells Fargo Bank Minnesota, N.A. v. Kobernick*, 2009 WL 7808949, *7 (S.D. Tex. 2009) (slip opinion).

[14] *In re Jenkins Court Assoc. Ltd. P'ship*, 181 B.R. at 37 (cited with approval in *In re Clouse*, ___B.R.___, 2010 WL 5423712 (Bankr. E.D. Pa. 2010).

[15] *Matter of Pease*, 195 B.R. 431 (Bankr. D. Neb. 1996)

effect in bankruptcy cases. However, I conclude that the pre-bankruptcy debtor simply does not have the capacity to waive rights bestowed by the Bankruptcy Code upon a debtor in possession, particularly where those rights are as fundamental as the automatic stay. A debtor may not waive the automatic stay of 11 U.S.C. § 362 until after the bankruptcy case is commenced and the debtor is acting in the capacity as debtor in possession. Even then, however, the debtor in possession may not unilaterally waive the automatic stay. An agreement to modify or terminate the automatic stay requires court approval after notice and an opportunity to object is provided to all parties in interest. See FED. R.BANKR.P. 4001(d).

Second, the Bankruptcy Code explicitly invalidates provisions of private agreements which deprive the debtor of the use and benefit of property upon the filing of a bankruptcy case. For example, Bankruptcy Code §§ 541(c), 363(l) and 365(e) provide, respectively, that an interest of a debtor in property becomes property of the estate, and that the debtor is permitted to use, sell or lease that property (or if it is a contract or lease right, then the debtor may assume the executory contract or lease interest), notwithstanding any provision in an agreement that is conditioned on the insolvency or financial condition of the debtor or the filing of a bankruptcy case. Congress thus explicitly chose to invalidate provisions of private agreements that deprive the debtor of the use and benefit of property upon the filing of a bankruptcy case. . . . Section 363(l) invalidates contractual provisions purporting to waive the automatic stay because enforcement of such a waiver deprives the debtor in possession of the ability to use, sell or lease the Bank's collateral. The enforcement of a pre-petition waiver of the automatic stay would impermissibly circumvent section 363(1). I conclude the Agreement's prohibition preventing the debtors from resisting the motion for relief from stay is unenforceable under section 363(l).

Third and finally, the Bankruptcy Code extinguishes the private right of freedom to contract around its essential provisions. This conclusion follows from the comprehensive nature of the Bankruptcy Code and its underlying purpose of providing a nationally uniform collective remedy to debtors and creditors. The judicial enforcement of a contractual waiver of the automatic stay would permit a single creditor to opt out of the collective process mandated by the Bankruptcy Code to the potential detriment of the debtor and other creditors. This should not be permitted. [16]

In the case at bar, the Court notes it has no reason to doubt West LB's assertion the waivers in the Loan Amendments were well-understood by the Debtors, and were given in return for forbearance and other consideration by West LB. However, the Court agrees with the Court in *Pease* that the waivers, unless they were part of a previous bankruptcy proceeding - for

---

[16] *Id.* , 195 B.R. 433-435.

example, part of a confirmed plan or stipulation resolving an earlier motion for relief - appear to conflict with the policies and purposes of the Bankruptcy Code, and should not be enforced.

> In addition, the Court agrees with the observation of the *Jenkins* Court, which stated:

> Here—as in many "single asset cases," enforcement of the Debtor's pre-petition waiver of the protection of the automatic stay could quickly foretell the end of the Debtor's case. If the Debtor's single asset, *i.e.* the Project, passes from the bankruptcy estate through foreclosure, the Debtor, it can easily be seen, will have no realistic opportunity to attempt to formulate a repayment or reorganization plan. In the absence of a complete evidentiary hearing—wherein other grounds for modifying the stay are established, the Court believes that enforcement of the pre-petition waiver of the automatic stay in this instance too closely approximates the more reviled prohibition against filing for bankruptcy protection.[17]

Since the Court has already received evidence as to the Motions for Relief from Stay, West LB and the Debtors have had the opportunity the *Jenkins* Court envisioned, and the Court will therefore review the evidence as it applies to the provisions for relief from stay contained in 11 U.S.C. § 362.[18]

## B.   Should West LB be Granted Relief from Stay?

> Section 362(d) sets forth the grounds for relief from the stay:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay –

>> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest; or

>> (2) with respect to a stay of an act against property, if –

>>> (A) the debtor does not have an equity in such property; and

>>> (B) such property is not necessary to an effective reorganization.[19]

---

[17] *Jenkins*, 181 B.R. at 37.

[18] Unless otherwise noted, all future statutory references in the text are to Title 11 of the United States Code.

[19] 11 U.S.C. § 362(d).

Upon filing a relief from stay motion, the initial burden going forward to show the grounds that compel the lifting of the stay rests with the creditor.[20]  Once grounds have been established, the moving party need only prove the issue of lack of equity in the property.  The burden of proof rests with the debtor as to all other issues.[21]

  *1.  Cause Under § 362(d)(1).*

With respect to § 362(d)(1), the purpose of providing adequate protection is to insure that a creditor receives the value for which it bargained pre-bankruptcy.[22]  Adequate protection is, essentially, protection for the creditor to assure its collateral is not depreciating or diminishing in value and is evaluated on a case-by-case basis.[23]  The secured creditor "must, therefore, prove this decline in value – or the threat of a decline – in order to establish a *prima facie* case."[24]  The erosion, or threatened erosion, of a secured creditor's position "may be shown through evidence of declining property values, the increasing amount of the secured debt through interest accruals or otherwise, the non-payment of taxes or other senior liens, failure to insure the property, failure to maintain the property, or other factors that may jeopardize the creditor's present position."[25]

The Debtors have asserted they are offering sufficient adequate protection through 1) assuming the approval of the proposed DIP financing arrangement, releasing funds currently subject to the state court Interpleader Action, resulting in transfer of $2.7 million to West LB, 2) making monthly cash payments of $100,000 to West LB, apparently using the funds to be provided in the DIP financing arrangement, and 3) hiring a third-party manager to restart sales and marketing of the Project, and to move the Project towards completion.[26]  According to West LB's expert witness, however, the completion of the Project within the boundaries identified by the Debtors is speculative, and a possible reorganization plan based upon the DIP financing

---

[20] *See In re Anthem Communities*, 267 B.R. 867, 870-871 (Bankr. D. Colo. 2001).

[21] 11 U.S.C. § 362(g).

[22] *In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987).

[23] *Id.,* at 1397.

[24] *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D. N.Y. 1994).

[25] *Anthem Communities*, 267 B.R. at 871.

[26] The Debtors assert they are only required to provide adequate protection for the secured portion of West LB's claim, which they argue is only $25,000,000, based on West LB's February 2010 appraisal of the Real Property.  Dancing Bear Exhibit LL.  Although not fully developed at trial, it appears West LB would dispute at least the value of its secured claim, as it submitted testimony as to the November 2010 appraisal of the Real Property at $40,450,000.  West LB has asserted a total claim of approximately $60,000,000.

model submitted as Dancing Bear Exhibit HH could not be confirmed because it proposed to pay only $53,912,809 of West LB's $60,000,000 debt, while requiring West LB to wait five years to receive these payments, assuming the successful completion of the Project and the sale of all of the fractional ownership units.

Based on the agreement of the parties that there is no current equity in the Real Property, no equity cushion exists to provide adequate protection. Further, the issue whether the "as is" valuation of the Real Property is $25,000,000 or $40,450,000 is not critical to the question of adequate protection. Specifically, if the Court denies the Motions for Relief from Stay, West LB will be prevented from receiving, through sale of the Real Property, an amount somewhere between $25,000,000 to $40,450,000. At the same time, if the Motions are denied, the Debtors admit they cannot reorganize, pay creditors the amounts suggested by their expert, or pay West LB the offered $100,000 per month unless they are allowed to obtain the DIP funding which primes the secured lien of West LB, in whatever amount that secured lien may be.[27]

Even assuming the DIP financing is approved and secured in the stated amounts, the Debtors do not anticipate completion of the Project until May 2013, and do not contemplate commencing payments on West LB's debt, which they list at $53,912,809, until October 2013.[28] The Debtors do not anticipate selling out the second building of the Project until August 2016.[29] Further, there is no information on how the proposed "third party manager" would be selected, how much the manager would cost, or when such a manager could be in position.

Finally, while the Debtors argue they cannot be faulted for failing to propose a plan or a plan outline since it is early in the case and since they do not have access to their books and records due to the presence of the Receiver, the Court finds such arguments unpersuasive because the Debtors have had ten months to evaluate their reorganization options. Moreover, the Debtors and their principal, Di Venere, have had enough financial information at their disposal to seek potential lenders and obtain the proposed DIP financing arrangement. It is disingenuous for them to say they cannot be expected to propose a plan.

In addition, the Court finds the limited proposals and projections the Debtors did present do not provide a convincing basis for finding adequate protection. The Court recognizes valuation of real property and prediction of real property sales and prices are inexact. However, the previous cost overruns of the Project, coupled with the fact the Debtors must rely on high

---

[27] Specifically, as noted in the Stipulated Facts, unless the Debtors are permitted to borrow the currently proposed $5,000,000 DIP Facility, they agree they will not be able to reorganize under Chapter 11, and, without at least approximately $19,173,594 of priming financing and the ability to sell West LB's collateral to fund development expenses, they cannot successfully develop the Project.

[28] Dancing Bear Exhibit HH, p. DB 000309.

[29] *Id.*, p. DB 000311.

cost, super-priority financing to finish the Project, support a finding the Debtors' assertions of repayment of West LB are at best extremely speculative. Such proposals do not offer adequate protection.[30]

For these reasons, the Court finds adequate protection does not exist for purposes of § 362(d)(1). Therefore, West LB has shown cause for relief from stay against the Debtors.

>    2.    *Lack of Equity and Lack of Necessity for an Effective Reorganization Under § 362(d)(2).*

Typically, valuation and the presence of equity play a large part in the analysis of motions brought under § 362(d).[31] In this case, however, the parties have stipulated there is no equity in the Real Property.[32] The parties therefore focused their presentations on whether the Debtors could provide adequate protection for West LB, and whether the Real Property was necessary for an effective reorganization.[33]

As to necessity for an effective reorganization, the burden is on the Debtor to prove the Real Property is "necessary to an effective reorganization."[34] Obviously, in single asset real

---

[30] *Rader v. Boyd*, 252 F.2d 585 (10th Cir. 1958) ("an arrangement which offers no more than a speculative venture with creditor's funds is not adequate protection for the secured creditors"); *see also Rocco v. J.P. Morgan Chase Bank*, 255 Fed. Appx. 638 (3rd Cir. 2007) (finding speculative offer of adequate protection relating to litigation outcome is not sufficient), and *In re Whitney*, 1988 WL 141523, *5 (Bankr. D. Minn. 1988) ("an offer of illiquid and highly speculative value in an incomplete construction project does not rise to the level of adequate protection contemplated by 11 U.S.C. § 361").

[31] *In re YL West 87th Holdings I, LLC*, 423 B.R. 421, 428 (Bankr. S.D. N.Y. 2010) ("In making its determination with respect to valuation, a court should sift through the appraisal and testimony and make a judgment as to the 'accuracy and credibility' of the appraisers.").

[32] Stipulated Facts, ¶ 4, and as set forth on page 3, above.

[33] The Debtors' expert witness, Mr. Greg Pitts, created a model, Dancing Bear Exhibit HH, which projected proceeds from the relaunch of the Project after obtaining the proposed DIP financing would result in revenue sufficient to pay West LB in full and leave at least $6,000,000 for unsecured creditors and equity holders. Specifically, Mr. Pitts projected after completion of the Project and sales of the units, $99,155,625 would be available for distribution, of which the first $39,188,246 would go to repay Colbeck, followed by a repayment of $53,912,809 to West LB, leaving $6,054,570 remaining for unsecured creditors and equity holders. Dancing Bear Exhibit HH, p. 1. By contrast, and really not comparable in the same way two appraisals of real property are generally comparable, West LB's expert witness, Mr. Christopher Donaldson, valued the Real Property "as is" at $40,450,000. See West LB Exhibit 61, Mr. Donaldson's Appraisal dated November, 2010. In another argument which was rather unusual in relief from stay litigation, the Debtors contend Mr. Donaldson's valuation is far too high, and unreliable because he valued the Real Property at $25,550,000 in an earlier appraisal dated February, 2010. See Dancing Bear Exhibit LL, Mr. Donaldson's Appraisal dated February, 2010.

[34] See 11 U.S.C. § 362(g)(2).

property cases, as these, without the real property, reorganization is impossible.  This alone however, is not sufficient to deny West LB's  relief from stay motion.[35]

The seminal case addressing the standard to be applied under § 362(d)(2)(B) is *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs., Ltd.* [36]  Although *Timbers* involved a question under § 362(d)(1), it nevertheless provided the framework and analysis for evaluating relief from stay motions filed under (d)(2).  According to *Timbers*, to demonstrate property is necessary to a successful reorganization requires:

> not merely a showing that if there is conceivably to be an effective reorganization, this property will be needed for it; but that the property is essential for an effective reorganization that is in prospect.  This means, as many lower courts . . . have properly said, that there must be "a reasonable possibility of a successful reorganization within a reasonable time."[37]

In assessing whether a debtor can prove "a reasonable possibility of a successful reorganization within a reasonable time," courts generally apply a lesser standard in determining whether the debtor has met its burden early in a case.[38]  This standard has been referred to as the "sliding scale" burden of proof, "intended to benefit debtors who have a realistic chance of reorganization but who have not had sufficient time to formulate a confirmable plan."[39]  As the case progresses further from the entry of the order for relief, the "sliding scale" or "moving target" burden of proof requires a greater showing than "plausibility."[40]  Rather, "a debtor must demonstrate that a successful reorganization within a reasonable time is 'probable.'"[41]  Stated differently:

> Necessity and the prospect of an effective reorganization are intertwined concepts. Obviously, the real property upon which a real estate development sits is necessary

---

[35] *See In re Holly's, Inc*., 140 B.R. 643, 703-704 (Bankr. W.D. Mich. 1992).  *See also Albany Partners Ltd. v. Westbrook*, 749 F.2d 670, 673 n. 7 (11th Cir. 1984) ("the mere fact that the property is indispensable to the debtor's survival is insufficient.").

[36] *United Savings Association of Texas v. Timbers of Inwood Forest Associates, Ltd.*, 484 U.S. 365, 370 (1988).

[37] *Timbers*, 484 U.S. at 375-76.

[38] *See In re Apex Pharmaceuticals, Inc.*, 203 B.R. 432, 441 (N.D. Ind. 1996).

[39] *Id*. at 442.

[40] *In re Holly's, Inc.*, 140 B.R. at 702.

[41] *Id.*

to the success of that venture.  Yet it is only "necessary" in the context of § 362(d)(2) if the debtor can show the reasonable possibility of an effective reorganization.[42]

As noted above, the Debtors have not proposed a plan or an outline of a plan.  They have presented a project analysis indicating the Project cannot be completed without reliance on a super-priority DIP financing arrangement, and the "value engineering" and "rebranding" of the Project.  In addition, new contractors and an as-yet unnamed "third party manager" will have to be hired, and the Debtors offered no evidence as to whether they had investigated the availability and timing of hiring such personnel.  Even with the proposed DIP financing, the Project's second building will not be completed until May 2013, approximately two years from now.  Payments on West LB's secured debt will not begin until six months after that, and the sales of the interval interests will not be completed until August 2016, over six years after the filing of the involuntary petition.  These proposals are simply too speculative and too attenuated to comprise a reasonable possibility of a successful reorganization within a reasonable time.[43]  Accordingly, the Court finds grounds exist for relief under § 362(d)(2).[44]

## MOTION TO BORROW

### The Motion and Responses:

As noted above, Capital and Land seek to approve a DIP financing agreement for $5 million, with an option for a further $35 million, from Colbeck, giving that entity, or its assignees, super-priority status.  The Motion notes the Project was financed with a senior secured loan from West LB in the principal amount of $53 million on June 15, 2006, and with a mezzanine loan in the principal amount of $5 million on September 22, 2006.  According to the Motion, from 2008 to 2010, the Debtors and West LB talked about restructuring or a deed in lieu transaction, but were not able to agree.  Instead, in March 2010, West LB obtained the appointment of the Receiver by the Pitkin County District Court.  According to the Debtors, the failure of negotiations with West LB was due to Aspen HH's interference.  In May 2010, Aspen HH filed its own motion for a separate receiver in the West LB state court action.

As more fully detailed in the parties' Stipulated Facts, the salient terms of the proposed financing agreement are:

---

[42] *In re RIM Development, LLC*, 2010 WL 1643787, at *12 (Bankr. D. Kan. April 21, 2010).

[43] *See In re Gunnison Center Apartments, LP*, 320 B.R. 391, 403 (Bankr. D. Colo. 2005).

[44] In its briefing, West LB also alleges the bankruptcy petitions were filed in bad faith, constituting another cause for relief from stay.  The Debtors dispute such allegations.  However, because the Court finds relief from stay is appropriate on other grounds under § 362(d)(1) and (2), it need not address this issue.

1. The Debtors can borrow up to $5 million by making requests, as in a line of credit.
2. In order to close this loan, the Debtors must reach the 13-week projections contained in the DIP Agreement. A future loan of $35,000,000 is anticipated if these projections are met.
3. The interest rate is LIBOR plus 13% per annum.
4. The loan matures 12 months from the effective date of a reorganization plan.
5. The Debtors will grant a senior lien on the property, priming the lien of West LB.
6. The Debtors assert West LB will be adequately protected by the anticipated increase in value in the Property, and by monthly adequate protection payments of $100,000.

Moreover, the $2.4 million currently held by West LB subject to the Interpleader Action is offered as adequate protection.

West LB alleges the Debtors have no free and clear assets with which to offer adequate protection, and have no equity cushion in any of their assets which could be used for the same purpose. West LB asserts the adequate protection described in the Motion does not compensate it nor provide adequate protection in the face of the proposed $5 million super-priority loan, because the Debtors are relying totally on speculative increases in value. Further, West LB contends the initial $5 million will be used solely to pay administrative expenses, not to finish the Project, so it will not increase the Real Property's value. According to West LB, the Debtors cannot demonstrate cause to allow the super-priority borrowing, as the Debtors are so far "under water" with the Project, and the proposed loan is so risky, no benefit would be realized by the estate. West LB argues Colbeck has not made a firm commitment actually to fund the $5 million (or the later amount) even if the financing agreement were approved, and is charging what amounts to an excessive 21% interest rate. In addition, West LB objects to the Debtors' proposal to divert all sales proceeds, which are West LB's collateral, to Colbeck. West LB believes there has been no showing a priming loan is justified because there is very little chance the Project can succeed as the Debtors claim.

Aspen HH's objection asserts Di Venere has no authority to act in the absence of consent by Aspen HH.[45] It contends the funding would only benefit Di Venere, and would increase the approximately $63 million debt on the Real Property by potentially $35 million. According to Aspen HH, since the initial $5 million would be used to pay administrative expenses, it would

---

[45] The Debtors, on the other hand, argue Di Venere has authority to act as manager of Capital, and can enter into agreements such as that proposed. They also contend the Bankruptcy Appellate Panel for the Tenth Circuit's affirmance of this Court's dismissal of the earlier voluntary petition of Capital on the grounds Di Venere, as manager, did not have authority to file it, does not preclude Di Venere taking other actions on behalf of Capital. *See Capital Holdings, LLC v. Aspen HH Ventures, LLC (In re DB Capital Holdings, LLC)*, 2010 WL 4925811, *5 (10th Cir. BAP Dec. 6, 2010) (slip opinion). Because the Court finds the proposed Motion to Borrow may not be approved on substantive grounds, it need not address the issue of whether the Motion could be proposed.

have no benefit to the estate.  Moreover, Aspen HH argues Di Venere's estimation the completed Project might be worth $100 million is entirely unrealistic and speculative, and placing nearly $100 million of debt on the Real Property makes no economic sense.

**Discussion:**

Section 364(c) of the Bankruptcy Code provides:

If the trustee  is unable to obtain unsecured credit allowable under section 503(b)(1) of title 11 as an administrative expense, the court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt-

(1) with priority over any or all administrative expenses of the kind specified in section 503(b) or 507(b) of this title;

(2) secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3) secured by a junior lien on property of the estate that is subject to a lien.[46]

In turn, § 364(d)(1) provides: "[t]he court, after notice and a hearing, may authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if-

(A) the trustee is unable to obtain such credit otherwise; and

(B) there is adequate protection of the interest of the holder of the lien on the property of  the estate on which such senior or equal lien is proposed to be granted.[47]

The Bankruptcy Court for the Southern District of New York has observed the following regarding postpetition financing and priming liens:

Courts have generally deferred to a debtor's business judgment in granting section 364 financing.  *In re Ames Dept.  Stores*, 115 B.R. 34, 40 (Bankr. S.D. N.Y.1990); *In re Snowshoe Co., Inc.*, 789 F.2d 1085, 1088 (4th Cir. 1986); *In re Curlew Valley Assocs.*, 14 B.R.  506, 513-514 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.*, 47 B.R.  444, 449 (Bankr. D. Colo. 1985).  However, granting post-petition financing

---

[46]  11 U.S.C. § 364(c).

[47]  11 U.S.C. § 364(d)(1).

on a priming basis is extraordinary and is allowed only as a last resort. *In re Seth*, 281 B.R. 150, 153 (Bankr. D. Conn. 2002) ("The ability to prime is extraordinary"); *see also Resolution Trust Corp. v. SwedeLand Dev. Group, Inc. (In re SwedeLand Dev. Group, Inc.)*, 16 F.3d 552, 564 (3rd Cir. 1994); *In re Beker Indus.*, 58 B.R. 725, 736 (Bankr. S.D. N.Y. 1986) (holding that the application of what is adequate protection for secured creditors is left to the vagaries of each case "but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process."). Further, priming is impermissible unless there is adequate protection to existing lien holders. *See In re First South Sav.*, 820 F.2d 700, 701-11 (5th Cir. 1987).

The existence of an equity cushion seems to be "the preferred test in determining whether priming of a senior lien is appropriate under section 364." *In re Strug-Div., LLC*, 380 B.R. 505, 513 (Bankr. Ill.2008); *see Snowshoe*, 789 F.2d at 1088-90; *see In re Dunes Casino Hotel*, 69 B.R. 784, 795-96 (Bankr. D. N.J. 1986); *In re Reading Tube Indus., Inc.*, 72 B.R. 329, 333-34 (Bankr. E.D. Pa.1987) (Where there is no equity cushion, section 364(d)(1)(B) is not satisfied). There are also courts that have adopted a more "holistic approach" by analyzing all relevant facts "with a particular focus upon the value of the collateral, the likelihood that it will depreciate or appreciate over time, the prospects for successful reorganization of the Debtor's affairs by means of the Plan, and the Debtor's performance in accordance with the Plan." *In re Tashjian*, 72 B.R. 968, 973 (Bankr. E.D. Pa. 1987); *See In re Aqua*, 123 B.R. 192, 196-97 (Bankr. E.D. Pa. 1991).[48]

To prevail on a motion to obtain financing on super-priority basis, a debtor has the burden of showing the following: 1) the proposed financing is an exercise of sound and reasonable business judgment; 2) no alternative financing is available on any other basis; 3) financing is in the best interests of the estate and its creditors; and 4) no better offers, bids, or timely proposals are before the court.[49] Under section 364(d), the trustee or debtor in possession has the burden of proof on the issue of adequate protection.[50] Adequate protection requires 1) periodic payments, 2) additional or replacement liens, or 3) other "indubitable equivalent" of the creditor's lien interest.[51]

For the reasons stated above, the Court finds the proposals of the Debtors with respect to reorganization and providing payments to West LB are speculative and do not provide adequate

---

[48] *YL West 87th Holdings*, 423 B.R. at 441-442.

[49] *In re Western Pacific Airlines, Inc.*, 223 B.R. 567 (Bankr. D. Colo. 1997).

[50] 11 U.S.C. § 364(d)(2).

[51] 11 U.S.C. § 361.

protection for purposes of relief from stay.  Similarly, with respect to evaluation of the proposed DIP financing, the Debtor has not shown it will be able to provide an indubitable equivalent of West LB's current lien.

Specifically, although periodic payments are proposed, such payments do not come from any assets owned by the Debtors, but merely from the super-priority financing itself.  Any failure by the Debtors to meet the requirements of Colbeck to obtain some or all of the financing, or any failure by the Debtors to finish the Project and sell the fractional interests as they anticipate, will endanger payments to West LB, and result in West LB losing value in its secured interest because Colbeck will receive payment in full before any payment on West LB's debt.  Therefore, such payments are speculative and risky and do not offer adequate protection.  The Debtors have not offered, and, due to lack of equity and lack of unencumbered assets, cannot offer, additional or replacement liens.  Finally, the proposals to pay the debt of West LB beginning over two years from now, in October 2013, with final payment to be made in 2015, do not offer the indubitable equivalent of West LB's current lien interest.  Rather, under the proposal, West LB must wait years for repayment, at a time when no plan of reorganization has been proposed, and on a basis which, for the reasons noted above, is speculative and vague.  Therefore, the Court finds the Debtors have not met the requirements of § 364(d)(1)(B), and the Motion to Borrow must be denied.

## MOTION TO APPOINT A CHAPTER 11 TRUSTEE

Aspen HH's Motion to Appoint a Chapter 11 Trustee, filed in the Capital case, states the following grounds:  1)  Di Venere does not have the authority to act on behalf of Capital because the members of Capital are Aspen HH and Development, and Di Venere has a minority interest in Development;  2) Di Venere has not provided full information in his personal bankruptcy in Florida, and should not retain control of these Debtors; and 3) Di Venere's personal friendships with Capital's two largest creditors, William Dennis and Fred Funk, create a conflict of interest because Di Venere also claims to be owed over $625,000 by Capital.  Aspen HH asserts Di Venere has engaged in self dealing and has not proceeded in good faith in operating the Debtors, necessitating the appointment of a trustee.

Capital's objection states Aspen HH has not shown the Debtor is deadlocked or has engaged in gross mismanagement.  Capital asserts it has the authority to act on its own behalf, because the only finding made in the previous case was that its co-owner did not have authority to file a voluntary petition without Aspen HH's approval, not that it had no authority to act after an involuntary petition is filed.  Capital denies any fraudulent conduct or mismanagement that would warrant appointment of a trustee, and asserts a trustee would simply create administrative expenses and would not benefit the estates or the creditors.

West LB's response to the Motion to Appoint a Trustee states the presence or absence of a trustee has no bearing on the fact West LB is entitled, in its own estimation, to relief from stay

as to the assets of all three debtors, and a trustee should not impair West LB's ability to pursue its lien rights.

Since the Court is granting the Motions for Relief from Stay and dening the Motion to Borrow, the Court finds any ruling on a Chapter 11 Trustee would be moot.  Assuming West LB pursues its state court remedies as to the Real Property, the Debtors may have few or no remaining assets for administration by a Chapter 11 Trustee.  Therefore, the Motion to Appoint a Chapter 11 Trustee will be denied without prejudice.

## CONCLUSION

For the above reasons,

IT IS ORDERED that West LB, AG's Motion for an Order Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 361(d) as to Dancing Bear Land, LLC, is GRANTED.

IT IS FURTHER ORDERED that West LB, AG's Motions for an Order Granting Relief from the Automatic Stay Pursuant to 11 U.S.C. § 361(d) as to DB Capital Holdings, LLC and Dancing Bear Development, LLC are GRANTED to allow West LB to exercise its rights as to the Real Property owned by Dancing Bear Land, LLC.

IT IS FURTHER ORDERED that Debtors' Second Motion for an Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364 and 502 (1) Approving Postpetition Financing, (2) Granting Liens and Providing Superpriority Administrative Expense Status, (3) Granting Adequate Protection, and (4) Modifying Automatic Stay is DENIED.

IT IS FURTHER ORDERED that Aspen HH Ventures, LLC's Motion for Appointment of  Chapter 11 Trustee is DENIED without prejudice.

Dated May 25, 2011

BY THE COURT:

Michael E. Romero
U.S. Bankruptcy Judge

Page 23 of  23